Delgado-Hernández, District Judge.
This is an action for damages under Puerto Rico law predicated on diversity of citizenship pursuant to 28 U.S.C. § 1332 (Docket Nos. 1 and 28). Before the court are two motions for summary judgment, one seeking dismissal of third-party claims as a result of a settlement agreement reached between plaintiffs and some of the third-party defendants (Docket No. 236), the other, filed by non-settling third-party defendants, requesting dismissal on timeliness, improper impleader, jurisdictional, and what may be characterized as "indirect settlement beneficiary" grounds (Docket No. 279). The motions generated oppositions, replies and sur-replies. See, Docket Nos. 277, 300, 323, 333, 334, 339, 352, 357, and 358. For the reasons explained below, the motion for summary judgment at Docket No. 236 is GRANTED and the motion at Docket No. 279 is DENIED.
I. BACKGROUND
Working out at a gym, Neslie I. Bernardi-Ortiz suffered severe injuries, leading her and her parents and siblings to initiate this action for recovery of damages against Cybex International, Inc., the manufacturer of the exercise machine that broke on Ms. Bernardi, and Cybex's insurer, Navigators Specialty Insurance Company Code (Docket Nos. 1 and 28).[1] Cybex filed a third-party complaint against: (1) the gym's owner and/or operator HCOA Mayagüez, LLC, HCOA PR Management Services LLC, HCOA PR Franchise Holding, TS Fitness PR HoldCo, LLC, Total Body Fitness PR, LLC and their insurer, MAPFRE-PRAICO Insurance Company; and (2) Fitness and Spa Solutions, Inc., Fitness Services, Inc., Zayra Sánchez, Milton Esteva, Irwin Rodríguez and their insurer, Universal Insurance Company (Docket Nos. 14, 48, 140, 142, 263, 264).
During discovery, plaintiffs settled with MAPFRE, the HCOA entities and TS Fitness PR HoldCo, as a result of which, the settling defendants moved for summary judgment (Docket No. 236). The remaining third-party defendants (the "Universal defendants") followed suit, moving for summary judgment as well (Docket No. 279). Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate when the record shows no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. See, Fed R. Civ. 56 (a)(setting forth standard). The issues sub judice consist of legal disputes properly raised by way of Rule 56 for evaluation and decision.
*117 II. DISCUSSION
A. Bar Order
In August 2017, as part of case management and ordering of proceedings, the court prohibited filing of motions for summary judgment except motions related to State Insurance Fund (i.e. workers' compensation) immunity (Docket No. 215, pp. 1-2). Subsequently, the parties moved for summary judgment as indicated above. The settling defendants' motion is predicated on a settlement agreement entered into after the bar order, and thus, is based on a ground that did not exist at the time the order was docketed. As such, it falls beyond the scope of the order.
In contrast, the Universal defendants' motion for summary judgment was partly filed in violation of the order, for it is predicated on: (1) the argument that the action is time-barred; (2) allegedly improper impleader and related jurisdictional grounds; and (3) the theory that the actions against the Universal defendants cannot subsist in light of the settlement agreement reached between the plaintiffs by the settling defendants. The court will not consider the timeliness issue given that, contrary to the other grounds proffered in support of the motion, it is not related to the court's jurisdiction or the settlement agreement. In the interest of judicial economy, however, the motion will not be ordered stricken only to be refiled without reference to arguments regarding the alleged untimeliness.
B. Impleader/Jurisdiction
The Universal defendants allege that the third-party actions which Cybex filed against them are improper and suggest that if not dismissed, could result in lack of subject matter jurisdiction due to absence of complete diversity of citizenship between the parties (Docket No. 279, p. 11; Docket No. 352, p. 2). Pursuant to Rule 14(a) of the Federal Rules of Civil Procedure, at any time after the commencement of the action, a defending party, as a third-party plaintiff, may cause a summons to be served upon a person not a party to the action "who is or may be liable to the third-party plaintiff for all or part of the plaintiff's claim against the third-party plaintiff." Fed. R. Civ. P. 14(a). Third-party practice under Rule 14 is usually referred to as impleader. See, 3 MOORE'S FEDERAL PRACTICE, § 14.02, p. 14-9 (so noting). It basically permits a defending party to join an absentee for the purpose of deflecting to that absentee all or part of its potential liability to the plaintiff on the underlying claim. Id. at § 14.03 [1], p. 14-10. Almost always, this deflection will be based on an assertion that the absentee owes the defending party a duty of contribution or indemnity. Id.
The right of contribution does not arise until one of the tortfeasors pays more than its share of liability. Nevertheless, a contingent claim may be filed against any of the other alleged tortfeasors. Therefore, a tortfeasor may use a third-party action to accumulate a claim against any potential joint tortfeasor contingent to the result of the principal action. See, MOORE'S, supra, at § 14.05 [2], pp. 14-28-14-29 (Rule 14(a) permits impleader of joint tortfeasors for contribution before the claim accrues; the fact that defendant's right has not yet accrued by virtue of paying a judgment does not affect the sufficiency of its third-party complaint to state a claim for relief).
Third-party practice fosters efficient litigation by packaging the underlying claim for liability and any contribution or indemnity claims in a single case, sparing the judicial system and at least some of the parties the waste and expense of multiple lawsuits. Id. It does not, however, operate in a vacuum. It is only available *118 when the applicable substantive law provides the right to pursue the claim against the third-party defendant. See, United Nat. Ins. Co. v. Indian Harbor Ins. Co., 306 F.R.D. 153, 154 (E.D. Pa. 2015) (liability of third-party defendant depends on relevant substantive law); Connors v. Suburban Propane Co., 916 F.Supp. 73, 76 (D.N.H. 1996) ( Rule 14 is available to bring causes of action recognized under statutory or common law).
From these parameters, plaintiffs allege that Bernardi was injured while performing squat exercises using a Cybex Smith Press machine at a gym owned by HCOA Mayaguez LLC (Docket No. 28, ¶¶ 17, 18). They assert the machine suddenly broke, and a weight of approximately 270 pounds hit Bernardi's cervical area, causing paraplegia. Id. at ¶¶ 18, 20. They claim Cybex is strictly liable to them for having designed, manufactured and marketed a defective machine, and for negligence, as it failed to take appropriate measures to avoid accidents such as the one that occurred here, and to provide adequate instructions and warnings of the risks involved in using the equipment (Docket No. 1, ¶¶ 26, 28, 32, 33, 34, 37, 38, 39).
Cybex filed third-party claims for contribution and indemnification against the Universal defendants, alleging that those defendants were responsible for maintaining and servicing the machine and that plaintiffs' injuries, if any, were caused by the Universal defendants' negligent conduct in failing to observe necessary and routine maintenance of the machine and/or modified or altered the machine from its original manufactured condition (Docket No. 263, ¶¶ 8, 9, 10,16, 17, 20, 21, 24, 25, 26, 29, 32, 33). Thus, it brought forth allegations upon which the Universal defendants may be liable to it for all or part of plaintiffs' claims, by pointing to a direct line of liability between itself and those defendants, a legitimate line to establish and pursue, given that Puerto Rico permits tortfeasor contribution. See, Fernández v. Corporación Insular de Seguros, 79 F.3d 207, 210 (1st Cir. 1996) (so recognizing in context of Rule 14(a) ).
Impleader is proper if there is a question as to whether the parties are in fact joint tortfeasors. See, Arroyo López v. Hospital Dr. Domínguez, Inc., 262 F.R.D. 93, 96 (D.P.R. 2009) (so noting). Requiring a district court "to determine the merit of all defenses potentially available to the original defendant as a precondition to allowing that defendant to file a third-party complaint would frustrate [the core purpose of Rule 14(a) ] and countervail the efficient allocation of judicial resources." Lehman v. Revolution Portfolio L.L.C., 166 F.3d 389, 395 (1st Cir. 1999). Consequently, the impleader here does not violate Rule 14(a) of the Federal Rules of Civil Procedure. See, Corning Glass Works v. Puerto Rico Water Resources Authority, Inc., 396 F.2d 421, 423 (1st Cir. 1968) (alleged joint tortfeasor defendant may implead all who by their concurrent negligence might be liable to him for contribution).
The Universal defendants take issue with this conclusion, alleging they are not liable to Cybex for product liability (Docket No. 279, pp. 13-17; Docket No. 352, pp. 13-15). Admittedly, what the defendant, third-party plaintiff asserts in its own right must be derivative of some claim set forth in the plaintiff's complaint. See, Metropolitan Life Ins. Co. v. Ditmore, 729 F.2d 1, 9 (1st Cir. 1984) ("[t]hird party claims [are] ... by definition logically dependent on the resolution of the original suit ..."). But plaintiffs brought forth claims for product liability and negligence. And Cybex contends the Universal defendants were negligent in a way that would make them liable to Cybex as joint tortfeasors *119 for contribution and/or indemnification in the event Cybex is found liable to plaintiffs (Docket No. 339, p. 17; Docket No. 358, p. 5). In any event, at the end of the day, the focus on the products liability part of the complaint is immaterial because contribution is available even when tortfeasors are liable under different theories of liability. See, Lehman, 166 F.3d at 394 (so noting). Rule 14 actions are permitted notwithstanding the fact they do not include claims based on the same cause of action or theory of liability asserted in the original complaint. See, Wanta v. Powers, 478 F.Supp. 990, 993 (M.D. Pa. 1979) (acknowledging rule)(citing Judd v. General Motors Corp., 65 F.R.D. 612 (M.D. Pa. 1974) (third-party complaint based on negligence properly brought in action where the main claim was based on strict liability in tort). In the end, the Universal defendants' argument lacks merit.
Finally, third-party claims fall within the court's supplemental jurisdiction over the original suit. See, Ditmore, 729 F.2d at 9 (recognizing jurisdictional characterization of these types of claims). That being so, they do not need a separate subject jurisdictional basis to stand. See, Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, 6 FEDERAL PRACTICE AND PROCEDURE (2010), CIVIL § 1444, p. 375 (discussing issue). If one were needed, there is diversity of citizenship between the parties in the original case and between the parties in the impleader action. In addition, plaintiffs are not pursuing any remedy in the instant case against the otherwise third-party defendants.[2] Therefore, the Universal defendants' jurisdictional challenge anchored on the impleader fails.
C. Settlement Agreement
The settling defendants argue that the settlement agreement requires dismissal of the third-party actions against them (Docket No. 236). Admitting they are not a party to the settlement agreement, the Universal defendants nonetheless state the action against them cannot stand in light of the agreement (Docket No. 279). Cybex opposes both dismissal requests (Docket Nos. 275, 276). As the court sits in diversity, it applies Puerto Rico's substantive law. See, Commercial Union Ins. Co. v. Walbrook Ins. Co., Ltd., 41 F.3d 764, 772-773 (1st Cir. 1994) (when sitting in diversity, a federal court must apply the substantive law of the forum state).
1. Universal Defendants
The Universal defendants contend that the settlement agreement extinguishes all claims against them because Cybex's claims are contractual in nature, based on a maintenance agreement between the Universal defendants and the settling HCOA entities, and insofar as the agreement operates to extinguish Cybex's claims against the HCOA defendants, the claims against the Universal defendants must be dismissed (Docket No. 279, pp. 21, 26; Docket No. 339, p. 18). Cybex's third-party action is not one for breach of contract. Its claim does not depend on why the Universal defendants undertook to repair and maintain the Cybex machine, rather than on the allegation that they did so negligently. See, Docket No. 339, pp. 14-15 (stating proposition). Hence, the action remains regardless of HCOA's status as a party in the lawsuit.
More important, however, whether a settlement agreement extinguishes a claim depends on the settling *120 parties' intent. See, Vernet v. Serrano-Torres, 566 F.3d 254, 260 (1st Cir. 2009) (so observing). The language in the agreement controls. Id. at 261. The release or discharge from liability granted by a plaintiff to a joint codebtor "does not release the other joint tortfeasors from liability for the damage when the intention of the parties in the settlement and release agreement has acknowledged this fact." Szendrey v. Hospicare, Inc., 158 D.P.R. 648 (2003), Official English Translation (Attachment I to Opinion and Order), p. 4.
On this end, Paragraph 1.2 the settlement agreement provides that the release it contains is intended to inure to the benefit of the MAPFRE RELEASED PERSONS (that is, the settling defendants) only and not to other parties "including but not limited to, Cybex International, Inc., Navigators Specialty Insurance Company, Fitness & Spa Solutions, Inc., Milton Esteva, Zayra Sánchez, Universal Insurance Company, Fitness Services, Inc. or Irwing Rodríguez Varela" (Docket No. 238-1, pp. 3-4). Likewise, Paragraph 3.13 clarifies that the release "in no way shall be interpreted as a release of ... Cybex International, Inc.[,] Navigators Specialty Insurance Company, Fitness & Spa Solutions, Inc., Milton Esteva, Zayra Sánchez, Universal Insurance Company, Fitness Services, Inc. or Irwin Rodriguez Varela and/or any other insurance carrier." Id. at p. 10.
As indicated earlier, the Universal defendants include Universal Insurance Company, Fitness & Spa Solutions, Inc., Milton Esteva, Zayra Sánchez, Fitness Services, Inc. and Irwin Rodríguez Varela. And so, from the language of the settlement agreement it is evident that the parties thereto did not intend to extinguish any of the claims against the Universal defendants. The situation is not unlike the one the Puerto Rico Supreme Court evaluated in Merle v. West Bend Co., 97 P.R.R. 392 (1969).
In Merle, plaintiff filed a claim for damages against two different defendants under the Puerto Rico dealer's act and general tort statute, and subsequently entered into a settlement stipulation with one of the codefendants. Id. at pp. 393-394. The remaining defendant, West Bend Co., requested the dismissal of the complaint against it, arguing that according to the complaint the defendants were severally liable for the damages and the release in the settlement agreement benefited West Bend because it was a solidary debtor. Id. at p. 394. The trial court granted the motion to dismiss (id. ), but the Puerto Rico Supreme Court reversed, holding that joint tortfeasors are not released from liability if the intention of the parties did not contemplate it. Id. at 398-400. And in that case, they did not intend to release West Bend. Id. at 402-403.
Applying the same principle, the First Circuit in Vernet, 566 F.3d 254, rejected a codefendant's argument that plaintiff's settlement with the codefendant's employee, who had crashed into co-plaintiff's vehicle, legally extinguished any possible vicarious liability on its part because in that instance, liability was contingent upon the existence of the employee's primary liability, which no longer existed by virtue of the settlement. Id. at pp. 257-258. The First Circuit examined the language of the settlement agreement, concluding that plaintiffs did not intend for the settlement with the employee to extinguish their claims against the codefendant. Id. at pp. 260-261.[3] So too here. In consequence, the *121 settlement agreement does not lead to dismissal of Cybex's claims against the Universal defendants.
2. Settling defendants
Having examined the settlement agreement in connection with the Universal defendants, the court turns to the effect of the agreement on the plaintiffs, the settling defendants, and Cybex. The agreement operates at various levels. As to definitions, Section 1.2 refers to the settling defendants as MAPFRE RELEASED PERSONS (Docket No. 238-1, p. 3). Concerning release, Section 3.1 provides that in consideration of the amount to be paid as part of the settlement, plaintiffs release the MAPFRE RELEASED PERSONS from "all past, present or future claims ... of any kind whatsoever ... whether based on a tort, contract, statute or other theory of recovery ... [that] may in any way arise out of, or are in any manner related to the Casualty," which Section 1.3 defines as "the accident in which Neslie Bernardi was injured on December 11, 2013 at the HCOA gym in Mayaguez, Puerto Rico." Id. at pp. 4, 5.
Section 3.5 addresses the effect of liability on the settling defendants, stating that plaintiffs "waive the right to recover any damages that may be adjudged or imposed against the MAPFRE RELEASED PERSONS by way of judgment or otherwise imposed ... and agree that: (1) the total amount of damages which the plaintiffs may obtain by way of judgment in any action against other non-released tortfeasors or defendants "shall be reduced to the extent of the proportionate share of liability attributed to the MAPFRE RELEASED PERSONS ...." and (2) "any liability of the MAPFRE RELEASED PERSONS has been extinguished by virtue of [the agreement] this Agreement." Id. at p. 7.
Moreover, Section 3.5 expresses that "it is the specific intent of the [plaintiffs] to release the MAPFRE RELEASED PERSONS of any and all liability arising from the Casualty and Lawsuits, and such release will apply to the MAPFE RELEASED PERSONS not only in the external relationship between [plaintiffs] and the MAPFRE RELEASED PERSONS, but also in the internal relationship between joint tortfeasors." Id. (emphasis in original). Further, it specifies that plaintiffs "will absorb whatever portion of liability that may be assessed against the MAPFRE RELEASED PERSONS in the future, if any .... meaning that the MAPFRE RELEASED PERSONS will never have to pay plaintiffs or any non-released joint tortfeasors or their insurers, or cross-claimants or third-party plaintiffs any amounts over the amounts paid by virtue of [the agreement]." Id. at pp. 7-8. Furthermore, it states that "it is the express intention of the parties to [the agreement] that the MAPFRE RELEASED PERSONS ... not pay any compensation to anyone other than the compensation for damages in section 2.1" of the agreement. Id. at p. 8.
Following the same line, Section 3.6 provides that plaintiffs agree to hold harmless MAPFRE RELEASED PERSONS against any liens, claims, suits, demands, liabilities, judgments, decrees, awards, and causes of action of whatever kind or nature, which arise from or relate to, directly or indirectly, the injuries allegedly suffered by the plaintiffs from the casualty, which may be brought by any party or entity as a result of medical services or benefits provided to plaintiffs, a provision that the same section indicates is "intended to encompass and include claims or demands brought by any provided or medical, psychiatric, rehabilitative, or other services, any other person, party, or entity seeking to enforce subrogation, contribution, *122 and/or indemnity rights against the MAPFRE RELEASED PERSONS, and any person, party, or entity claiming to be entitled to damages or benefits as a result of the Casualty." Id.
As to disposition, Section 6.1 expresses that in "the case filed before the U.S. District Court ..., the MAPFRE RELEASED PERSONS will file a Motion requesting dismissal of the Third-Party Complaints filed by other parties against MAPFRE RELEASED PERSONS notifying that an agreement has been reached between MAPFRE RELEASED PERSONS and [p]laintiffs. Plaintiffs will not oppose such request and authorize the MAPFRE RELEASED PERSONS to represent in the motion [p]laintiffs' support of the same." Id. at p. 11. Additionally, it provides that "[t]he parties ... agree to provide reasonable cooperation, including to provide non-privileged documents and to make witnesses available in the lawsuits and execute any and all supplementary documents and to take all additional action which may be necessary or appropriate to give full force and effect to the basic terms and intent of this settlement agreement or to any related claims." Id. at p. 12. The settlement agreement is comprehensive, covering all relevant aspects of liability to justify dismissal.
i. Solidarity
In Puerto Rico, when the tortuous acts or omissions of more than one person have adequately caused a harm, each of the tortfeasors is solidarily liable to the plaintiff for the harm done. See, Tokyo Marine and Fire Ins. Co., Ltd. v. Pérez & Cía., de Puerto Rico, Inc., 142 F.3d 1, 8 (1st Cir. 1998) (discussing concept).[4] Solidarity originates in Roman Law. See, Fraguada Bonilla v. Hosp. Aux. Mutuo, 2012 TSPR 126, Certified English Translation (Attachment II), pp. 12-13 (so noting). The term emanates from the latin in solidum , defined as the whole of a sum. Id. at 13. Its defining features are laid forth in the Civil Code. See, Tokyo Marine and Fire Ins. Co., Ltd., 142 F.3d at p. 5 & n.4 (citing relevant civil code provisions); Zurich American Ins. v. Lord Elec. Co. of Puerto Rico, 828 F.Supp.2d 462, 469 & n.11 (D.P.R. 2011) (same).
Solidarity generates two types of effects: primary and secondary. Primary effects include the unity of debt and plurality of links. See, Fraguada Bonilla (Attachment II) at p. 14. Secondary effects refer to interruption of the statute of limitations and of delay, and the promise of compliance of all of the joint and several debtors. Id. These effects do not apply to extracontractual liability, which is considered imperfect in cases involving persons who do not know each other, who are merely accidental co-debtors or when their relations are sporadic. Id. at p. 15. In those instances, each of the tortfearsors' liability is autonomous or independent from that of the others. Id. However, each of them is jointly liable to the injured party for the totality of the damages awarded. Id.
With this in mind, an obligation is solidary among debtors when each debtor is considered in his relation with the creditor as debtor of the entire performance, obliged in totum ex totalier . Because each solidary debtor is bound for the whole of the debt as if it were the only debtor, the creditor has the right to demand payment of the entre credit from any of the debtors it chooses. See, Zurich American Ins., 828 F.Supp.2d at 469 (acknowledging creditor's prerogative). The solidary *123 debtor who has paid in excess of its portion of the debt has the right to demand contribution from the remaining debtors to recover the excess amount paid. Id. [5] The right "extends to insurers standing in the stead of a tortfeasor." Reyes-López v. Misener Marine Const. Co., 854 F.2d 529, 534 & n.23 (1st Cir. 1988). Thus, solidarity results in an external relationship between the creditor and the debtors making each of the debtors liable for the entire obligation, and in an internal relationship among the debtors, wherein each debtor is liable for its own proportion of fault or negligence. See, Quilez-Velar (Docket No. 317, Exhibit 1)(Attachment III) at p. 7 (describing relationships). The parties may work this configuration into settlement agreements involving less than all of the solidary tortfeasors.
ii. Effect of Agreement
Where a plaintiff expressly releases one tortfeasor from all liability in the case -internal and external- which may arise with respect to the tortious act subject of the claim, it is considered both a release of liability from the plaintiff to the settling joint tortfesor and a release of liability as between joint tortfeasors, with the plaintiff absorbing the portion of liability attributed to the settling tortfeasor. See, Fonseca v. Inter-American Hospital for Advanced Medicine, 2012 TSPR 3, Certified English Translation (Attachment IV), pp. 11-12 (explaining settlement agreement). In those cases, the plaintiff is estopped from collecting that portion of liability out of the non-settling tortfeasors. Id.
Those tortfeasors will only be liable for their percentage of liability after subtracting the amount of the released tortfeasor's portion of liability, not for the total amount of damages. Id. at p. 12. Correspondingly, the non-released tortfeasors cannot move for contribution against the tortfeasors that were released from liability. Id. And by the same account, the settling tortfeasor may not obtain contribution from the nonsettling tortfeasor because its payment did not discharge any part of that tortfeasor's debt. See, Diggs v. Hood, 772 F.2d 190, 196 (5th Cir. 1985) (so observing under the Louisiana Civil Code and Code of Civil Procedure).[6] Accordingly, the action of contribution would no longer be viable as a matter of law.[7]
In those settings, the plaintiff assumes the risk that the amount of the released tortfeasor's share of liability will be greater than that received in exchange for the release of liability, while the released tortfeasor assumes the risk that the amount of its share of liability will be less than the amount paid in exchange for the release. See, Fonseca, 2012 TSPR 3 (Attachment IV), p. 6 (discussing risks). In *124 addition, if the released tortfeasor is ultimately found not liable, he will not be entitled to recover the amount paid, nor may the non-released tortfeasor demand a deduction of the amount paid by the released tortfeasor found not liable, allowing plaintiff to receive the gain. Id. at pp. 12-13.
The settling defendants do not have to remain parties in the action, as the nonsettling defendant effectively obtained contribution from the settling defendants by having assessed against it only its own percentage of liability. Id. In those conditions, the third-party complaint cannot survive because the settling third-party defendants would not be liable to the third-party plaintiff for "all or part of the plaintiff's claim against the third-party plaintiff" as is required to maintain an impleader action under Rule 14(a) of the Federal Rules of Civil Procedure. See, Szendrey, 158 D.P.R. 648, Certified English Translation (Attachment I)(pointing out that if the codefendant that remains in the action is liable to plaintiff only for the share that represents its degree of contribution to the cause of the damage, a third-party complaint is as unnecessary as it is untenable).
The First Circuit has upheld similar agreements, characterizing them as Pierringer releases, following the Wisconsin's Supreme Court's decision in Pierringer v. Hoger, 21 Wis.2d 182, 124 N.W.2d 106 (1963). See, Austin v. Raymark Industries, Inc., 841 F.2d 1184, 1189 (1st Cir. 1988) (examining Pierringer agreement). As the First Circuit explained, in Pierringer the plaintiff in a tort action settled with all but one defendant before trial. Id. The settling defendants then filed a motion before trial to dismiss the cross-complaints for contribution filed against them by the one remaining defendant. The trial court granted the settling defendants' motions, for which the nonsettling defendant appealed. Id. The Supreme Court of Wisconsin ruled that the releases plaintiff executed preserved the plaintiff's cause of action against the nonsettling defendant, while barring the nonsettling defendant's right to contribution from the settling defendant. Central to the court's reasoning was the fact that the releases satisfied a part of the cause of action against the nonsettling defendant in an amount equivalent to the settling defendants' proportionate liability. Id.
Shifting focus, plaintiffs (i) released the settling defendants from all potential liability toward the plaintiffs (external relationship) and toward any third-party plaintiffs (internal relationship) with respect to all claims and damages arising out of the accident that Ms. Bernardi suffered in the HCOA gym in Mayaguez; and (ii) assumed and absorbed any liability that may be found against the settling defendants by way of judgment of otherwise. Further, the settling parties agreed that any future amount imposed against the non-settling tortfeasors would be reduced by way of the proportionate share of liability attributed to the settling tortfeasors such that in the end, the non-settling defendants would only be liable to the plaintiffs for their proportionate degree of liability, making the third-party complaint "unnecessary and untenable" as in Szendrey (Attachment I) at p. 6.
On this record, dismissal of the third-party actions against the settling defendants follows as a matter of law. See, Alumax Mill Products, Inc. v. Congress Financial Corp., 912 F.2d 996, 1010-1011 (8th Cir. 1990) (dismissing cross-claims for contribution and indemnity against settling defendants, as pursuant to settlement agreement, the non-settling defendant would only be liable for its own proportionate share of damages and no longer needed *125 the protection of its cross-claims for contribution and indemnity); Bordelon v. Consolidated Georex Geophysics, 628 F.Supp. 810, 811-813 (W.D. La. 1986) (summary judgment dismissing third-party complaint against settling tortfeasor because the effect of the settlement was to reduce from any judgment against the nonsettling tortfeasor the proportion of fault attributable to the settling tortfeasor).[8]
iii. Cybex's Objections .
Cybex objects to dismissal of the third-party complaint against the settling defendants on various grounds. In general, non-settling defendants "lack standing to object to a partial settlement." Alumax Mill Products, Inc., 912 F.2d at 1001. An exception, however, has been carved to benefit non-settling defendants to the extent they demonstrate that they will sustain some legal prejudice as a result of the settlement. Id. at 1002. So courts recognize that a non-settling defendant has standing to object to a partial settlement which purports to strip it of a legal claim or cause of action such as an action for contribution or indemnity. Id. On that basis, the court accords Cybex standing to object to the settlement and consequent dismissal of the third-party complaint against the settling defendants. Having credited standing, Cybex's objections follow.
First, Cybex asserts that plaintiffs and the settling defendants cannot by contracting between themselves, deny a third party like Cybex the rights it enjoys under the law (Docket No. 277, p. 2; Docket No. 323, p. 2). The assertion is accurate, see Río Mar Associates LP, SE v. UHS of Puerto Rico, Inc., 522 F.3d 159, 164 (1st Cir. 2008) (so acknowledging), but of no consequence in the present case, as the settlement agreement does not deprive Cybex of any rights. In the end, it will only pay for its proportionate share of liability, no more than if all defendants had gone to trial. See, Pierringer, 124 N.W.2d 106 (granting settling defendants' motion to dismiss cross-complaints for contribution filed against them by the one remaining defendant, given that defendant effectively obtained contribution from the settling defendants by having assessed against it only its own share of liability, and as long as the causal negligence of all the relevant parties is determined by the jury, there is no requirement that a settling defendant remain a party to the suit).
Second, Cybex argues the settlement agreement is tantamount to a waiver of Cybex's claims against the settling defendants (Docket No. 277, pp. 10-11), a result contrary to the holding of Febles Montalvo v. Pérez Cordero, 2011 WL 5166431 (TCA), Certified English Translation (Docket No. 277, Exhibit 6)(Attachment VII), p. 6. Cybex's reliance on Febles Montalvo is misplaced. In that case, a panel of the Puerto Rico Court of Appeals affirmed a trial court's decision to dismiss plaintiffs' claims against a codefendant, Reyes Contractor. Id. at p. 3. Plaintiffs had sued several entities, one of which, the Highway Authority ("HA"), filed a third-party complaint against Reyes Contractor alleging that, if it were held liable for plaintiffs' damages, Reyes Contractor would be directly responsible to plaintiff or would have to reimburse HA for any sum of money it had to pay. Id.
Plaintiffs amended the complaint to include direct allegations against Reyes Contractor *126 ( id.& n.2 ) and entered into a settlement agreement with it, leading the trial court to dismiss all claims against Reyes Contractor. Id. at p. 3. HA sought reconsideration, arguing, among other things, that it had not waived the right to pursue its claim against Reyes Contractor. Id. The trial court reconsidered its prior decision and dismissed only plaintiffs' claims against Reyes Contractor, rather than all claims against it. Id. The appellate panel affirmed the trial court's ruling, noting that it was "legally impossible" for the parties to the settlement agreement to have released Reyes Contractor and its insurers from all liability. Id. at p. 8. For that reason, Cybex argues that "[p]laintiffs are free to abandon any claims they might have against [the settling defendants] but they cannot do the same with respect to Cybex's ... claims" (Docket No. 277, pp. 11-12).
As relevant, the settlement agreement at issue in Febles Montalvo stated that: (1) plaintiffs released Reyes Contractor and its insurer (Mapfre-Praico) from all liability toward them for the damages alleged in the Complaint; (2) if Reyes Contractor was found at fault in any degree, plaintiffs waived their right to claim from Reyes Contractor and its insurer that part of the judgment attributable to Reyes Contractor's fault or negligence; (3) plaintiffs would only collect from HA and any other liable party that part of the judgment attributable to those parties' fault; and (4) Reyes Contractor would not have to pay plaintiffs or the remaining defendants by way of contribution, leveling, or any other concept. See, Febles Montalvo (Docket No. 277, Exhibit 6)(Attachment VII), at pp. 6-7 (describing settlement agreement). The appellate panel limited dismissal to plaintiffs' claims against Reyes Contractor, refusing to extend the effect of the settlement agreement to other claims referred to therein because, for the panel, it was "legally impossible" for settling parties to waive other parties' claims. Id. at p. 8.
As a general proposition that may be true, but without more, it does not account for the need to examine under the Szendrey framework, the consequences of a plaintiff's waiving claims against a third-party defendant and of binding itself to limit collection to that part of the judgment attributable to the remaining defendants' proportionate share of liability, thus reproducing the net result derived from application of solidarity rules under the Puerto Rico Civil Code. To that extent, the "legally impossible" proposition runs counter to the Puerto Rico Supreme Court's express holding that in the settlement agreement, "the victim may release the co-causer of all liability ... toward the victim as well as in the internal relationship between co-causers." U.S. Fire Insurance Co. (Attachment V), at p. 9. When that occurs, "the victim assumes the portion of liability that is attributed to the released co-causer ... [and] the other co-causers of the damage cannot recover from the released co-causer an[y] amount whatsoever." Similarly, in Sagardía de Jesús (Attachment VI), the Supreme Court expressed that if "the victim releases a co-defendant from all liability to the victim as well as to the liability existing between the codefendants," by assuming the share of liability attributed to the released tortfeasor, the remaining tortfeasors cannot recover anything from the released tortfeasor. Id. at 7.
The appellate panel did not articulate any principled basis to bypass these holdings -none exists- making that part of its ruling unpersuasive to support the proposition for which Cybex has cited it. However, the panel looked beyond the settlement agreement to focus on the contractual arrangements that linked Reyes Contractor to HA, which fully explains the result *127 reached. In that sense, it observed that there were insurance policies issued by Mapfre-Praico in favor of Reyes Contractor that were made extensive to HA. See, Febles Montalvo (Exhibit No. 277, Exhibit 6)(Attachment VII), at p. 8 (describing policies). Moreover, pursuant to a Certificate of Insurance, Reyes Contractor had released HA and bound itself and its insurance company to provide HA with, and bear the cost of, legal representation, and to paying any judgment against HA. Id. Furthermore, Reyes Contractor had included HA as an additional insured in its insurance policies. Id. On that record, neither plaintiffs nor Reyes Contractor or Mapfre-Praico could have waived Reyes Contractors' contractual commitments to pay for HA's share of judgment, costs and attorney's fees, unless HA agreed to it, and it had not. But that is not where Cybex stands, because, so far as the parties have represented and the court ascertained, none of the settling parties ever entered into a contract assuming Cybex's share of the judgment, costs, and attorney's fees.
Third, Cybex argues that it would be premature to dismiss its third-party claims against the settling defendants, for in Río Mar, 522 F.3d at 165-166, the First Circuit allowed a non-released defendant to maintain a cross-claim for contribution under a successive tortfeasor liability scenario, recognizing that Szendrey, 2003 TSPR 18 (Attachment I), did not provide "sweeping condemnation of all contribution claims under all circumstances" (Docket No. 277, p. 10). In that way, it posits that it would be "inappropriate to allow dismissal of its contribution and indemnification claims on the basis of Szendrey alone." Id. Neither Río Mar nor Szendrey precludes dismissal of the actions Cybex filed against the settling defendants.
In Río Mar, plaintiffs sued a hotel and a hospital; defendants filed cross-claims against each other; and prior to trial the hospital settled with plaintiffs through a Pierringer release. See, 522 F.3d at 161-162 (describing procedural background). Plaintiff filed a notice of voluntary dismissal against the hospital, which was granted. Id. The district court then decided to bifurcate the case in two phases, with a first trial on the action against the hotel, and a second trial "for any damages that the hospital may have caused. Id. at 161. Nevertheless, after the jury returned a $1,844,000 verdict in favor of plaintiff, the district court entered judgment against the hotel for the total amount of the verdict, denied its motion for a setoff, and dismissed its cross-claim. Id. at pp. 161-162. The First Circuit reversed to allow the second trial to proceed in order to fix the proportionate share of the hotel and hospital's liability ( id. at p. 168 ) because the hotel was the only defendant at trial, the evidence presented pertained to the hotel's negligence and involvement in the events leading to plaintiff's injury, the jury was instructed to consider damages only as to the hotel ( id. at p. 162 ), and the hotel was entitled to some process by which it could test how the plaintiff's total damages should be allocated between it and the hospital. Id. at p. 164.
In Szendrey (Attachment I), plaintiff reached a settlement agreement with one of the codefendants (Hospicare). After examining the terms of the agreement, the trial court dismissed the complaint against Hospicare. A co-defendant - INDECA - unsuccessfully requested reconsideration and in the alternative, leave to file a third-party complaint against Hospicare. The court of appeals reversed the trial court, concluding that the third-party complaint was in order inasmuch as allegedly all of the defendants were joint tortfeasors with respect to the damages claimed, and the *128 determination of their proportional share of liability required that all of them be parties to the action. Otherwise, according to the appeals court, the principle of procedural economy would be impaired because once damages were awarded, INDECA would have to file a separate, post-litigation action for contribution.
The Puerto Rico Supreme Court reversed, upholding the trial court's determination. The Supreme Court pointed out that plaintiffs had: (1) released Hospicare from: (i) all liability arising from the facts of the case relevant to the action; (ii) the damages claimed; and (iii) claims or judgments in favor of plaintiffs to recover from Hospicare, while (2) reserving their right to continue litigation against the other codefendants. Id. at p. 6. As a result, it concluded that even if the final judgment to be rendered in due course found that the non-settling codefendants contributed along with Hospicare to plaintiff's damages, the third-party complaint was not necessary or tenable because the judgment would have to assess the total cash value of the damage caused to plaintiffs by all of the tortfeasors, and deduct from that amount a sum equivalent to Hospicare's degree of liability. Id. at pp. 6-7.
On this account, the key question in Río Mar and Szendrey focused on the need to determine the degree or portion of liability of the settling defendant in light of the structure of the agreement the settling parties had subscribed. As such, they do not preclude dismissal in order to allow Cybex "to determine the settling defendants fault" (Docket No. 323, p. 3). On the contrary, consistently with their holding, Cybex will be given the opportunity to establish at trial, in the absence of the settling defendants as a party, its own share, if any, of liability in accordance with Puerto Rico law. See, Quilez-Velar, 2017 TSPR 165, Certified Translation (Docket No. 317, Exhibit 1)(Attachment III) (validating reduction of damages on account of an absent party's proportionate share of liability).
Quilez-Velar is instructive. In that case, plaintiffs sued Ox Bodies in federal court under a theory of products liability and other non-diverse defendants and the Municipality of San Juan in state court under Puerto Rico's general tort statute. Id. at p. 1. Ox Bodies filed a third-party complaint against the Municipality, the Municipality deposited in court the statutorily imposed monetary cap of its insurance liability ($500,000), and the case proceeded to trial without the Municipality as a party.[9] The jury returned a $6,000,000 verdict for plaintiffs, allocating 80% of liability to the Municipality and 20% to Ox Bodies. The Puerto Rico Supreme Court held that Ox Bodies was entitled to a reduction of the award in proportion to the Municipality's proportionate share of liability, making it liable for $1,200,000. Id. at pp. 1-2; 4-5.
Cybex argues that Quilez-Velar is distinguishable because it involved a government entity which had imposed by law a statutory cap on its liability, the codefendant's claim for contribution was barred by statute, not by a private settlement agreement, and the co-defendant was unable, by operation of law, to recover from the government on a theory of contribution as a result of a law that was held akin to statutory employer indemnity (Docket No. 323, *129 p. 4). Those are distinctions devoid of significance, as the basic point is that the jury validly allocated each of the codefendants' degrees of liability even though one of those defendants was no longer a party in the case. On that basis, see Stefano v. Smith, 705 F.Supp. 733, 737 (D. Conn. 1989) (applying comparative-fault rule to hold that a defendant who settles and against whom the complaint is accordingly withdrawn is no longer a party to the action, but that does not prohibit a remaining codefendant to introduce evidence at trial that a person who is not a party to the lawsuit is responsible for the harm incurred; hence, the non-settling codefendant may introduce evidence that the injury was caused by the fault of that other person); and Zurich America Ins., 828 F.Supp.2d at 470-471 (specifying in dismissing third-party complaint, that to the extent third-party plaintiffs established the third-party defendant's share of liability, their contribution would be reduced accordingly).[10]
Fourth, Cybex states it has the right to proceed with its contribution claims because the contribution claims in Szendrey were brought after the settlement and Cybex brought its third-party complaints before settlement was reached (Docket No. 323, p. 3). Unless there is a potential statute of limitations issue, the date an impleader is brought is not material, for settlement agreements may be entered into at any point before judicial action is initiated or thereafter, prior to trial or after trial. See, Fleming v. Threshermen's Mut. Ins. Co., 131 Wis.2d 123, 388 N.W.2d 908, 910 (1986) (noting that many defendants settle before a plaintiff commences suit against other tortfeasors such that it would be counterproductive to require a defendant to insist that a plaintiff commence suit prior to settlement in order that cross-claims could be filed before settlement); U.S. Fire Insurance, 2008 TSPR 160 (Attachment V), p. 2 (settlement after the trial court granted complaint ordering payment of the amount claimed therein); Sagardía de Jesús, 2009 TSPR 173 (Attachment VI) p. 3 (settlement before trial). So too a tortfeasor may bring forth a contribution action either within the same suit where judgment was entered determining the solidarity of the obligation or through an independent suit. See, Wojciechowicz, 474 F.Supp.2d at 295 (discussing and applying formulation). The effects of the settlement agreement do not change with the timing of the underlying action.
Fifth, Cybex claims that Puerto Rico recognizes different multi-tortfeasor scenarios that may need to be treated differently, positing that: (i) the potential liability of, and among the parties is not clear; (ii) plaintiffs theory of the case is a mystery; (iii) the parties' responsibilities are open-ended; and therefore (iv) it is uncertain which if any of the multi-tortfeasor scenarios this case presents (Docket No. 277, p. 4). And so it maintains that until certainty or more certainty is reached, the settling defendants' dismissal request is "premature at best and must be denied." Id.
*130 The argument is unavailing, given that extracontractual solidarity "does not presuppose that the scope or source of liability is identical for each solidary debtor." Tokyo Marine and Fire Ins. Co., Ltd., 142 F.3d at 6. It may operate even when the creditors and the debtors are not bound in the same manner, for the same periods and under the same conditions, to the point that solidary debtors may be obligated in different degrees. Id. An obligation may be in solido notwithstanding the fact that the obligations of the obligors arise from separate acts or by different reasons. See, Joiner v. Diamond M. Drilling Co., 688 F.2d 256, 263 (5th Cir. 1982) (so holding under the Louisiana Civil Code). In this light, a settlement agreement involving releases as to both the external and internal aspects of the solidary obligation makes the parties' ultimate theory of liability irrelevant, by protecting the non-settling tortfeasor from paying more than its portion of liability. Therefore, the right to contribution is recognized even when tortfeasors are "liable under different theories of tort liability." Lehman, 166 F.3d at 394.[11] This formulation fits Río Mar and subsequent developments in Puerto Rico.
On this end, Río Mar evaluated the effect of a partial settlement based on a Pierringer release in a successive tortfeasor setting, which it distinguished from garden-variety joint tortfeasor scenarios, applying the proportional-share rule used in case of joint tortfeasors because the Pierringer release "molds the successive tortfeasor scenario into one strongly resembling" joint tortfeasor situations where each defendant is "ultimately responsible only for its proportionate share of overall damages." Id. at pp. 165-166. It described the situation of tortfeasors linked only by principles of vicarious liability as less easily resolved, as from its perspective, when one tortfeasor is vicariously liable for the actions of another, the same damages are by definition attributed to each of the tortfeasors. Id. at p. 165.
After Río Mar, the Puerto Rico Supreme Court decided Sagardía de Jesús (Attachment VI), which validated the use in a vicarious-liability setting of the offset rule, when the trial court permits nonsettling tortfeasors to present evidence regarding the settling defendants' percentage of responsibility, a development the First Circuit acknowledged in Gómez v. Rodriguez-Wilson, 819 F.3d 18, 22-23 (1st Cir. 2016). Most recently, in Fonseca (Attachment III), the Puerto Rico Supreme Court looked into the effect of a settlement agreement in a vicarious liability scenario where a hospital was found jointly liable with the defendant doctors. The plaintiffs and the doctors settled, the plaintiffs reserving their right to collect against the hospital in proportion to the hospital's fault. However, the hospital was deemed released by the settlement agreement, for no evidence was presented that the hospital was at fault in any degree.
Closing the circle, all multi-tortfeasor scenarios referred to in Río Mar-those involving garden-variety joint tortfeasors, successive tortfeasors, and tortfeasors joined by principles of vicarious liability- lead to the same result: payment *131 of damages subject to each of the tortfeasors' proportionate degrees of fault, without regard to the parties' theories of liability. In consequence, that different liability scenarios may exist does not preclude dismissal. See, Safeway Stores v. Nest-Kart, 21 Cal.3d 322, 146 Cal.Rptr. 550, 579 P.2d 441-443 (1978) (applying principles of comparative negligence to apportion responsibility between a strictly liable defendant and a negligent defendant, as well as between multiple negligent defendants).[12]
Sixth, Cybex contends that: (i) contribution is different than indemnity; (ii) it has sued the settling defendants not only for contribution but also for indemnity; and hence, (iii) it is entitled to maintain the indemnity action because it is not liable at all, much less liable in concert with the settling defendants (Docket No. 277, pp. 6, 8-9). It states that indemnification is not only viable but in its view, a likely outcome of this litigation. Id. An action for contribution shifts part of the loss depending on the comparative responsibility of the parties. See, Doyle v. Rhodes, 451 N.E.2d 382, 390 (Ind.App. 1983) (so noting). Indemnity has the effect of shifting the entire loss from the defendant to another party. Id. It "...enures to a person who, without active fault of his own part, has been compelled by reason of some legal obligation to pay damages occasioned by the initial negligence of another," thereby permitting the person made responsible for the payment to move against the author of the damage for recovery of the amounts spent in the discharge of its liability. Lucas v. Hackett Associates, Inc., 18 F.Supp.2d 531, 535 (E.D. Pa. 1998).[13]
Indemnity may arise contractually, and where it has been recognized, extracontractually. See, Gibbs-Alfano v. Burton, 281 F.3d 12, 20 (2d Cir. 2002) (referring to contractual and "common law" indemnity). However, no indemnity contract has been alleged or demonstrated to exist in this case. So, relying on Cortijo-Walker v. Water Resources Authority, 91 P.R.R. 557 (1964), the settling defendants argue that: (i) there is no discernible or practical distinction between contribution and noncontractual indemnity in Puerto Rico; (ii) any indemnity claim against them would fail; and (iii) in consequence, it poses no impediment to dismissal (Docket No. 33, p. 5).[14]
In Cortijo Walker, the Puerto Rico Supreme Court stated that the technical distinction between the concepts of *132 contribution and indemnity for all practical purposes "may seem to be cutting it a bit fine." Id. at 565. In like manner, Pierringer-type releases have been held to impute to the plaintiff whatever liability in contribution or indemnity the settling joint tortfeasor may have to the nonsettling joint tortfeasor, and to bar subsequent contribution or indemnity actions the nonsettling joint tortfesor might assert against the settling joint tortfeasor. See, Brandner by Brandner v. Allstate Ins. Co., 181 Wis.2d 1058, 512 N.W.2d 753, 762 (1994) (so acknowledging). Furthermore, the First Circuit has pointed out that "by definition and extrapolation" noncontractual indemnity claims are in effect, "only a more extreme form of [a claim] for contribution." U.S. v. Cannons Engineering Corp., 899 F.2d 79, 92 (1st Cir. 1990). By extension, it makes no difference whether a tortfeasor demands contribution of 90% of the damages if found 10% liable or of 100% if found liable on a theory of vicarious or analogous liability, without evidence of fault.
The 90% scenario involves partial contribution whereas the 100% scenario, the one typically associated with indemnity, is but total contribution. See, In re U.S. Oil and Gas Litigation, 967 F.2d 489, 495 (11th Cir. 1992) (finding no principled distinction between bar orders against contribution and orders against indemnity); Austin Ex Rel. Soiett v. Universal Cheerleaders Ass'n, 812 A.2d at 255 (a Pierringer release enables a plaintiff to settle with one defendant without releasing a nonsettling defendant from liability, allowing the settling defendant to avoid becoming liable to the nonsettling defendant for contribution or indemnity). And because Cybex's claims for contribution can validly be barred in the course of implementing a Szendrey / Pierringer agreement,[15] its claim for "total contribution, i.e., indemnity, can likewise be foreclosed."See, In re U.S. Oil and Gas Litigation, 967 F.2d at 492-93 (so holding); Alumax Mill Products, Inc., 912 F.2d at 1010-1011 (dismissing cross-claims for contribution and indemnity against settling defendants, as pursuant to settlement agreement the nonsetting defendant would only be liable for its own proportionate share of damages).
Seventh, Cybex states it should be entitled to recover costs and attorney's fees from the settling defendants "as part of its claim for noncontractual indemnification" (Docket No. 323, pp. 5-6). The general "American Rule" is that each side bears its own litigation costs and that the prevailing party is not entitled to recover attorney's fees. See, In re Puerto Rican Cabotage Antitrust Litigation, 815 F.Supp.2d 448, 457 (2011) (so noting). Nonetheless, pursuant to Rule 54(d) of the Federal Rules of Civil Procedure, the prevailing party is entitled to an award of costs other than attorney's fees unless a federal statute, the Federal Rules of Civil Procedure or a court order provides otherwise. See, Fed.R.Civ.P. 54(d) (awarding of costs to prevailing party). Likewise, Rule 44.1(d) of the Puerto Rico Rules of Civil Procedure provides in part that: "[i]n the event any party or its lawyer has acted obstinately or frivolously, the court shall, in its judgment, impose on such person the payment of a sum for attorney's fees which the court decides corresponds to such conduct." P.R. Laws Ann. tit. 32, App. V, R.
*133 44.1.[16] Rule 44.1(d) has substantive effect. See, Servicios Comerciales Andinos, S.A. v. General Elec. Del Caribe, Inc., 145 F.3d 463, 478 (1st Cir. 1998) (recognizing substantive character of Rule 44.1(d) ); Gómez, 819 F.3d at 23 (similar). In a diversity case in which the substantive law of Puerto Rico supplies the basis of decision, a federal court applies Rule 54(d) in connection with costs and Rule 44.1(d) as to attorney's fees.
The purpose behind Rule 44.1(d) is not to compensate the prevailing party, but to penalize a losing party that because of its obstinacy and insistent frivolous attitude has forced the other party to assume the pains, costs, efforts, and inconveniences of a litigation, needlessly. See, Candelario, 2016 WL 1275038 at **30-31 (discussing Rule 44.1(d) ). For this reason, attorney's fees are payable only if the offending party's behavior results in a litigation that could have been avoided, or prolongs the litigation needlessly, or obligues the other party to embark on needless procedures. Id. at *31. Still, the mere fact that a party prevails before a jury does not, without more, entitle it to an award of attorney's fees. See, Reyes v. Banco Santander de Puerto Rico, 583 F.Supp. 1444, 1446 (D.P.R. 1984) (articulating and applying concept). That the fruit of its labor was successful does not mean the opponent was obstinate. Id. at 1445-1446. Once the court determines that a party has been obstinate, however, the imposition of attorney's fees and prejudgment interest is obligatory. Id. Assessment of obstinacy must be made within the context of the case as a whole. See, Candelario, 2016 WL 1275038 at *34 (examining proposition).
From this perspective, when a settling tortfeasor is adjudged a percentage of responsibility, the plaintiff subrogates herself in the settling tortfeasor's position. See, Gómez, 819 F.3d at 22 & n.4 (examining effect of settlement agreement). And in general, one who rests on subrogation "stands in the place" of one whose claim he has paid or absorbed. See, U.S. v. Munsey Trust Co. of Washington, D.C., 332 U.S. 234, 242, 67 S.Ct. 1599, 91 L.Ed. 2022 (1947). The rights to which the subrogee succeeds are the same as, but no greater than those of the person for whom he is substituted. See, Bales v. Warren County, 478 N.W.2d 398, 400 (Iowa 1991) (describing subrogation).
The subrogee cannot acquire any claim, security or remedy the subrogor did not have. Id. But the rights, claims, and securities to which it succeeds are taken subject to the limitations, burdens, and disqualifications incident to them in the hands of the party to whom it is subrogated. Id. As a result, assuming Cybex prevailed in the litigation and were able to support a colorable claim against the settling defendants under Rule 44.1(d), the settlement agreement between plaintiffs and the settling defendants would not prevent Cybex from moving for recovery of costs as a prevailing party under Rule 54(d), and of attorney's fees against plaintiffs as defendants' subrogees under Rule 44.1(d).
III. CONCLUSION
In view of the foregoing, the settling defendants' motion for summary judgment (Docket No. 236) is GRANTED and the Universal defendants' motion for summary judgment (Docket No. 279) is DENIED. The name of all defendants will be individually included on the verdict from in order to allow the jury to properly allocate liability *134 as to each of them. The third-party claims against the settling defendants are hereby dismissed.
SO ORDERED.
ATTACHMENT I
Szendrey v.Hospicare, Inc.
158 D.P.R. 648 (203)
[English Translation]
*135 IN THE SUPREME COURT OF PUERTO RICO
Ladislaus M. Szendrey and his wife, Maricarmen Ramos de Szendrey, and the Conjugal Partnership constituted by them, Plaintiffs and petitioners v. No. CC-2000-845 Certiorari Hospicare, Inc., et al., Defendants and respondents
CHIEF JUSTICE ANDRÉU GARCÍA delivered the opinion of the Court.
San Juan, Puerto Rico, February 14, 2003
[I]
On April 23, 1993, Hospicare, Inc., as seller, and Ladislaus Szendrey and his wife, as buyers, entered into a bilateral purchase and sale agreement on suites Nos. 802 and 804 of the Metropolitan Professional Park Condominium building in Río Piedras. At the time, Hospicare, Inc. owned all the office spaces located on five of the ten floors of the Metropolitan Professional Park Condominium. On the other hand, Inversiones y Desarrollos del Caribe, Inc. (INDECA) owned the remaining office spaces on the building's other five floors. A short time later, Hospicare and INDECA rented all the office spaces on the building to the Correctional Department and other related entities.
On March 23, 1994, Ladislaus Szendrey, his wife, and the conjugal partnership constituted by both brought action in the Court of First Instance against Hospicare, Inc.; INDECA; Enrique Irizarry Sorrentini, his wife, and the conjugal partnership constituted by both; Baldomero Collazo Salazar, his wife, and the conjugal partnership constituted by both; and Metropolitan Office Park, Inc. As first cause of action, they alleged breach of the purchase and sale agreement of suites Nos. 802 and 804, and demanded the execution of the pertinent purchase and sale deed. As their second cause of action, they contended that defendants were violating the provisions of the master deed regarding the intended use of the building's office spaces and some common elements. They sought specific compliance with the restrictions included in the master deed and compensation for the damage resulting from such violations.
*136 The complaint was amended on several occasions with the court's leave.[1] In the third amended complaint, the allegations regarding the damages claimed were extended to include all the defendants and to seek damages in the amount of $500,000.
On January 20, 2000, plaintiffs and Hospicare, Inc. filed in the court a settlement agreement entitled "Stipulation of Settlement and Release," which informed that Hospicare, Inc. executed the purchase and sale deed in favor of plaintiffs, as requested in the first cause of action, and that they had reached an agreement on the damages for which said codefendant was liable. Specifically, plaintiffs reserved the right to continue with their claims against the other codefendants. By partial judgment of January 21, 2000, the trial court accepted the parties' stipulation and ordered the dismissal, with prejudice, of petitioners' claims against Hospicare.
INDECA timely sought reconsideration of that partial judgment, alleging that should the settlement stand, dismissal of the claims filed against it would be in order. In the alternative, it asked to be allowed to include Hospicare and the current tenants of the office units previously owned by Hospicare, Luis Fernando Castillo, and Gladys Cruz Chinea, as third-party defendants. The Court of First Instance upheld its partial judgment, denied the motion to dismiss against INDECA, and did not allow the third-party complaint.[2]
Aggrieved, INDECA and the other codefendants appealed before the Circuit Court of Appeals, which upheld the trial court's refusal to dismiss the action against INDECA because it deemed that the complaint gave rise to a separate claim that was independent from the action settled by plaintiffs with Hospicare, Inc., namely, a petition for injunction to order defendants to observe the purpose and intended use of the building's apartments and common areas as established in the master deed and subject to the horizontal property regime. The intermediate court, however, concluded that although the action for damages affected all the codefendants, plaintiffs' intention was to release only Hospicare, Inc. from liability. For that reason, the court determined that INDECA's third-party complaint was in order, inasmuch as allegedly all the defendants are joint tortfeasors with respect to the damages claimed, and the determination of their
[1] The first amended complaint included the tenants of all the other office spaces in the condominium as defendants and claimed $50,000 in damages. The second amended complaint included Metropolitan Professional Park, Inc. as defendant. The third amended complaint did not change the list of defendants, but extended the claim for damages to all the defendants and increased the sum claimed for damages to $500,000. The fourth amended complaint, which was filed after the petition for certiorari was filed before the Circuit Court of Appeals, removed Hospicare from the list of defendants to reflect the settlement agreement reached with it, added F. Castillo Family Properties, Inc. and the limited partnership Gam Realty, S.E. (which had acquired the units previously owned by Hospicare) as defendants with respect to the injunctive relief, and limited the period for which damages were claimed to March 31, 1999, the date on which the former acquired the units from Hospicare.
[2] The fourth amended complaint of [May] 19, 2000, eliminated Hospicare, Inc. as defendant to reflect the settlement agreement they had reached. The new owners of the office spaces, previously owned by Hospicare were joined as defendants in the injunction sought in the second cause of action, and the claim for damages against them was limited to March 31, 1999 (the date on which they acquired the units from Hospicare, Inc.).
*137 proportional share of liability requires that all defendants be parties to the action. The court deemed that otherwise, the principle of procedural economy would be impaired because once damages are awarded, INDECA would have to file a separate postlitigation action for contribution.
Following this decision, plaintiffs came to this Court and alleged that the appellate court erred:
In ruling that INDECA may bring Hospicare as third-party defendant, inasmuch as [plaintiff] Szendrey had released it from liability and, consequently, it is Szendrey who must satisfy or assume any claim INDECA may have as joint debtor in the action for damages by reason of its right to contribution.3
Petition for Certiorari at 10.
II
[1] Rule 12.1 of Civil Procedure, 32 L.P.R.A. App. DI, R. 12.1, provides:
At any time after commencement of the action, the defendant may, as a third-party plaintiff, serve a summons and a complaint upon a person not a party to the action and (1) who is or may be liable to him for all or part of the plaintiff's claim, or (2) who is or may be liable to the plaintiff exclusively.
The purpose of this rule is to establish a mechanism to facilitate the prompt and inexpensive resolution of multiple actions that may arise from a single set of facts.Camaleglo v. Dorado Wings, Inc., 118 D.P.R. 20 [18 P.R. Offic. Trans. 24] (1986);A.A.A. v. Builders Ins. Co., Etc., 115 D.P.R. 57 [15 P.R. Offic. Trans. 76] (1984). This action does not create, extend or limit substantive rights; it expedites its resolution. For that reason, a claim against a third party lies only when the third party's liability is contingent on the outcome of the main action or when the third party is "`secondarily or directly liable to plaintiff.'"Gen. Accid. Ins. Co. P.R. v. Ramos, 148 D.P.R. 523, 534 [48 P.R. Offic. Trans. ___, ___] (1999);Camaleglo v. Dorado Wings, Inc., 118 D.P.R. at 30 [18 P.R. Offic. Trans. at 35].
[2] In Puerto Rico, the right of contribution between joint tortfeasors has been acknowledged sinceGarcía v. Government of the Capital, 72 P.R.R. 133 (1951). The well-known rule that applies when the damage is caused by two or more persons provides that all joint tortfeasors are liable to the plaintiff for the damage sustained by the latter. However, there is among these joint tortfeasors a right of contribution derived from Civil Code sec. 1098 (31 L.P.R.A. § 3109), which allows one of the codebtors who has paid more than his or her share to claim from the other codebtors their respective shares. Thus, we have held that joint tortfeasors are solidarily liable to the injured party, but the
[3] In the second assignment of error, plaintiffs contend that unlike the decision of the Circuit Court of Appeals, the third-party complaint was belatedly filed. The untenability of the third-party complaint in this case releases us from addressing this second assignment of error.
*138 onerous effect between the joint tortfeasors should be distributed in proportion to their respective degree of negligence.Security Ins. Co. v. Tribunal Superior, 101 D.P.R. 191, 208 [1 P.R. Offic. Trans. 271, 290] (1973). See alsoArroyo v. Hospital La Concepción, 130 D.P.R. 596 [30 P.R. Offic. Trans. ___] (1992).
[3] The main purpose of the right of contribution in Puerto Rico has been to prevent situations of unjust enrichment. As we stated inP.R. Fuels, Inc. v. Empire Gas Co., Inc., 149 D.P.R. 691, 713 [49 P.R. Offic. Trans. ___, ___] (1999):
It is really aimed at preventing situations of unjust enrichment, subjectively allocating the obligation to those [to whom], in the last instance, it may correspond.
The right to contribution is based principally on equity, inasmuch as it is altogether unfair, if two or more persons caused the damage, to allow the plaintiff, by reason of relationship, friendship, collusion, or for any other reason, to release them from liability and to direct his action exclusively against others. García v. Government of the Capital [72 P.R.R. at 143].
See alsoArroyo v. Hospital La Concepción, 130 D.P.R. 596 [30 P.R. Offic. Trans. ___] (1992).
[4] Although the right of contribution of a codebtor does not arise until he or she pays more than his or her share, he or she may file a contingent claim against the other codebtors.Security Ins. Co. v. Tribunal Superior, 101 D.P.R. at 198 [1 P.R. Offic. Trans. at 279];García v. Government of the Capital, 72 P.R.R. at 141. In other words, under Civil Procedure Rule 12.1, a joint tortfeasor may file a third-party complaint within the action in which he or she was required to pay more than his or her share of the damages compared to his or her degree of contribution to the occurrence of the damage.
[5-6] The release or discharge from liability granted by a plaintiff to a codefendant and joint codebtor does not release the other joint tortfeasors from liability for the damage when the intention of the parties in the settlement and release agreement has thus acknowledged this fact.P.R. Fuels, Inc. v. Empire Gas Co., Inc., 149 D.P.R. 691 [49 P.R. Offic. Trans. ___] (1999);Merle v. West Bend Co., 97 P.R.R. 392 (1969). InMerle, the codefendants alleged that when one of the defendants was released from liability, the release benefited all the other codefendants, since they were all jointly liable for the damage and, therefore, dismissal of the complaint against them was in order. We held that the determining factor in that case was the intention of the parties when releasing one of the joint tortfeasors from liability under the provisions of our Civil Code sec. 1233 (31 L.P.R.A. § 3471), which provides that if the terms of a contract are clear and leave no doubt as to the intentions of the contracting parties, the literal sense of its clauses shall be observed. There, we held that joint tortfeasors were not released from liability if the intention of the parties did not contemplate such release in the settlement agreement.Merle v. West Bend Co., 97 P.R.R. at 402.
*139 InMerle, however, we did not pronounce ourselves on the issue raised in this case: whether it is necessary to join, as third-party defendant, the joint tortfeasor that was released from liability for purposes of the action for contribution. We pointed out that it was incumbent upon the trial court to determine the scope of the settlement agreement with respect to the joint tortfeasor that remained in the action, because the settlement agreement seemed to provide that the plaintiff had assumed whatever liability the released codebtor could have to the debtor who remained in the action.Id. at 402-403.
[7] Just like inMerle, in this case it is necessary to examine the scope of the release contained in the settlement agreement in order to determine the tenability of the third-party complaint for which INDECA sought court authorization. If the codefendant that remains in the action is liable to plaintiff onlyfor the share that represents its degree of contribution to the cause of the damage, a third-party complaint is unnecessary and untenable because it does not meet the requirement of being liable to the plaintiff for all or part of the claim. Civil Procedure Rule 12.1 (32 L.P.R.A. App. III). See, generally,Gen. Accid. Ins. Co. P.R. v. Ramos, 148 D.P.R. 523 [48 P.R. Offic. Trans. ___] (1999). The tenability of a third-party action depends, therefore, on a practical analysis of the facts in which we must determine the degree of liability of the remaining codefendant or codefendants, that is, the defendant or defendants who were not included in the settlement agreement. In other words, the court must determine whether these defendants must answer to the plaintiff for the liability of the joint tortfeasor that was released as a result of the settlement. SeeA.A.A. v. Builders Ins. Co., Etc., 115 D.P.R. 57 [15 P.R. Offic. Trans. 76] (1984).
III
In the instant case, the Court of First Instance dismissed all claims against Hospicare, Inc. on January 21, 2000, when it approved the January 20, 2000, Stipulation of Settlement and Release signed by plaintiff and codefendant.
With regard to the scope of the release of Hospicare, Inc. from liability, section 1(e) of the stipulation states:
[P]laintiffs release Hospicare, Inc. ... from any and all liability, financial or otherwise, for any cause of action they might currently have or have had in the past between them as a consequence of all the facts involved in this complaint, whether these were exercised or not, including the bankruptcy proceedings of Hospicare, Inc.
Appendix to the Petition for Certiorari at 108.
In that same subsection, plaintiffs released the new buyers of the units previously acts committed by Hospicare, Inc., Fernando Castillo Barahona and his wife, Gladys Cruz Chinea, from liability for:
[D]amages or causes of action they might have against them as a result of acts committed by Hospicare, Inc. ... up to March 31, 1999, the date on which the Castillo Barahona-Cruz Chinea spouses acquired ownership over the real property.
*140 Id.
In section number 1(f), it was clarified:
[P]laintiffs expressly reserve every and all rights to continue litigation of their claim and causes of action, including those to recover damages and those that relate to the compliance with the horizontal property regime, against each and every codefendant in the action that was not released by this settlement.
Id. at 109.
We can thus notice the plaintiffs' unequivocal intention to release Hospicare, Inc. fromall liability arising from the facts of this case with regard to the breach of the contract, the damages claimed, and the compliance with the horizontal property regime.[4] This intention, however, does not affect the cause of action asserted against the other codefendants by virtue of the action for damages and the permanent injunction sought, insofar as it was so expressly agreed.
The core language of the stipulation that actually settles this issue is the express release of codefendant (Hospicare, Inc.) from:
[A]ny and all claims or judgments against it that may be rendered in favor of other persons, who may or may not be codefendants in the action, as a consequence of cross-claims, third-party claims, or actions for contribution already filed or to be filed in the future against them to recover from judgments against them and in favor of plaintiffs.
Appendix at 109-110. (Emphasis added.)
Thus, we see that the parties' intention was to release Hospicare, Inc. from liability for the facts involved in the second cause of action that made Hospicare, Inc. liable for the damages caused as owner of some of the apartments and as joint tortfeasor, along with the other owners of the apartments of the building in question.
In other words, even if the final judgment to be rendered in due time by the Court of First Instance determines that the codefendants that remained in the action contributed jointly and severally, along with Hospicare, to the damage caused to plaintiffs, they need not file any claim against Hospicare, Inc. on account of its contribution to the damage caused, because the court judgment will have to assess the total cash value of the damage caused to plaintiffs byall the tortfeasors and will deduct from said total amount a sum equivalent to Hospicare's degree of liability. Likewise, for purposes of contribution
[4] Once Hospicare, Inc. ceases to own any share in the building subjected to the horizontal property regime, dismissal of the action regarding the compliance with said regime lies. Section 15 of the Horizontal Property Act, as amended by sec. 1 of Act No. 157 of June 4, 1976 (31 L.P.R.A. § 1291 m-1).
*141 among the codefendants that remain in the action,[5] the court must determine the degree of each codefendant's contribution to the damage suffered by plaintiffs, even when they remain solidarily liable to plaintiffs for the totality of the remaining damages - that is, those that result after subtracting the sum corresponding to Hospicare's degree of contribution.
Therefore, the third-party complaint does not lie in this case because it does not fulfill the purpose of Civil Procedure Rule 12.1, which requires that the third party be liable to the defendant for all or part of the plaintiff's claim or otherwise be liable to the plaintiff exclusively.
IV
For the foregoing reasons,the judgment of the Circuit Court of Appeals is reversed for the purpose of establishing the untenability of the third-party complaint, as held by the Court of First Instance.
Justice Rivera Pérez disqualified himself.
WBR/mvs
[5] The right of contribution, also called restitution, reimbursement, or return among joint debtors is recognized by Civil Code sec. 1098 (31 L.P.R.A. § 3109), which provides:
The payment made by any of the joint debtors extinguishes the obligation.
The person who made the payment can only claim from his codebtors the shares pertaining to each one with interest on the amounts advanced.
The nonfulfilment of the obligation by reason of the insolvency of a joint debtor shall be made good by his codebtors in proportion to the debt of each of them. [Emphasis added.]
Ever since Mendez v. Torres, 56 P.R.R. 70, 75 (1940), we have stated:
The confusion noticeable at first sight disappears if it is considered that the concept of solidarity is applicable only to the obligation of the debtors towards their creditor [external relation] but not to the relations of the debtors between themselves [internal relation]. As regards the creditor the liability is a solidary one. As between the debtors among themselves the liability is distributed. Section 1098 of the Civil Code, 1930 ed., clearly and expressly provides that `[t]he payment made by any of the joint debtors extinguishes the `obligation,' and that `[t]he person who made the payment can only claim from his codebtors the shares pertaining to each one with interest on the amounts advanced.'
SeeCarr v. Nones, 98 P.R.R. 230 (1970), in which this Court refused to apply said section to a tacit joint-surety contract.
*142 ATTACHMENT II
Fraguada Bonilla v.Hosp. Auxilio Mutuo
2012 TSPR 126
[English Translation]
*143 EXHIBIT 2
Daniel Fraguada Bonilla et als, Appellees v. Hospital Auxilio Mutuo, Dr. Manuel Anguita et als, Petitioners
CC-2009-918
SUPREME COURT OF PUERTO RICO
2012 TSPR 126; 2012 PR Sup. LEXIS 124
August 13, 2012
PRIOR HISTORY: [*1]
Court of Appeals: San Juan Judicial Region. Matter: Damages - Art. 1802 Civil Code - Interruption of the prescriptive term in claims when there are several co-causers; revocation of the standard of Arroyo v. Hospital La Concepcion regarding interruption of the term in these situations.
Attorney for the Petitioner: Atty. Maritza López Camuy. Attorneys for the Appellee: Atty. Wilfredo Zayas Nieves, Atty. Zedided Ortiz Martínez, Atty. Jose A. González Villamil.
JUSTICES: Opinion of the Court issued by Associate Justice MISTER ESTRELLA MARTÍNEZ. Dissident. Opinion issued by Associate Justice Mrs. PABÓN CHARNECO who is joined by Associate Justice Mister RIVERA GARCÍA and Associate Justice Mister FELIBERTI CINTRÓN.
OPINION:
San Juan, Puerto Rico, August 13, 2012.
We have occasion today to examine our rules regarding the interruption of the prescriptive period in situations where there concur multiple co-causers of an extracontractual damage. For this, we must determine if it is pertinent to distinguish between the effects of the solidarity agreed or of *144 a pre-existing bond and those of the solidarity that arises where there are several causers of an extracontractual damage.
I
On May 2, 2002 the[*2] relatives of Mrs. Hilda Pérez filed a complaint for damages against Hospital Auxilio Mutuo and Dr. Manuel Anguita.[1] In the complaint there were also included John Doe and Richard Roe as unknown defendants. It was alleged that they were jointly and severally liable in the event it was determined that they incurred in negligence.[2] Subsequently, the complaint was amended to include certain allegations. Jointly, the plaintiffs alleged that on January 14, 2000 Dr. Manuel Anguita operated Mrs. Pérez and found that her intestine was obstructed. After the operation, the personnel of the hospital placed a nasogastric tube on the sixty year old patient. A nurse proceeded to perform a test called Turner and injected a liquid through the aforementioned tube without allegedly verifying if it was in the stomach. The plaintiffs alleged that at this time Mrs. Pérez started to scream.
-------------------------Footnotes-----------------------------
1 The plaintiff relatives are the following: Mr. Daniel Fraguada Bonilla, Mr. Héctor L. Fraguada Pérez, Mrs. Ana Hilda Fraguada Pérez, Mrs. María de los Ángeles Fraguada Pérez, Mr. Carlos Daniel Fraguada Pérez and[*3] Mr. Ángel G. Osorio Fraguada.
2 It is necessary to clarify that in the case before us Rule 15.4 of the Rules of Civil Procedure of 1979, 32 L.P.R.A. Ap. III R. 15.4, regarding a defendant of an unknown name is not applicable. As is known, the mere fact of including in a complaint the mention of a fictitious name for a defendant does not make Rule 15.4, supra, automatically applicable. This rule requires that the specific claim be stated and that the identity of the defendant be known.
*145 Upon examining the allegation included in the complaint we notice that it is one extremely succinct; a claim was not specifically stated as required by Rule 15.4,supra. We are before the situation of an unknown defendant, wherefore the cited rule is not applicable. Even in the assumption that we were before a case of a defendant of an unknown name, the plaintiffs did not comply with the requirements of Rule 15.4,supra, of making the corresponding amendment promptly upon discovering the true name.-----End Footnotes----------------
Subsequently, she developed respiratory difficulty and she had to be intubated. Months later, on July 1, 2000, the patient died. With the inclusion of all[*4] these allegations the plaintiffs stated that Mrs. Pérez died due to the negligent actions of Hospital Auxilio Mutuo and of its personnel, since they failed to provide an adequate medical treatment.[3]
-------------------------Footnotes-----------------------------
3 On May 18, 2006 a settlement agreement was reached. The plaintiffs agreed to dismiss the claim with regard to Hospital Auxilio Mutuo and it agreed to pay them $70,000. On October 25, 2006, the Court of First Instance issued a partial judgment whereby it disposed of the matter according to the settlement agreement between these parties.---End Footnotes---
Six years after the action commenced, the plaintiffs made a request to amend the complaint in order to include other presumed co-causers of the damage. They specifically, requested to bring Dr. Noel Totti and Dr. Octavio Mestre into the action.[4] After the Court of First Instance granted the amendment requested, on May 21, 2008 the plaintiffs amended the complaint. It was then that Doctor Mestre Morera and Doctor Totti found out that they as well as their respective conjugal partnerships were co-defendants in a litigation that had been filed more than half a decade ago. The physicians, *146 [*5] as alleged by the plaintiffs, had placed the nasogastric tube on Mrs. Pérez in a negligent manner.
-------------------------Footnotes-----------------------------
4 In this request, the plaintiff alleged that as a result of the discovery there had emerged information that the aforementioned Doctors had been negligent in the medical treatment provided to Mrs. Pérez.
The request made in 2008 to amend the complaint was not one of substitution or of indication of the names of defendants of an unknown name, but for the purpose of bringing new defendants into the action. Furthermore, in the complaint amended in 2008, there remained the allegation of liability of defendants John Doe and Richard Roe which had been included in the initial complaint.---End Footnotes-----
Doctor Mestre Morera filed his answer to the amended complaint. Later on, and during the litigation, the physician filed a motion for summary judgment. In the same he argued that the claim had prescribed because the plaintiff previously knew his identity and his participation in the event.[5] Thus, the doctor emphasized that even though the plaintiff was in a position to exercise his claim it was not until six years after having filed the original complaint that they filed[*6] the action against him. He assured that this delay constituted a gross lack of diligence by the plaintiff in exercising its cause of action, wherefore the claim against him should be dismissed.
-------------------------Footnotes-----------------------------
5 The allegation regarding knowledge of the plaintiffs of the identity of the physicians is based on a deposition taken to the co-plaintiff, Mrs. María de loa Angeles Fraguada Pérez on July 11, 2005, Appendix, page 101. In the same, Mrs. Fraguada Pérez ---the daughter of Mrs. Pérez--- made a chronological and detailed narration of what had occurred according to her *147 perception. Specifically, she testified that on the day of the alleged facts Doctors Mestre Morera and Totti arrived at Mrs. Pérez' room after she requested that the nurse find a physician, because her mother started to cough after they placed a liquid through the nasogastric tube to perform the exam. Co-plaintiff sustained that she heard Doctors Mestre Morera and Totti alternatively order each other to remove the tube, because it was in the lung and it could cause an embolism. Id. Furthermore, Doctor Mestre emphasized that anyway, as of January 12, 2005 the[*7] plaintiffs had a report from their expert that alleged deviations in the placement of the nasogastric tube. He argued that if the date of the deposition was taken into consideration as the moment of awareness of the plaintiffs regarding the elements to exercise their cause of action, three years would have still elapsed as of that point of inflection to the time that a claim was finally made from him.-------------End Footnotes---
Plaintiffs fild their oposition to the motion for summary judgment of Doctor Mestre Morera. They did not justify the delay to file a claim against him after six years, but stated that even though his participation was minor to that of the other physicians, as of the moment in which they filed the original complaint the prescriptive term against any physician that was negligent in the treatment of Mrs. Pérez was interrupted.[6]
-------------------------Footnotes-----------------------------
6 In this opposition to summary judgment the plaintiff assured that the alleged discussion between Doctors Mestre Morera and Totti was madein the presence of the relatives. ----End Footnotes----------------------------------------
Having evaluated the positions of the parties, the Court of First Instance issued a resolution in which it "denied" the motion for summary judgment. Not in agreement with this ruling, Dr. Mestre Morera[*8] filed a request forcertiorari *148 before the Court of Appeals. Subsequently, the intermediate appellate forum issued a resolution in which it denied to issue the appeal. It based its ruling on the standard contained inArroyo v. Hospital La Concepción, 130 D.P.R. 596 (1992).
Once again not in agreement, Doctor Mestre Morera resorted to us, through a request forcertiorari. In what is pertinent, he stated that the Court of Appeals erred in concluding that the claim filed six years after the original complaint had not prescribed. He argued that according to the cognoscitive theory of the damage, the term to file the claim had expired, since the plaintiffs previously knew his identity and the rest of the elements necessary to be able to exercise their cause of action. The physician questioned that through a mere procedural formality without any ulterior proceeding, the plaintiff was relieved of its duty to act in a diligent and timely manner in claiming its rights.
Inevitably he requests that we revoke the standard established inArroyo v. Hospital La Concepción, 130 D.P.R. 596 (1992), regarding the automatic and indefinite interruption of the prescriptive term against the[*9] alleged joint and several co-causers of a damage who were not included in the original complaint. In its stead, he proposes that we adopt the doctrine ofin solidum obligation.
On April 16, 2010, we granted the plaintiff a term to show cause why we should not issue the writ ofcertiorari and revoke the finding of the Court of Appeals. They have appeared. With the benefit of the different positions, we proceed to resolve.
*149 II
A.
Prescription is an institution that extinguishes a right due to the inertia of a party to exercise it during a specific period of time. We have repeatedly explained that extinctive prescription is a figure of a substantive and not a procedural nature, which is governed by the principles of our Civil Code. Serrano Rivera v. Foot Locker Retail Inc., res. on August 15, 2011, 182 D.P.R. (2011);COSSEC et al. v. González López et al., 179 D.P.R. 793, 805 (2010); Santos de García v. Banco Popular, 172 D.P.R. 759, 766 (2007). This applies as a matter of law with the passing of time, unless there occurs any of the assumptions provided in our juridical laws. COSSEC at al v.González López et al., supra, pages[*10] 805-806;Santos de García v. Banco Popular, supra, page 766. To that effect, Art. 1873 of the Civil Code, 31 L.P.R.A. sec. 5303, establishes that the prescription of actions is interrupted by its exercise before the courts, by an extrajudicial claim of the creditor and by any act of recognition of the debt by the debtor.[7]
-------------------------Footnotes-----------------------------
7 Also relevant with regard to prescription are Arts. 1094, 1868, and 1874 (31 L.P.R.A. secs. 3105, 5298 and 5394).--End Footnotes----------------------------------------
Prescriptive terms seek to punish inertia and stimulate the rapid exercise of the actions,COSSEC et al. v. González López et al., supra, page 806; Campos v. Cía. Fom. Ind., 153 D.P.R. 137, 143 (2001). The objective of the same is to promote security in the juridical traffic and the stability of juridical relations. Id. We have stated that the existence of prescriptive terms responds to a firmly established policy for the expedited solution of claims. Campos v. Cia. Fom. Ind., supra, page 143. In this manner we avoid surprises *150 generated by the resuscitation of old claims, in addition to the inevitable consequence of the passing of time, such as: loss of evidence, imprecise memory and[*11] difficulty to find witnesses. Id., page 144. This figure is based on "the human experience that valid claims are acted on immediately and are not abandoned."Culebra Enterprises Corp. v. E.L.A., 127 D.P.R. 943, 950 (1991). In this regard, the passing of the period of time established by law, without any claim whatsoever by the owner of the right, originates a legal presumption of abandonment. See,Zambrana Maldonado v. E.L.A., 129 D.P.R. 740, 752 (1992).
As is well known, obligations arising from fault or negligence are governed by what is provided in Art. 1802 of the Civil Code, 31 L.P.R.A. sec. 5141, which establishes that whoever "by action or omission causes damage to another, intervening fault or negligence, is obligated to indemnify the damage caused." The prescriptive term of these actions is one year pursuant to the provisions of Art. 1868 of the Civil Code, 31 L.P.R.A. sec. 5298. The brevity of this term responds to the lack of existence of a prior juridical relationship between the plaintiff and the defendant.Culebra Enterprises corp. v. E.L.A., supra, pages 951-952. In particular, the aforementioned term of prescription seeks to promote the timely establishment of the actions,[*12] seeking to assure that the passing of time will not confuse or erase the clarification of the truth in its dimensions of responsibility and evaluation of the amount. Campos v. Cía. Fom. Ind.,supra, page 950.
In accordance with thecognoscitive theory of the damage, this prescriptive term commences to count when the claimant knew, or should have known that he suffered a damage, who caused it to him and the necessary elements to be able to effectively exercise his cause of action. See,COSSEC et al v. González López et al, supra;Toledo Maldonado v. Cartagena Ortiz, 132 D.P.R. 249, 254-255 (1992); Colón Prieto v. Géigel, *151 115 D.P.R. 232, 247 (1984). However, we have repeatedly stated that "if the lack of knowledge is due to lack of diligence, then these considerations regarding prescription are not applicable". COSSEC etal v. González López et al, supra.
B.
Obligations can be classified according to the subjects that comprise the relationship. Thus, there are joint and several obligations. In joint obligations the debt can be divided and each debtor has to independently comply with his part. J. Castán[*13] Tobeñas, Derecho Civil Español, 10th ed., Madrid, Ed. Reus, 1967, T. III, page 107. In joint and several obligations each creditor is entitled to request and each debtor has the duty to pay the consideration due in its entirety. Id.
The rule that governs in matters of civil law is that solidarity is not presumed. Art. 1090 of the Civil Code, 31 L.P.R.A. sec. 3101, establishes that the concurrence of two or more debtors in a single obligation does not mean that each one of them should totally render the things object of the same. This article establishes joint liability as the rule and solidarity as the exception, the latter only arising when the obligation expressly determines it.
In matters of extracontractual liability, inCruz v. Frau, 31 D.P.R. 92, 100 (1922), we established that when a damage is caused by the concurrent negligence of several persons, their carelessness is the proximate cause of the accident, and, all are liable for indemnifying the damage caused. Later inCubano v. Jiménez et al., 32 D.P.R. 167, 170 (1923), this Court stated that "the tendency of jurisprudence has been to declarein solidum the liability of the different defendants."
*152 Despite our[*14] previous statements, in view of the query about the existence of the right to contribution in our code of laws, inGarciá v. Gobierno de la Capital, 72 D.P.R. 138, 148-149 (1951), we jurisprudentially extended the application of Arts. 1094, 1098 and 1874 of the Civil Code, 31 L.P.R.A. secs. 3105, 3109, 5304, regarding the effects of solidarity, to cases for damages. As a previous step to said conclusion, we stated, perhaps due to the exterior margin of clarity, that those who cause a damage are jointly and severally liable to the aggrieved for the judgment which is favorably issued to the same in due time.García v. Gobierno de la Capital, supra, pages 146-147.
Later on we had the opportunity to clarify our pronouncement regarding the doctrine of joint and several liability.In Arroyo v. Hospital La Concepción, supra, we reiterated that "what is provided in Art. 1090 of the Civil Code, 31 L.P.R.A. sec. 3101, with regard to the non presumption of joint and several liability, does not apply in matters of extracontractual liability. " Id., page 605 But what is even more important, yet, moved mainly by the Spanish doctrine of that time -1992- in that case we preferred not to make a distinction between different[*15] types of solidarity - perfect and imperfect- and jurisprudentially sustained that solidarity in our laws had a homogenous nature, wherefore the primary as well as the secondary effects were applicable. As a result thereof,we resolved that the timely filing of a complaint by an aggrieved against a joint and several coauthor automatically interrupts the prescriptive term against all of the other co-causers of the damage. We stated that with an amendment to the complaint or a third party complaint the alleged joint and several co-causers of the damage not originally included, can be incorporated into the action, and that the claimant only has to allege well and sufficiently that the new defendant is jointly and severally liable for the damages. With this, in that case we allowed that there be *153 brought into the action several co-defendants four years after the initial complaint was filed.
We subsequently resolvedGarcía Pérez v. Corp. Serv. Mujer, 174 D.P.R. 138, 155 (2008), which had the singularity that the plaintiff was aware beforehand of the identity and the necessary elements to be able to exercise his cause of action against a presumed joint and several co-author, but did not include the same in the original[*16] complaint.[8] It was not until three years later that the aggrieved amended the complaint to include her as a joint and several co-causer of the damage.[9]On this occasion we reiterated the standard of Arroyo v. Hospital La Concepción, supra, and decided that since in the amended complaint it was alleged that the new co-defendant was jointly and severally liable for all of the damages caused, the prescriptive term was interrupted with the initial filing of the complaint. Id, page 159.
------------------------Footnote---------------------------------
8 It also did not include the Commonwealth of Puerto Rico (C.W.P.R.) as an alleged joint and several liable person.
9 In that opportunity it also incorporated the C.W.P.R. as a co-defendant.----------------------End Footnote------------------
As we mentioned, inArroyo v.Hospital La Concepción, supra, we accepted the interpretation of the Spanish doctrine and jurisprudence in effect at that time. Time has passed and the changes that have occurred since then have not been few. The interpretation admitted in the alluded case was abandoned in Spain for several years now, and in its stead there was adopted the French doctrine that distinguishes between two types of several liability: perfect and imperfect.
*154 III
It corresponds to us to resolve if the rules established regarding prescription in actions for damages should be maintained in effect. In particular[*17] if the filing of a complaint for civil extracontractual liability against an alleged joint and several co-causer interrupts the prescriptive term against the rest of the presumed co-causers. For this,we analyzed if we must integrate a distinction between the cases of joint and several liability agreed or pre-existing bond -known as proper solidarity or perfect solidarity- and the cases of joint and several liability when there are several persons responsible for an extracontractual damage- known as improper solidarity or imperfect solidarity. If this distinction is admitted, the interruptive effect of Art. 1874 of the Civil Code, 31 L.P.R.A. sec. 5304, would apply to cases of proper solidarity, but would not extend to the scope of civil extracontractual liability when there are several co-causers who are judicially condemned.[10]
------------------------Footnote---------------------------------
10 Art. 1874 of our Civil Code provides, in what is pertinent: that "[t]he interruption of the prescription of actions in joint and several obligations equally benefits or affects all of the creditors or debtors." 31 L.P.R.A. sec. 5304.-------------End Footnote-----------------------------------
The prudent study of the obligations derived from the responsibility for extracontractual damages requires a historic examination of its nature[*18] and extension.
A.
The word solidarity originates from the latinin solidum, which is defined as the whole of a sum. A. Blánquez Fraile, Diccionario Latino-Español, Español-Latino, Barcelona, Ed.
*155 Ramon Sopena, S.A., 1985, T. II, page 1460. The institution of thein solidum obligation originates in turn from Roman Law. It recognized it all its extension the division between joint and joint and several obligations as the distribution of the liability occurred or not between the parties. J. R. León Alonso, La Categoriá de la obligatiónin solidum, Sevilla, Publicaciones de la Universidad de Sevilla, 1978, page 51. Obligations with a plurality of subjects were considered joint and several provided there was no pact between the parties. C. Gómez Ligüerre, Solidaridad y Derecho de daños. Los limites de la responsabilidad colectiva, (s.1.), Thomson, Civitas, 2007, page 79. Roman joint and several liability allowed the creditor to be able to require the entire compliance of the obligation from any of the debtors.
Since 1286 b.c., through Aquilian Law, Romans provided a regime for situations where there concurred several cocausers of a damage. Gómez Ligüerre, op. cit. page 81.[*19] Pursuant to the same, the victim could claim the entire indemnification from any of those declared liable. Id.
Obligations in Roman Law were presumed joint and several. Joint liability was the exception, and it was applied when it was agreed between the parties or when the obligation was divisible. Subsequently, this rationale was inverted by Justinian Law (527-565 a.c.), which changed the presumption: it imposed the division of the obligation as the rule and established joint and several liability only when it was agreed. Gómez Ligüerre,op. cit., page 80. It was an unavoidable requirement that the claim be directed against all of the debtors at the same time. Id., page 81.
Since its creation, joint and several liability has been divided according to the source from which it originates. Roman Law proposed the idea of distinguishing between two types of plural obligations: correal andin solidum obligations. See: E. Petit, Tratado Elemental de Derecho *156 Romano (J.M. Rizzi, trad.), México, Ed. Editora Nacional, 1966, pages 348-355. Although similar in appearance, both obligations were differentiated in their source or origin. J. Cubides Camacho, Obligaciones, 5th Ed., Bogotá, D.C., 2007, page 68. Id.[*20] In solidum obligations originated from natural causes -such as those derived from the common fault or offense of the debtors- and correal obligations originated from voluntary causes. E. Petit,op. cit., pages 353-354. Similarly,in solidum obligations could only exist between debtors, while correal could be established between debtors as well as creditors. Id.
The rule of non presumption of solidarity of the Roman Law had a significant influence in the creation of the civil codes of France and Spain. However, these codes do not expressly establish how the co-causers of an extracontractual damage will respond, wherefore both countries have supplied this absence through jurisprudence. In this aspect our Civil Code is similar to that of France and Spain.
B.
In France, Art. 1.202 of its Civil Code provides that solidarity is not presumed, it must be expressly agreed. As we suggested, the aforementioned code is silent about the obligation that should exist in cases of plurality of causers of a damage.
In matters of general liability, French doctrine distinguishes between two types of effects of solidarity:[*21] the primary effects and the secondary effects. The primary include the unity of the debt and the plurality of bonds. Secondary are the interruption of prescription, the interruption of the delay, and the promise of compliance of all of the joint and several debtors. Gómez Liguerre,op. cit., page 127. This distinction is crucial in this doctrine, *157 since the secondary effects of the solidarity are not applicable to the scope of extrancontractual liability.
Since solidarity can originate from the law or from the will of the parties, in France a distinction is made between the cases of perfect solidarity and those where solidarity is imperfect. The solidarity is considered percent when it is "between several persons joined by a common interest, which have frequent relations among themselves or know each other. J. R. León Alonso, op. cit., page 32. On the other hand, imperfect is when it is established by law "between persons who do not know each other, who are merely accidental codebtors or when their relations are sporadic." Id. pages 32-33.
When the solidarity is imperfect, there arises anin solidum obligation.[11] Pursuant to the same, in cases of plurality of causers each of them[*22] is entirely liable, but his liability is autonomous from that of the others. Á. Cristobal Montes, Mancomunidad o solidaridad, 1985, ed. Bosch, Casa Editorial, S. A., Barcelona, page 36. This, since the bond from which the obligation of each co-causer is derived is independent. Id. That is why, the French doctrine does not consider said obligation as one that is regular and several, butin solidum. Even though each of the co-causers has the responsibility for paying the whole, the secondary effects of the traditional solidiarity -among them, the interruption of the prescriptive term- do not govern. This means that in actions for extracontractual damages, the injured party must individually interrupt the prescriptive term with regard to each joint and several co-causer. Id, page 38. That is, the time filing of a complaint against one joint and several cocauser of an extracontractual damage does not interrupt the term against the rest of the alleged authors.
*158 ------------------------Footnote---------------------------------
11 Some commentators have attributed to the French doctrine the creation of thein solidum obligation. J. R. León Alonso,op. cit., page 32.--------------End Footnote------------
Insofar as the interruption of the prescription, Art. 1.206 of the French Civil Code -similar[*22] to Art. 1874 of our Civil Code,supra - establishes that "actions exercised against one of the joint and several debtors interrupts the prescription with regard to all of them." French Civil Code (Á. Núñez Igleasias, comm.), Madrid, Ed. Marcial Mons, 2005, page 552. Now, however,the French doctrine does not apply this article to the extracontractual field. This is mainly due to the fact that the classic solidarity is explained in France as an idea of mutual representation, which requires that all be inspired by a common will. See, Gómez Liguerre,op. cit., page 99. This does not occur in cases ofin solidum liability. In the same, since there does not exist a mutual representation due to the absence of the will of the coparticipants to bind themselves jointly, the obligation that arises among the co-causers of a damage is not considered comparable in all its extension to a proper solidarity.
The exclusion of the secondary effects of the solidarity of several causers of an extracontractual damage is justified by the absence of a community of interests among those coobligated. J. Lopez Richart, Responsabilidad Personal e Individualizada, Madrid, Ed. Dikinson, 2003, page 40. There does not exist[*24] a common interest or a mutual representation because thein solidum obligation does not arise from a prior agreement or pact, but from an unconventional event. I. Sierra Gil de la Cuesta, Tratado de Responsabilidad Civil, España, Ed. Bosch, 2008, T. II, page 669.
In short, in the extracontractual field, the French doctrine considers that when there coexist several causers of *159 an extracontractual damage there arises anin solidum obligation where the secondary effects of the solidarity are not produced. In order for the injured party to conserve its action against the alleged co-causers, he must interrupt the prescription against each one of them. Á. Cristóbal Montes,op. cit., page 38.
C.
The Civil Code of Spain follows the model of the French Civil Code and does not expressly contemplate the alleged obligation that governs in cases of extracontractual liability of several causers of a damage. Á. Cristóbal Montes,op. cit., page 29. Art. 1.902 of the Spanish Civil Code -similar to Art. 1802 of our Civil Code,supra - encompasses the figure of extracontractual fault. On its part, Art. 1.137 of the Civil Code of Spain establishes that solidarity is not presumed.[12] Nevertheless, pursuant to judicial interpretation[*25] the co-causers of an extracontractual damage are jointly and severally liable.
------------------------Footnote---------------------------------
12 Art. 1.137 of the Spanish Code -identical to our Ar. 1091, 31 L.P.R.A. sec. 3102- establishes the following:
The concurrence of two or more creditors or of two or more debtors in a single obligation does not entail that each of them is entitled to ask, nor each of them should render in its entirety, the things object of the same. This will only apply when the obligation expressly determines this, being the same constituted with the nature of solidarity.
------------------------------End Footnote-----------------------
At the time that we resolvedArroyo v. Hospital La Concepcion, supra, the standard in effect in Spain *160 contemplated a homogenous solidarity which accepted that the timely filing of a complaint by an aggrieved against a joint and several co-author of damages, interrupted the prescriptive term against those who were subsequently found to be jointly and severally liable. This, since there was no distinction between the solidarity arising from the pact and the solidarity product of the damages caused by several authors. As we mentioned, this rule was abandoned in Spain. In its stead, there was incorporated the dominant French interpretation which admits a distinction between[*26] proper and improper solidarity. According to the modern standard in Spain, solidarity is proper when its nature is derived from a legal standard or from a conventional pact, and it is improper when it originates from the judgment. See J. June 7, 2010, No. 521/2010.
The figure of improper solidarity presented "the solution to one of the problems presented by joint and several liability: the interruption of the prescription". Gómez Liguerre,op. cit., page 129. This, due to the fact that improper solidarity is an exception to the standard of interruption of the prescription. The Spanish figure is very similar to the consolidated French doctrine ofin solidum, in effect since the XIXth century. C. Gómez Liguerre, op.cit., page 125. It was specifically in the judgment of March 14, 2003, J. of March 14, 2003, No. 3645/2003, that Spanish jurisprudence integrated the aforementioned distinction. The facts of this judgment are as follows. A worker sued the company for which he worked, the entity promoting the work and the architectural director for damages. A judgment absolved the latter, and in the act condemned the first two to indemnify the injured party. He was unable to perceive the[*27] compensation due to the insolvency of the defendants and proceeded to sue the technical architect and his insurance companies. The lower courts found that the action had prescribed because Art. 1.974 of the Spanish Civil Code was not applicable to this cause of extracontractual action. The *161 Supreme Court of Spain confirmed the ruling after consulting the General Board of Magistrates of the First Supreme Court, which adopted the following agreement by an ample majority of votes:
The first paragraph of Article 1.974 of the Civil Code only contemplates an interruptive effect in the assumption of joint and several obligations in the proper sense when said nature is derived from the legal standard or a conventional pact, without being able to extend it to the scope of extracontractual liability when there are several parties judicially condemned. J. of March 14, 2003, No. 3645/2003. (Emphasis ours)
As can be observed, at present the Spanish jurisprudence -as well as French doctrine- consider that the interruptive effect of the prescription established in its Art. 1.974 applies only to cases of proper solidarity. See: Judgment of March 14, 2003,[*28], No. 3645/2003; Judgment of June 4, 2007, No. 662/2007. That is, in the case of Spain, when said nature arises from a pact or the law. Id. Nevertheless, the interruption does not extend to improper solidarity since it is non-existent until the moment that it arises pursuant to a judgment. Id. This solidarity does not arise from a preexisting bond, but from the illegal act that produced the damage, which obtains its recognition through the judgment that declares it to be so. Id. Therefore, interruptive acts operate individually. "[I]f the solidarity does not arise except for a judgment, which is the so-called improper solidarity, the interruption of the prescription with regard to one of the debtors does not reach the other, since he was not a joint and several debtor and was only so as of the judgment that declared this, not before." J. of June 4, 2007, No. 3645/2007; J. of March 14, 2003, 3612/2003.
*162 This doctrine is already consolidated in Spain. J. of October 19, 2007, No. 1086/2007. And it has been applied uniformly since 2003. See: J. of July 18, 2011, No. 545/2011; J. of October 19, 2007, No. 1086/2007; J. of May 8, 2007, No. 466/2997; J. of May 8, 2007, No 466/2007; J. of June 5,[*29] 2003, No. 534/2003; J. of October 23, 2003, No. 979/2003.
IV
We have carefully examined the standard ofArroyo v. Hospital La Concepción, supra. In this case we are faced with the existence of two possible interpretations regarding solidarity in our code of laws, one of them reiterated the homogeneous nature of solidarity and, as a result thereof, the recognition in all its extension of its primary and secondary effects. The other admitted a distinction between proper and improper solidarity. Pursuant to this last exegesis, the primary effects of solidarity will be intact -that each co-debtor is responsible for paying the entire debt-, but the secondary effects of solidarity would not be recognized -in this case, that the interruption of the prescriptive term against a co-causer of an extracontractual damage will in turn interrupt, in an indefinite manner, the term against the rest of the co-causers-.
Based on this situation, inArroyo v. Hospital La Concepcion, supra, we leaned towards the appreciation of the Spanish doctrine in effect at that time -and abandoned in that jurisdiction almost a decade ago- and interpreted that according to Art. 1874 of our[*30] Civil Code, supra, whose first paragraph provides that "[t]he interruption of the prescription of actions in joint and several obligations equally benefits or affects all of the creditors or debtors", the timely filing of a complaint for damages against a joint and several co-causer interrupted the prescriptive term against all of those who were liable in a joint and several manner. It was not the first time that we filled a vacuum in *163 legislation regarding extracontractual civil liability, since the proper joint and several liability of the co-causers of the damage does not arise expressly from the law, but from a judicial interpretation of the provisions of our Civil Code. C.J. Irizarry Yunqué, Responsabilidad Civil Extracontractual, 6th ed., [sin. 1.], ed. of the author, 2007, page 343. Thus, inArroyo v. Hospital La Concepción, supra, we jurisprudentially interpreted that in our laws there was only one joint and several obligation and we refused to make a distinction between perfect and imperfect solidarity, and in turn admitted the effects that this implied with regard to the interruption of the prescriptive term.
We did the above for the purpose of achieving a fair balance between[*31] opposing forces. We affirmed inArroyo v. Hospital La Concepcion, supra, that the standard adopted therein "achieve the best equilibrium between all of the interests". Id., page 608. It was the enunciation of a hypothesis to be verified. Two decades later, the cumulus of experience forces us to conclude that the standard therein established did not achieve the equilibrium that we sought. In effect, afterArroyo v. Hospital la Concepción, supra, we recognized that this rule in effect provides a greater protection to the plaintiff. See, by way of example,Garcia Perez v. Corp. Serv. Mujer, supra, Page 151. And this is sustained by the multiple effects of the rule applied in practice.
The plaintiff can bring another person as a co-defendant into the action even though he files the claim outside of the term of prescription. In fact, even though he knows beforehand the identity of the alleged joint and several co-causer, he does not have to include him in the original complaint. SeeGarcía Pérez v. Corp. Serv. Mujer, supra. The aggrieved does not even have to allege the joint and several liability of the co-causers in this complaint, since he can do so afterwards through an amendment to the complaint. Id. In said amendment *164 he must only allege that the new defendant is[*32] jointly and severally liable for the damages claimed from the original defendant, against whom he filed the complaint within the term of prescription provided by the code of laws. In this manner, even though the plaintiff is in a position to exercise his cause of action against the presumed joint and several co-cause, he has no limit whatsoever to do so. This, since the standard inArroyo v. Hospital La Concepción, supra, in effect provided an automatic and indefinite interruptive effect in prejudice to all of those who could be jointly and severally liable for the damage.
On its part, the alleged joint and several co-causer brought into the action several years after having filed the original complaint -six years in this case- has to employ, and not on very few occasions, numerous efforts to remember with specific certainty -if any- the particular events that motivated the claim against him. He must face, also, the diligent search for documents conceived at that historical point in time; a matter which becomes complicated when they are in the hands of third parties with which one has little or no relationship, or in the hands of a third party that no longer exists. Similarly, the more time passes until he is finally incorporated as a codefendant,[*32] the greater will be the probability of confronting difficulties to find witnesses. Similarly, the presumed joint and several co-causer must incur in expenses associated with a litigation which would have otherwise prescribed, due to the brevity of the term in our Civil Code for these claims.
As should be contemplated, far from achieving a balance between opposing interests, this standard tips the balance of the situation in favor of the claimant. As a result of the above, and despite the express and extensive recognition of the substantive figure of prescription in Arts. 1840 to 1874 of our Civil Code,supra, the severity that characterizes the terms of prescription diminishes considerably. This, despite *165 the fact that the existence of the same is based on the search for stability of the juridical relations and the promotion of diligence in the vindication of rights.
We note again that the rule regarding solidarity in matters of extracontractual liability devised inArroyo v. Hospital la Concepcion, supra, does not arise expressly from our Civil Code. When it alludes to "joint and several obligations" it does not specify if we are before an assumption of a single[*34] or several joint and several obligations, and in this last case, how many and which in particular. Sadly and despite said absence, we have jurisprudentially granted preeminence to the standard adopted therein regarding the substantive figure of prescription, which is expressly regulated in our code. The problem of the construction of this standard is that it did not achieve a solution that was in harmony with the rest of the juridical code of laws. Its outcome has been an institution of undermining prescription, since one party has the eternal right to claim damages from another. Equally dangerous, said standard has the unfortunate effect of awarding inertia in the vindication of a right and of promoting the strategic use of inaction, given that the plaintiff can arbitrarily select when it is most convenient for him to include a party in the litigation.
Another problem confronted by the automatic interruption and the indefinite postponement of the cause of action is that the term of prescription limited to one year for claims under Art. 1802 of the Civil Code,supra, responds mainly to the absence of a prior juridical relationship between the plaintiff and the defendant. The obligation[*35] for causing an extracontractual damage does not arise from the agreement between the parties, wherefore there is no opportunity whatsoever to negotiate the terms of the obligation nor to consent freely, contrary to the contractual relationship. Thus, the brief term provided by the legislator. In this *166 manner a minimum of certainty was granted to a relationship that did not have the same. This minimum amount of security somehow compensates the absence of knowledge regarding the scope of the obligation. Thus, it provides a minimal protection that allows conserving a fair equilibrium between the parties. And it should not be set aside.
From everything stated herein, we adopted in our jurisdiction the in solidum obligation in matters of prescription of the cause of action for civil extracontractual liability when there coincide more than one causer.[13]Pursuant to the same, the injured party may recover from each co-causer sued the entire amount of the debt that is pertinent, because the primary effects of the solidarity are maintained. But he must interrupt the prescription in relation to each co-causer separately, within the term of one year established by Art. 1868 of the Civil Code, supra, if he is interested in conserving his cause of action against each one [*36] of them. This does not constitute a greater burden for the injured party, since he must only exercise the same diligence required when he claims from an author of the damage. In this manner, the timely filing of a complaint against a presumed co-causer does not interrupt the term of prescription against the rest of the alleged co-causers, because said secondary effect of the solidarity is not pertinent in the in solidum obligation.[14]Therefore, Art. 1874 of the Civil Code, supra, does not apply to cases of damages under Art. 1802 of the Civil Code, supra.[15]
------------------------Footnote---------------------------------
13 We reiterate, also, that what is provided in Art. 1090 of the Civil Code,31 L.P.R.A. sec. 3101, with regard to the non presumption of solidarity, does not apply in matters of extracontractual liability. We also emphasized that we do not adopt the standard ofin solidum obligation in all its extension, but only with regard to the interruption of the *167 prescriptive term when there coincide several co-causers of the damage under Art. 1802 of the Civil Code,supra.
14 Improper solidarity does not admit an automatic an indefinite interruption of the term of prescription in prejudice to other co-causers, which, by their own fault, have an obligation towards the[*37] injured party. The responsibility of each of them is autonomous from the others, wherefore there arises a plurality of independent bonds, which requires that the term of prescription against each debtor be individually interrupted. This, since imperfect solidarity does not arise from a pre-existing bond, but from the illegal act that produced the damage as recognized by the judgment that declares it.
15 In Puerto Rico, the same as occurred in Spain, concerns have been stated about the adoption of this standard. The concerns mainly revolve around the existence of a solid precedent and the possible effect that this change in the standard would have on juridical security. Similarly, it has been stated that its adoption is against the purpose of the application of solidarity in cases of extracontractual liability. See, J. J. Álvarez González, El Tribunal Supremo De Puerto Rico: Análisis Del Término 2007-2008,78 Rev. Jur. U.P.R. 457 (2009). We differ from said interpretation. As we have stated, the fair balance that we sought to achieve with the application of solidarity in actions for extracontractual damages in reality resulted in a greater protection to the[*38] plaintiff, indefinite postponements of causes of action, among other effects which undermine juridical stability. The standard that we adopt today with regard to the interruption of the term of prescription when there coincide several co-causers of a damage under Art. 1802 of the Civil Code,supra, achieves a fair equilibrium between the parties and harmonizes our code of laws. Nor does it represent a greater burden for the plaintiff, who must only exercise his cause of action with diligence against all of the possible co-causers of the damage *168 whose identity he knows. That is, in total harmony with the cognoscitive theory of the damage. Another concern stated revolved around the fact that the standard which we today adopt was contrary to Rule 51.7 of Civil Procedure of 1979, 32 L.P.R.A., App. III. The aforementioned rule was eliminated from the body of Rules of Civil Procedure of 2009, precisely because it was "contrary to the juridical code of laws, which allowed executing a judgment against a person who was not a party in the action and over which the court did not acquire jurisdiction." Supreme Court of Puerto Rico, Secretariate of the Judicial and Notarial Conference, Report of Rules of Civil Procedure,[*39] March 2008, page 583. Thus, we consider that the need for a change in standard exceeds the concerns stated.---------------------End Footnote--------------------------------
Naturally, the standard adopted today is also in harmony with the cognoscitive theory of the damage, wherefore the prescriptive term commences to count when the aggrieved knew or should have known, if he had employed some degree of diligence, the existence of the damage and who caused it, as well as the necessary elements to be able to effectively exercise his cause of action. CSMPR v. Carlo Marrero et al., 182 D.P.R. 411, 425-426 (2011); COSSEC etal. v. González López et al., supra; Vera v. Dr. Bravo, 161 D.P.R. 308, 328 (2004); Santiago v. Ríos Alonso, 156 D.P.R. 181, 189 (2002).Thus, if through the discovery of evidence or another method the aggrieved becomes aware of the existence of another coauthor and of the rest of the necessary elements to claim from him, the term of prescription against his alleged co-causer will commence to elapse as of that moment. This, since a statute of prescription whose effect is to require that the plaintiff file a cause of action before becoming aware of the existence of the same, violates due process. COSSEC et al. v. González López et al,supra, pages [*40] 821-822;Vera v. Dr. Bravo, supra, page 327;Vega v. J. Pérez & Cía., Inc., 135 D.P.R. 746, 754 (1994).
*169 In this manner we harmonize the standard when there are several co-causers of an extracontractual damage with the cognoscitive theory of the damage and with the substantive figure of prescription, while we respect in turn the minimum of certainty granted by the legislator for this type of relationship. At the same time, through the adoption of improper solidarity we resolve the problem of uncertainty presented by the indefinite duration of the cause of action for civil extracontractual liability. The standard herein established allows the curtailment of the dangerous border where the search for redress of a damage does not find any requirement whatsoever of diligence, despite the express mandate of the provisions of our Civil Code. The diligence in the claim of a right is indispensable in the whole.
We are aware that the previous doctrine is a consolidated one, but said circumstance is not an impediment to harmonizing our juridical code of laws and remedying an injustice. Even though the doctrine ofstare decisis establishes that a court must follow its decisions in subsequent cases, it does not reach[*41] the point of stating that the opinion of a Court becomes a dogma that the Court must blindly follow.Pueblo v. Díaz De León, 176 D.P.R. 913, 921 (2009); A. Railroad Co. v. Comisión Industrial, 61 D.P.R. 314, 326 (1943). That is why when the rationale of a decision no longer resists a careful analysis we are not obligated to follow it.Arizona v. Gant, 556 U.S. 332, 348 (2009). In this manner the consistent development of legal principles is allowed. Pueblo v. Díaz De León,supra; Seminole Tribe of Florida v. Florida, 517 U.S. 44 (1996)
V
The complaint in this case was filed on May 2, 2002. It was six long years in which the plaintiffs contained their claimed against Doctor Mestre Morera, who they finally *170 incorporated into the action on May 21, 2008, through an amended complaint.
The statements of the plaintiff themselves reveals their knowledge about the identity and the participation of Doctor Mestre Morera in the event. Coplaintiff Fraguada Pérez testified that she was in Mrs. Pérez' room, watching the procedure that was being performed by the nurse. It was then when she observed that Mrs.[*42] Pérez started to cough, repetitively. In view of this unexpected situation, Doctor Mestre Morera and another physician went hurriedly to the room. Co-plaintiff herself asked the doctors to do something, while she remained firm at her mother's side. She witnessed the alleged discussion between Doctor Mestre Morera and the other physician regarding the placement of the nasogastric tube in the patient's lung, and the admonishment that one of them launched to his conversational partner about the potential danger of an embolism. The coplaintiff continued at the side of her mother and very near the physicians who -as she testified- alternatively ordered the removal of the patient's tube. In this instance, and before the eyes and presence of the coplaintiff, the tube was taken out from the interior of Mrs. Pérez.
Precisely, the alleged erroneous placement of the nasogastric tube and the alleged discussion of Doctor Mestre Morera are the only two reasons for which the plaintiff claims from the physician in the amended complaint that was filed six years later. From the coplaintiff's testimony, given in a deposition, it clearly appears that as of the day of the event the plaintiffs were aware of the identity of the physician and[*43] his alleged responsibility in the production of the alleged damage, which had its culminating moment months later with the death of Mrs. Pérez. Despite being aware of the above, the plaintiff did not include Doctor Mestre Morera in its original complaint. On the contrary, it decided to do so six years later, an action which demonstrates its negligence *171 and abandonment of this claim.[16] Therefore, pursuant to the standard adopted today, the plaintiff should have individually claimed from Doctor Mestre Morera as an alleged joint and several co-causer within the term of prescription of one year provided in Art. 1868 of our Civil Code,supra, which commenced to count as soon as it became aware of the damage, the identity of the author, and the necessary elements to exercise its cause of action.
------------------------Footnote---------------------------------
16 Notice also that since 2005 the plaintiff had the report of an expert which advised about the deviations in the placement of the nasogastric tube. Despite this, it also did not claim to doctor Mestre Morera, until three years had elapses since it obtained the aforementioned report.-----End Footnote---------------------------------------------------------
Notwithstanding the above, in evaluating the criteria established to declare the retroactive or prospective application[*44] of a judicial finding -reliance deposited by the plaintiffs on the prior standard; purpose pursued by the new rule to determine if their retroactiveness advances it, and the effect of the new standard in the administration of justice- we resolve that our decision should have a prospective effect. See:Isla Verde Rental v. García, 165 D.P.R. 499, 505 (2005); Datiz v. Hospital Episcopal, 163 D.P.R. 10, 18 (2004); Gorbea Vallés v. Registrador, 131 D.P.R. 10, 16 (1992); Correa Vélez v. Carrasquillo, 103 D.P.R. 912, 918 (1975). This is because it is newly minted and the application of said standard to this case would entail substantially unfair results for the appellees, who relied on the previous standard that was displaced by the new standard which we today implement. Considerations of public policy and social order move us to have this new standard have a prospective effect, since the objective pursued is to grant fair and equitable remedies that respond to the best social cohabitation.López v. Porrata Doria, 169 D.P.R. 135, 169 *172 (2006);Isla Verde Rental v. Garcia, supra. Hereinafter all causes of action filed pursuant to Art. 1802 of the Civil Code,supra, [*45] will be judged according to the standard herein stated.
VI
Wherefore, we issue the writ ofcertiorari and revoke the standard ofArroyo v. Hospital La Concepción, supra, with regard to the interruption of the term of prescription in claims under Art. 1802 of the Civil Code,supra, when there are several causers of an extracontractual damage, as well as any other pronouncement incompatible with what is resolved herein. Furthermore, we issue the request forcertiorari filed, we impart a prospective nature to the standard adopted and, as a result thereof, we confirm the resolution issued by the Court of Appeals. We remand the case to the Court of First Instance for the continuation of the proceedings.
Judgment will be issued accordingly.
Luis F. Estrella Martinez
Associate Justice
JUDGMENT
San Juan, Puerto Rico, August 13, 2012.
Pursuant to what is stated in the preceding Opinion, which is made to form part of this Judgment, the writ ofcertiorari is issued and the standard ofArroyo v. Hospital la Concepción, supra, is revoked with regard to the interruption of the term of prescription for claims under Art. 1802 of the Civil Code,supra, when there are several co-causers of an[*46] extracontractual damage, as well as any other pronouncement incompatible with what is resolved herein.
*173 Furthermore, we issue the writ ofcertiorari filed, impart a prospective nature to the standard adopted and, as a result thereof, we confirm the resolution issued by the Court of Appeals. We remand the case to the Court of First Instance for the continuation of the proceedings.
So pronounced, ordered by the Court and certified by the Clerk of the Supreme Court. Associate Justice Mrs. Pabón Charneco dissents with a written opinion, which is joined by Associate Justices Messrs. Rivera Garcia and Feliberti Cintrón.
Associate Justice Mrs. Fiol Matta makes the following statement:
*174 Associate Justice Mrs. Fiol Matta dissents of the decision of the Court that revokes the standard established in Arroyo v. Hospital La Concepción, 130 D.P.R. 596 (1992). The opinions in Arroyo and in García Pérez v. Corp. Serv. Mujeres, 174 D.P.R. 138 (2008), as well as the Dissident Opinion in this case of Associate Justice Pabón Charneco and the article of Professor José Julián Álvarez González Responsabilidad Civil Extracontractual, 78 Rev. Jur. U.P.R. 457, 473 (2009), apply the reasons why the [*47] in solidum doctrine should not be adopted in our jurisdiction.
I coincide with the majority Opinion in the difficulties presented that a potential co-defendant be brought into an action years after the same was filed, as a joint and several co-causer of the damage alleged, because the original complaint interrupted the prescriptive terms of all of the co-causers. Nevertheless, the standard adopted in Arroyo allowed attending this problem, adequately, since it did not impede at all that there be considered, under the doctrine of negligence, those extraordinary circumstances, such as the one in this case, where a plaintiff crosses his arms and is not diligent in finding out the identity of other possible co-causers of the damage or, if known, bringing them into the action. For this, it is not necessary to resort to the in solidum doctrine and dividing extracontractual solidarity between primary and secondary effects. What was pertinent was ruling out an inflexible application of the Arroyo standard and adjusting it to attend situations such as the one in this case, without having to revoke twenty years of precedents and adopting a new interpretation of the Civil Code. The result in this case would have been, without doubt, the dismissal [*48] of the complaint, not by the application of the new doctrine, but because the plaintiff incurred in negligence by crossing its arms and not amending the complaint when he knew the identity of the co-causers.
I am concerned that the new standard will cause more problems than those it resolves and will produce situations where a victim is unnecessarily prejudiced. I believe that the Opinion of the Court partially recognizes this reality and, because of that, is obligated to establish numerous protections, thereby creating an unnecessarily confusing and complicated scheme. UnderArroyo our standards gave priority to the indemnification of the damage suffered by the victim, while it protected the defendants in case of negligence and lack of diligence by the plaintiffs. Now, to protect the potential co-defendants brought tardily into actions, the victims are deprived of one of the main tools to attempt to redress its damages: the simultaneous interruption of the terms of *175 prescription for all of the joint and several co-causers, subject, of course, to the basic rules of law, among them, diligence. I fear that the inevitable consequences of this decision will be the eventual adoption of a standard of[*49] joint liability for cases of extracontractual civil liability, setting aside almost one century of precedents of statutory interpretation which have not been altered by the Legislative Assembly.
I share many of the concerns of the majority Opinion. Without doubt, an inflexible application of the standard inArroyo could produce situations that are obviously unfair for some potential defendants which would be subject to some plaintiffs crossing their arms relying on the fact that the complaint against a co-causer perpetually interrupts the terms of prescription against the rest. But this can be attended without altering the standard in effect up to now. That is why I differ, very respectfully, with the solution adopted."
Aida Ileana Oquendo Graulau
Clerk of the Supreme Court
DISSENSION:
In San Juan, Puerto Rico, August 13, 2012.
I respectfully dissent with the majority Opinion. It makes a normative change of a regressive nature in the field of civil extracontractual liability bypartially adopting the Doctrine ofIn Solidum Obligations.[17] In this manner, the Opinion introduces atertium genus between joint and joint and several obligations which are not recognized[*50] in our *176 rules.[18] In turn, it rules out without further ado a jurisprudence consolidated for the purpose of limiting the term of prescription for the co-causers of a damage that were not brought into the action within the Original complaint.
-------------------------Footnote--------------------------------
17 The majority Opinion adopts the Doctrine ofIn Solidum Obligations "only with regard to the interruption of the term of prescription when there coincide several co-causers of the damage under Art. 1802 of the Civil Code." Majority Opinion, pages 26-27, endnote 11.
18 V. Múrtula Lafuente, LaResponsabilidad Civil por los Daños Causados por un Miembro Indeterminado de un Grupo, Madrid, Ed. Dykinson, 2005, pages 103-104; A. Cristobal Montes,Mancomunidad o Solidaridad en la Responsabilidad Plural por Acto Ilicito Civil, Barcelona, Ed. Bosch, 1985, page 41.-------------End Footnote--------------------------------
Certainly, on occasions the creditor of the damage omits suing one of the co-causers for a prolonged period - despite knowing his identity- and during the course of the action amends the Complaint to include him. This situation which in principle adheres to the language of the law, can be perceived as an abuse of the abnormal exercise of the law when it affects the defense of these co-causers, as well as effective judicial economy.[*51] There is no doubt that our juridical system provides the tools to deal with the difficulties that this type of practice can entail without having to resort to a doctrine that does not adhere to our system.
Let us briefly examine the facts that originated this controversy.
*177 I
On May 2, 2002, the appellee (comprised by Mr. Daniel Fraguada Bonilla, Mr. Héctor L. Fraguada Pérez, Mrs. Ana Hilda Fraguada Pérez, Mrs. Maria de los Ángeles Fraguada Pérez, Mr. Carlos Daniel Fraguada Perez and Mr. Ángel G. Osorio Fraguada) filed a Complaint for damages against Hospital Auxilio Mutuo, Dr. Manuel Anguita Alvarado and two (2) other unknown physicians. In short, it alleged negligence in the medical treatment of Mrs. Hilda Pérez, who died on July 1, 2000. Furthermore, in the Complaint the exception was made that "at the time of filing this complaint they did not know all of the details related to the facts and the same was being filed for the purpose of interrupting the term of prescription".[19]
10 Appendix to the Petition forCertiorari, page 48.
On October 25, 2006, the primary forum issued a Partial Judgment[*52] due to an Amended Stipulation pursuant to which it approved the settlement and released the Hospital Auxilio Mutuo from the claim.[20] This being the case, on April 2008 the appellee requested authorization to amend the Complaint and indicated that as a result of its action in the investigative phase of the evidence there arose information of two (2) other doctors who were negligent in the treatment of Mrs. Pérez. On April 14, 2008, the appellee amended the Complaint to include Dr. Octavio Mestre Morera (hereinafter Mestre Morera or petitioner) and Dr. Noel Totti.
20 Appendix of the Petition forCertiorari, page 64.
*178 On his part, Doctor Mestre Morera filed in his Answer to the Complaint the affirmative defense of prescription on February 10, 2009. He particularly indicated that:
The cause of action which is attempted to be exercised against the appearing party has prescribed. Our current rules promote diligence in the exercise of rights and penalizes negligence. The filing of the amended complaint involved herein to include the appearing party six years after the filing of the original complaint denotes a gross lack of diligence by the [*53] plaintiff. (Emphasis in the original). Appendix of the Petition for Certiorari, page 84.
On April 14, 2009, the petitioner filed a Motion Requesting Summary Judgment based on Prescription.[21] In the same he indicated that there arose from a deposition taken on June 11, 2005 from coplaintiff María de los Angeles Fraguada, that the appellee was aware that Dr. Mestre Morera had intervened in the treatment of Mrs. Pérez. He added that as of that date the appellee already had an expert report in this regard.[22] Therefore, he requested the dismissal of the cause of action in view of the lack of diligence of the plaintiff in exercising its action, since three (3) years had already elapsed since the plaintiff had the necessary information. On the other hand, the appellee indicated that the filing of the Original complaint had interrupted the term of prescription with regard to the other joint and several co-causers and that they could be included in the action through an Amended Complaint pursuant to the law in effect. This request was Denied on July 9, 2009.
21 Appendix to the Petition forCertiorari, pages 85-94.
*179 22 Appendix to the Petition[*54] forCertiorari, pages 99-101.
After the filing of a timely Motion for Reconsideration that was denied by the court of first instance, the petitioner filed a request for certiorari, before the Court of Appeals. It was denied.
Not in agreement, the petitioner appealed to us and stated the following error:
The Court of Appeals erred in applying the doctrine of solidarity between alleged joint and several co-causers without taking into consideration the allegation of negligence argued by the appearing party to sustain that in this case the plaintiff should not benefit from the liberal conditions of prescription, considering that the facts on which the appearing party is being claimed occurred eight years before the filing of the amended complaint in which he is included in the litigation and which pursuant to the cognoscitive theory of the damage, the plaintiff counted with all of the necessary elements to claim from Dr. Mestre Morera three years before the filing of the amended complaint.
II
A.
Civil extracontractual liability, is essentially based on Art. 1802 of the Civil Code, 31 L.P.R.A., sec. 5141. This article prescribes, in what is pertinent[*55] that: "whoever by action of omission causes damages to another, intervening *180 fault or negligence, is obligated to indemnify the damage caused."
In turn, Art. 1868 of the Civil Code, 31 L.P.R.A. sec. 5298, provides a prescriptive term of one (1) year for these actions. They commence to count when the injured party discovered or was able to discover the damage, its causer, as well as the necessary elements to be able to effectively exercise his cause of action.[23] Art. 1869 of the Civil Code, 31 L.P.R.A. sec. 5299. See also,COSSEC et al. v. González López et al., 179 D.P.R. 793, 806 (2010), Ojeda v. El Vocero, 137 D.P.R. 315, 325 (1994). This, since the passing of time entails the loss of the exercise of the rights in order to prevent the uncertainty of the juridical relations and punishes the inaction of the titleholders in the exercise of their rights.García Pérez v. Corp. Serv. Mujer, 174 D.P.R. 138, 147 (2008). Therefore, it must be interrupted pursuant to Art. 1873 of the Cvil Code, 31 L.P.R.A. sec. 5303.
23 "It is not necessary that the injured party know at that time the entire magnitude and extent of the harmful consequences of the corporal injuries since this[*56] point can be established at a subsequent time."Vera v. Dr. Bravo, 161 D.P.R. 308 (2004). Nevertheless, since prescriptive extinction punishes the indolence of the party, if the lack of awareness is due to the lack of diligence of the claimant, then the considerations regarding prescription are not applicable. COSSEC et al. v. González López et al., 179 D.P.R. 793, 806 (2010).
Despite these standards, there constantly appear new issues that require a greater analysis and interpretation of the same to answer new situations which continuously arise in this field. A frequent situation is the plurality of possible co-causers of a damage whose juridical regime is not expressly *181 determined in our Civil Code. This, in turn, generates multiple substantive and procedural difficulties. Let us examine how we have attended the situations of plurality of responsibility in the past.
B.
Faced with multiple causers of a damage through fault or negligence, there is no doubt that each one is obligated to redress the damage caused.Cubano v. Jiménez et al., 32 D.P.R. 167 (1923). Notwithstanding this, one of the difficulties that we face due to the brief statements of the Civil Code,[*57] without this entailing an unsurmountable obstacle, is if the obligation to redress the damage among co-causers is joint or joint and several. Our Code - as well as the Spanish Civil Code- does not expressly state this distinction contrary to most of the foreign Civil Codes.[24]
24 For a succinct narration, see, J. J. Santos Briz,La Responsabilidad por Hecho de Otro Derivada de Acto Ilícito No Penal, enTratado de Responsabilidad Civil (I. Sierra Gil de la Cuesta, cord.) Bosch, T. II, 2008, p. 670; J.J. Álvarez González,Responsabilidad Civil Extracontractual, 78 (No. 2) Rev. Jur. U.P.R. 457, 478 (2009).
As is known obligations with a plurality of subjects can bejoint or several. In principle, Art. 1090 of the Civil Code, 31 L.P.R.A. sec. 3101, provides that when before the concurrence of two (2) or more debtors or two (2) or more creditors, solidarity is not presumed except joint liability. That is, the credit or the debt is presumed divided into as many equal parts as there are creditors or debtors, considering different credits or debts one from the others when from the text of the obligation nothing else is stated. Art. 1091 of the Civil Code, 31 L.P.R.A. sec. 3102.[*58] This since solidarity between debtors aggravates the burden that *182 the debt represents when it is possible that one of the debtors satisfies his debt and that of the other in view of the insolvency of those co-obligated.Arroyo v. Hospital La Concepción, 130 D.P.R. 596, 602 (1992). As we will explain later on, we have already defined that Art. 1090 of the Civil Code is only applicable in the contractual regimen; which interpretation is also not contradicted by the majority Opinion.[25]
25 Majority Opinion, pages 26-27, endnote 11.
On the other hand joint and several obligation is understood to mean
one where there concur several creditors (active solidarity) or several debtors (passive solidarity), or several creditors and at the same time several debtors (mixed solidarity), and where each creditor is entitled to request, and each debtor has the obligation or duty to pay in its entirety, the consideration owed. Arroyo v. Hospital la Concepción, supra, page 600.
In those cases where the joint and several debtor pays the entire consideration, the obligation is extinguished, since the creditor is only entitled to receive it once. Nevertheless, he may recover from the others what he has paid in excess. Art. 1098 of the Civil Code, 31 L.P.R.A. sec. 3109.[*59] A contrario sensu, when the creditor is unable to collect the debt entirely through the claim filed against one (1) or several of the debtors, he may subsequently go against the others. Art. 1097 of the Civil Code, 31 L.P.R.A. sec. 3108.
*183 With the passing of time and after a careful analysis, we have developed a consolidated jurisprudence where it is stated that the juridical regimen in cases of plurality of causers of an indivisible damage is solidarity.[26]Arroyo v. Hospital La Concepción, supra., pages 604-605;García v. Gobierno de la Capital, 72 D.P.R. 138, 145 (1951);García Pérez v. Corp. Serv. Mujer, supra.
26 This jurisprudence is also supported by the prevailing doctrine. M. Martín-Casals y J. Solé,Multiple Tortfeasors under Spanish Law en: W.V.H. Rogers,Unification of Tort Law: Multiple Tortfeasors, The Hague, Ed. Kluwer Law International, 2004, page 189.
Despite prior statements inCubano v. Jiménez, et al, supra, andGarcía v. Gobierno de la Capital, supra, it was inArroyo v. Hospital la Concepcion, supra, that we clarified that the presumption of non solidarity of Art. 1090 does not apply in matters of extracontractual liability. This is because[*60] the rationale of the applicability of Art. 1090 in the contractual field are different. In this regard we indicated that "it is not the will of the parties that creates the obligation, since it arises unilaterally, by virtue of an act freely performed by a person in relation to another; and the law gives efficacy and sanctions the natural obligation to redress the prejudice invoked." (Emphasis in the original suppressed).Arroyo v. Hospital La Concepción, supra, page 602, citing A. BorellMacía, Responsabilidades Derivadas de Culpa Extracontractual Civil, 2da ed., Barcelona, Ed. Bosch, 1958, pág 319. Furthermore, in these cases the obligation arises from Art. 1802 itself, which requires that the obligated redress the damage caused.[27] That is why we adopt the interpretation of the majority doctrine, and at that time in the Spanish jurisprudence, since legal solidarity exists pursuant to Art. 1802 when two (2) or more cause a unique and indivisible damage. See, H.M. Brau,El término Prescriptivo *184 y su Interrupción en Acciones en Daños por Responsabilidad Extracontractual Solidaria en el Derecho Puertorriqueño, 44 (No. 2) Rev. C. Abo. P.R. 203, 204-205 (1983). In this manner the[*63] guarantee of the injured party is increased and he is protected with greater efficacy so that he can receive the entire indemnification in case of the insolvency of any of the causers.[28]
27 "The legal standards ordering solidarity have to be submitted, as is logical, to interpretation". Luis Díez Picazo,Fundamentos del Derecho Civil Patrimonial, Madrid, Ed. Thompson, V.II, 2008, page 2000.
28 In this regard, we have recognized the doctrinal debate.Arroyo v. Hospital la Concepción, supra, 130 D.P.R. 596 (1992).
Pursuant to these principles, we also establish that said "legal solidarity" has the same consequences as in the contractual field. When adopting solidarity between those co-responsible of the same damage, it must be with all its effects, since different types of solidarity are not justified in our Civil Code.Arroyo v. Hospital La Concepción, supra, page 606. See, J.J. Álvarez González,Responsabilidad Civil Extracontractual, 78 (No. 2) Rev. Jur. U.P.R. 457, 504-505 (2009); L.F. Reglero Campos,La Prescripción de la Acción de Reclamación de Daños, enTratado de Responsabilidad Civil, Tomo I, Ed. Aranzadi, 2008, T.I, page 1280; M. Albaladejo García,Interrupción o No de la Prescripción [*62] Frente a Todos los Deudores Solidarios por Reclamación a Uno Solo: Comentario a la Sentencia del Tribunal Supremo de 14 de Marzo de 2003, Rev. Der. Priv. 553 (2003); A. Cristobal Montes,Mancomunidad o Solidaridad en la Responsabilidad Plural por Acto Ilícito Civil, Barcelona, Ed. Bosch, 1985, page 42. As part of these effects, the interruption of the prescription against one affects the others pursuant to Art. 1874 of the *185 Civil Code, 31 L.P.R.A. sec. 5304.Rivera Otero v. Casco Sales Co., 115 D.P.R. 662 (1984). We specifically resolved that[29]
The doctrine of solidarity (consecrated in Garcia v. Gobierno de la Capital, supra) allows bringing to trial filed on time, a joint and several (co-causer) who was not originally [i]ncluded in the action ... through a third party complaint by the original defendant [or] by amendment to the complaint by the plaintiff ... [I]t is only required to alleged well and sufficiently in the complaint - the fact that the new defendant, or the third party defendant, whichever the case, responds jointly and severally for the damages claimed in the original complaint, against whom the complaint was filed within the term of prescription, provided by the rules ... [*63] (Emphasis in the original). Arroyo v. Hospital La Concepción, supra, pages 607-608, citing H.M. Brau, op. cit., page 243. See also, García Pérez v. Corp. Serv. Mujer, supra, page 155.
29 This after examining the French, German, Italian and Spanish doctrines with regard to prescription in these assumptions.
In this regard, the majority Opinion reiterates "that the non presumption of solidarity" does not apply in matters of extracontractual liability.[30] Nevertheless, it eliminates the homogenous treatment of solidarity pursuant to what was established by the Civil Code itself, or at least partially by *186 adopting said doctrine only with regard to prescription. In this manner it creates some effects until then unknown by our juridical rules and whose adoption corresponds to the Legislative Assembly. For this, it embraces the Doctrine ofIn Solidum Obligations, as it explains, "to harmonize the rule when there are several causers of an extracontractual damage with the cognoscitive theory of the damage and with the substantive figure of the prescription, while we in turn respect the minimum of certainty granted by the legislator for this type of relationship".[31] Therefore, let us examine what this[*64] doctrine sustains.
30 Majority Opinion, pages 26-27, sec. 11.
31 Majority Opinion, page 28.
C.
In view of the general rule that solidarity is not presumed, French doctrine has conveniently developed the Doctrine ofIn Solidum Obligations. With the same it attempts to justify that each one of those responsible is obligated to pay the entire debt without any of its effects, among them: prescription, possibility of res judicata with regard to other debtors and the appeal, among others.[32] "For this it distinguishes between two (2) types of solidarity in the scope of passive solidarity: perfect and imperfect solidarity; distinctions not contained in our Civil Code."[33]
*187 32 J.J. Alvarez González, supra, pages 478 nd 504, endnote 206.
33 As recognized by one of the defender of the Doctrine ofIn Solidum Obligations, José Ricardo Leon Alonso:
in our Law ... the in solidum obligation does not have a doctrinal basis on which it can be established, nor a specific standard from where to start; therefore, it will be convenient to successively study the possible placement of the in solidum obligation in the articulate or in the spirit of our C.c., the terminological separation of figures [*65] particularly related and of course, the path through the dark doctrinal panorama. J.R. León Alonso, La Categoría de la Obligación In Solidum, Sevilla, Pub. de la Universidad de Sevilla, 1978, page 27.
To explain this distinction, the majority Opinion borrows the definition ofin solidum obligations provided by José Ricardo León Alonso,. "Solidarity is perfect when it exists among several persons joined by a common interest, which have frequent relations among themselves or know each other", but it is "imperfect when the Law establishes it among persons who do not know each other, who are merely accidental co-debtors or when their relations are sporadic." See: J.R. León Alonso,La Categoría de la Obligación In Solidum, Sevilla, Pub. de la Universidad de Sevilla, 1978, pages 32-33, citing Mourlon,Repetitions Écrites Sur le Code Civil, Paris, T.III, 1896, no 1.260.
*188 34 Majority Opinion, page 15.
As clearly summarized by Prof. Virginia Múrtula Lafuente, the Doctrine ofIn Solidum Obligations:
... is based on specific cases of plurality of debtors, even though one of them responds for all, his responsibility is autonomous from that of the others, since the bond that is derived [*66] from the same is an independent bond, which has arisen on its own (it derives, then from the principle of equivalence of causes -all those who have participated in the harmful fact must be considered authors of the fact-). Contrary to joint and several obligations, where each debtor owes the same consideration, in in solidum obligations identical considerations are owed. With this it tries to avoid specific consequences proper of passive solidarity. Thus, the injured party to preserve its action against each one of the co-authors, must interrupt the prescription in relation to each one of them; the judgment that he obtains with regard to one will not be opposable to the others; and the appeal filed by one against a common judgment will not benefit the others. Nevertheless, common effects are recognized to the joint and several obligation; the creditor can claim the consideration in its entirety from any of the debtors and the payment made by one of them releases all. V. Múrtula Lafuente, La Responsabilidad Civil por los Daños Causados por un Miembro Indeterminado de un Grupo, Madrid, Ed. Dykinson, 2005, pages 103-104
*189 This doctrine was accepted by Spanish jurisprudence. Through[*67] the Judgment of March 14, 2003, the Spanish Supreme Court examined the appeal filed. In that case the plaintiff suffered a serious work accident while working on a construction project. He filed a Complaint claiming indemnification for the damage against the company for which he worked, the promoter of the project and the architect. Nevertheless, when the Judgment had already been issued and due to the insolvency of those condemned, he filed a new Complaint against the technical architect and two (2) insurance companies. The Complaint was dismissed due to prescription. The Judgment indicates that:
... doctrine has recognized together with proper solidarity ... another modality of solidarity called improper, or `in solidum' obligations which originate from the nature of the illegal and that of the plurality of subjects who have concurred in its production, and which arises when it is not possible to individualize the respective responsibilities. All of the rules provided for proper solidarity are not applicable to this last type of solidarity, and especially it does not require that Art. 1.974 of the Civil Code in its first paragraph be taken into consideration...
[When referring to the Judgment of October 31, [*68], 2002, it adds that] the source from where solidarity arises ... is the judgment, and it does not exist previously.35 J. of March 14, 2003, No. 223/2003.
*190 35 In this regard, the majority Opinion accepts that "imperfect solidarity does not arise from a pre-existing bond, but from the illegal act that produces the damage as recognized by the judgment that declares it." Majority Opinion, page 27, endnote 1. This position is highly criticized. See, M. Albaladejo García,Interrupción o No de la Prescripción Frente a Todos los Deudores Solidarios por Reclamación a Uno Solo: Comentario a la Sentencia del Tribunal Supremo de 14 de marzo de 2003, Rev. Der. Priv. 543, 554 (2003).
Nevertheless, the doctrine continues ruling outin solidum obligations, since Juridical Rules divide obligations with a plurality of subjects into joint and joint and several, and in view of this establishes its juridical regimen. See, V. Múrtula Lafuente,op. cit, page 104, M. Martín-Casals and J. Solé,Multiple Tortfeasors under Spanish Law in: W.V.H. Rogers,Unification of Tort Law: Multiple Tortfeasors, The Hague, Ed. Kluwer Law International, 2004, page 193.
III
The fact that the doctrine ofin solidum obligations has been[*69] adopted in Spain, does not deteriorate the fact that our rules only recognize one type of solidarity. In view of this, there are still valid and correct the reasons why we interpret that the obligations arising from the damage caused by a plurality of causers is joint and several, with all of the effects that the solidarity entails. In essence, no distinctions are introduced which do not find justification in the Civil Code, the guarantee of the injured party increases so that he can receive the entire indemnification of his damage, and effective judicial economy is fostered.
*191 Similarly, by including through an Amended Complaint a codebtor not included in the action originally filed improves the position of the solidary co-causer whose defense could be made difficult with the passing of time.
Nevertheless, this does not eliminate a concern of considerable importance: doesn't there exist a temporal limit for the creditor to include through an Amended Complaint a cocauser of the damage whose identity he knows, as well as all of the necessary elements to be able to effectively exercise the cause of action?
Certainly, it is a prerogative of the creditor to file a Complaint against one or all of the co-causers[*70] either under our juridical rules in effect as well as under the proposed Doctrine ofIn Solidum Obligations. Art. 1097 of the Civil Code, 31 L.P.R.A. sec. 3108 stats that:
[t]he creditor can address any of the solidary debtors or against all of them simultaneously. The claims filed against one will not be an obstacle for subsequently addressing them against the others, provided the debt has not been collected in full.
From the article we deduce the options for the creditor to address his action, either (1) against all of the codebtors; (2) against some of them, (3) against only one, or (4) against one and later against others until he collects the entire debt, since only the payment of the debt in its entirety will release all of the codebtors. Art. 1098 of the Civil Code, supra. Furthermore we have recognized that the Doctrine of Solidarity also allows bringing into an action filed in a timely manner a co-causer who was not originally included *192 through an amendment to the Complaint.Arroyo v. Hospital la Concepción, supra, pages 607-608. Nevertheless this right is not absolute or unlimited.
In this regard, Luis Puig and Ferriol illustrates us with the following statements:
[I]t should [*71] be believed that successive judicial claims are possible in the system of the Code insofar as the interest of the creditor has not been entirely satisfied, and without, on the other hand, there being imposed on the creditor to notify the different co-debtors the different procedures that he files, which perhaps could constitute a measure of sound prudence, in order to prevent useless expenses. In any case some of these inconveniences should be established, establishing this ius variandi of the creditor ex article 1.144 C.c. with the principle of good faith (cfr. Arts. 7- and 1.258 C.c.) and with the condemnation of the abuse of the right (art. 7-2 C.c.),36 as would perhaps occur in the case of successive litigations filed by the creditor for the sole purpose of accumulating judicial expenses or eventual condemnations in costs. (Emphasis added) L. Puig y Ferriol, Régimen Jurídico de la Solidaridad de Deudores, en Libro-Homenaje a Ramón M.a Roca Sastre, Madrid, Gráficas Cóndor, V.I, 1976, page 457.
26 After a doctrinal consideration and of jurisprudential application, the Spanish legislator incorporated the abuse of the right to the Civil Code through reform of the preliminary title of 1973-74. Clause 2 of Art. 7 of the Spanish Civil Code[*72] indicates that:
*193 1. Rights must be exercised pursuant to the requirements of good faith.
2. The law does not protect the abuse of the right or the antisocial exercise of the same. Any action or omission which by the intention of its author, by its object or by the circumstances in which they are made manifestly exceeds the normal limits of the exercise of a right, with a damage to a third party, will give rise to the corresponding indemnification and to the adoption of the judicial or administrative measures that prevent the persistence in the abuse. Art. 7 of the Civil Code, Madrid, Ed. Civitas, 1984, page 1554.
In Puerto Rico we do not have an identical provision in the Civil Code.
Similarly, in Puerto Rico we have recognized the principle that rights should be exercised pursuant to the requirements of good faith.Soriano Tavárez v. Rivera Anaya, 108 D.P.R. 663, 670 (1979). Similarly, we have indicated that the law does not protect the abuse of the right or its anti-social exercise. Id. That is, the exercise of any right must be reasonable without it entailing the rupture of orderly social cohabitation, either in its subjective tendency (by the exercise of the right with the intention to cause harm, or without a true interest) or objective[*73] (when the titleholder manifestly exceeds the limits imposed by good faith or by the social or economic goal of that right). Id, pages 670-671. See also, J. Roca,Art. 7.2 en Comentarios a las Reformas del Código Civil: El Nuevo Título Preliminar Y la Ley de 2 de mayo de 1975, V. I, Madrid, Ed. Tecnos, page 375. Furthermore, the behavior pursuant to good faith is a general precept encompassed by any juridical activity and it extends to the entire juridical rules.Velilla v. Pueblo Supermarkets, *194 Inc., 111 D.P.R. 585 (1981). Therefore, our rules provide ways to sanction diligence and avoid excessive conducts. One of them is the principle of the abuse of the right.[37]
37 Similarly, we have also recognized the Doctrine of Negligence to dismiss actions in which neglect or negligence are presented in the claim of a right. For this, the passing of time is not sufficient, since other circumstances have to be evaluated, among them the justification for the delay, the prejudice which it represents and the effect on the interests involved. See,Rivera v. Depto. de Servicios Sociales, 132 D.P.R. 240 (1992);Aponte v. Srio. De Hacienda, E.L.A., 125 D.P.R. 610 (1990).
Nevertheless[*74] we consider sufficient the protection provided by the principle of abuse of the right and which is contained within civil tradition.
The social and economic goal of authorizing amendments to the Complaint is to provide greater guarantees for the person affected to obtain the indemnification of all the damages caused, as well as to foster an efficient judicial economy. Nevertheless the victim has to exercise it reasonably and fairly, and not in an unconcerned manner. Therefore, if it is understood that there was an abuse of the right by the judger, he must admit the adoption of judicial measures, such as the dismissal of the Complaint with regard to that co-debtor.[38] In those cases, the excess translates into affecting the equilibrium between all of the interests, particularly the defense of the defendants, as well as procedural economy; which is why we have concluded that the juridical regimen of solidarity with all its effects applies to this type of case. Therefore, the so-acclaimed "eternal right" that the majority *195 Opinion comments, does not exist.A contrario sensu, we can consider abusive when already having filed the Complaint the creditor amends it to include a co-causer after an unreasonable period of time[*75] since he was aware of his identity and other necessary elements. This is so except when the delay arises from actions or omissions attributable to the co-causer. In this regard, the Legislative Assembly had already determined as reasonable the term of one year. Nevertheless, it is up to the co-debtor to allege said abuse of the right and state the facts from which it arises.
38 Nevertheless, we have stated that the contents of the ethicity of each act must be examined in light of its particular circumstances.Velilla v. Pueblo Supermarkets, Inc., 111 D.P.R. 585 (1981). See also, C. Lasarte Álvarez,Principios de Derecho Civil, Madrid, Ed. Trivium, 1992, page 171.
In harmony with the above, the fact that a doctrine is consolidated does not eliminate that it can be improved or that it respond more efficiently to the challenges of a changing society. Our juridical rules provide the necessary clarity and security to attend the consequences of an obligation that arose by multiple causers of a damage. Therefore, we do not have to resort to confections by other jurisdictions. Making distinctions that the Civil Code does not provide, such as recognizing the existence of two (2) types of solidary obligations[*76] -perfect and imperfect- to be able to select among some effects and rule out others, does not contribute at all to the juridical security of the parties. Therefore, we cannot base ourselves on the idea that the harmony of the juridical rule is achieved through the partial introduction of a figure that is not recognizes in the same.
*196 IV
In this case the appellee interrupted the prescriptive term of one (1) year through judicial claim. In turn, it made the exception that at the time it did not know all of the details related to the facts. Thus, it also sued two (2) unknown physicians. Nevertheless, during the course of the proceedings it became aware of the names of the other doctors who intervened with Mrs. Hilda Pérez, among them Dr. Mestre Morera and an expert report that attributed deficiencies in the diagnostic and treatment that they provided. However, more than three (3) years elapsed since the appellee became aware of all of the elements and brought Dr. Mestre Morera into the action. On the other hand, the petitioner alleged and justified before the instant forum the excess incurred by the appellee. In harmony with what is stated, the delay of the appellee[*77] is excessive and is not in agreement with the goal of authorizing amendments to the Complaint. Nor can this delay be attributed to the actions or omissions of the petitioner.
V
In view of the arguments stated above, I dissent from the majority Opinion. In exchange, I would urge the victims of a damage to promptly file their action against those causers after knowing their identity, if it is their interest of having greater guarantees of obtaining a complete indemnification. Otherwise, they run the risk that their omission be considered as an abuse attitude against the same.
Mildred G. Pabón Charneco Associate Justice
*197 ATTACHMENT III
Quilez-Velar v.Ox Bodies
2017 TSPR 165
[English Translation]
*198 Quilez-Velar v. Ox Bodies, Inc., 2017 WL 4125876 (2017) CERTIFIED TRANSLATION 2017 TSPR 165 2017 WL 4125876 (PR), 2017 TSPR 165 Berardo A. QUÍLEZ-VELAR; Marta Bonelli-Cabán; Berardo Quílez Bonelli; Carlos A. Quílez Bonelli, Petitioners v. OX BODIES, INC., Respondent. In the Supreme Court of Puerto Rico No. CT-2016-10 San Juan, Puerto Rico on August 31, 2017
Attorneys for the Petitioners: José Luis Ubarri García, Esq.; David W. Román Rodríguez, Esq.; Luis R. Mena Ramos, Esq.
Attorneys for the Respondents: Francisco J. Colón Pagán, Esq.; Francisco E. Colón Ramírez, Esq.
Matter: Tort Law-Joint and several debtor may take advantage of the statutory liability limit protecting a municipal codebtor, with regard to the portion of the debt that is attributable to said municipality.
Opinion of the Court issued by ASSOCIATE JUSTICE MDM. RODRÍGUEZ RODRÍGUEZ
*1 We have before us a certified question from the United States Court of Appeals for the First Circuit. This question allows us to analyze the effect of the liability limit protecting a municipality over its joint and several codebtor in an action for damages. As we consider that the certified question presents a novel issue in Puerto Rican law, without the elucidation of which the federal court would be prevented from disposing of the case, we proceed to answer it.
I.
A.
The facts of this case go back to October 1, 2010. On that day, Ms. Maribel Quílez Bonelli, a 28-year-old mother, was driving her car in the far left-hand lane on Ramón Baldorioty de Castro Avenue when she hit a truck property of the City of San Juan. The truck was equipped with a rear bumper designed by the Ox Bodies company. Nevertheless, at the time of the crash, the rear of the truck penetrated the interior of Ms. Quílez Bonelli's vehicle causing her serious injury. Ms. Quílez Bonelli subsequently died as a result of the accident.
Due to the tragedy, Mr. Berardo Quílez Velar, Ms. Marta Bonelli Cabán, Mr. Berardo Quílez Bonelli, and Mr. Carlos Quílez Bonelli, the parents and siblings of Ms. Quílez Bonelli (hereinafter "the plaintiffs"), filed a lawsuit for damages in both state and federal court.
In the Court of First Instance, the plaintiffs filed an amended complaint on November 1, 2011 wherein they claimed negligence and named the Commonwealth of Puerto Rico, the Roads and Transportation Authority, the City of San Juan (hereinafter "the City"), and its insurer, Integrand Assurance Company (hereinafter "Assurance") as defendants. This being the state of things, on May 16, 2014, Assurance deposited $500,000 with the Court of First Instance. This amount represented the maximum amount of the City's liability insurance. Subsequently, the lower court ordered the deposited funds to be delivered to the plaintiffs and dismissed the complaint with regard to the City.
In federal court, the plaintiffs filed an amended complaint against Ox Bodies on March 20, 2013 due to the defective design of the truck's rear bumper. Later, Ox Bodies and its parent company filed a third-party lawsuit against the City of San Juan. On May 16, 2014, the same day that the funds were deposited in state court, the City informed the federal court of the deposit. As a result, the federal court dismissed the complaint with regard to the City on September 4, 2014, with no objection whatsoever from Ox Bodies. Following the trial, the jury concluded that Ox Bodies was liable to the plaintiffs under an absolute liability theory due to the defective design of the rear bumper, and awarded damages totaling $6,000,000. Furthermore, the jury attributed the liability for the damages in the following manner: 20% of the liability was attributed to Ox Bodies, 80% to the City (which was no longer a party to the lawsuit), and 0% to Ms. Quílez Bonelli.
2* Considering this, Magistrate Judge Silvia Carreño Coll determined that Ox Bodies needed only compensate the plaintiffs for the damages *199 for which it was directly liable, that is, 20% of the total amount, which was equal to $1,200,000. The magistrate judge decided that since the City was protected by a liability limit and the latter had already reached this limit by depositing the funds in state court, Ox Bodies had no right to seek recovery from the City. At the same time, Magistrate Judge Carreño Coll reasoned that if a joint and several defendant loses the right to recover from a codebtor due to the immunity or statutory liability limit of the latter, the former can only be held liable to the plaintiff in the proportion of liability assigned. In order to reach this conclusion, she made an analogy with our case law on codebtor recovery against employers in cases of damages filed by workers against a third party.[1] Thus, she concluded that Ox Bodies could not be held liable for the 80% of liability attributed to the City of San Juan.
Dissatisfied with the decision, the plaintiffs filed an appeal with the United States Court of Appeals for the First Circuit. They argued that although Ox Bodies cannot seek reimbursement against the City, it continues to be a joint and several debtor in the total amount of the damages awarded, that is, $6,000,000. Therefore, it must pay the full amount. The Court of Appeals considered that the issue presented an important question for Puerto Rican Tort Law, and, consequentially, certified the following question for us:
Was the magistrate judge correct in deciding to limit the damages awarded against Ox Bodies to 1,200,000 and deny the Quílezes the joint and several damages amounting to $6,000,000 awarded by the jury? (our translation)2
II.
A.
Interjurisdictional certification allows federal courts and supreme courts of the different states of the United States of America to submit to us questions of Puerto Rican Law the answer to which may determine the result of a legal matter pending before the requesting court. See Muñiz-Olivari v. Steifel Labs., 174 DPR 813, 817 (2008).
As the rule that allows for it provides, interjurisdictional certification has two requirements: that the certified question may determine the result of the legal matter and that there are no clear precedents in our jurisprudence. 4 LPRA sec. 24s (g). In the past, we have refused to answer a certified question where the federal court could ignore our answer and decide said matter under federal grounds that were different from our own. See Pan American Computer Corp. v. Data General Corp., 112 DPR 780 (1982). This is because, in such cases, our decision would be an advisory opinion.Id. pg. 794.
*3 In the instant case, our answer to the certified question would put an end to the legal matter pending before the Court of Appeals and there is no precedent in our jurisprudence that would unequivocally decide the case. This being the state of things, we are in a position to consider the interjurisdictional certification filed.
B.
Obligations involving a multitude of debtors may be of a several or of a joint and several nature. While in the case of a several obligation each debtor must answer for his or her part of the debt independently, with a joint and several obligation, each debtor has the duty to satisfy the full amount of the credit had by the creditor. 31 LPRA sec. 3101; see Fraguada Bonilla v. Hosp. Aux. Mutuo, 186 DPR 365, 375 (2012); see also Eduardo Vázquez Bote,Tratado teórico, práctico y critico de Derecho privado puertorriqueño, t. V, pg. 136 (1991). Furthermore, in joint and several obligations, a joint and several debtor who has paid the full amount of the debt may later claim from his or her codebtors the portion corresponding to each of these by way of an action for recovery. 31 LPRA sec. 1098; see García v. Gobierno de la Capital, 72 DPR 138 (1951).
Now then, in our legal framework, Art. 1090 of the Civil Code establishes a presumption of severalty, except where otherwise expressly agreed to. 31 LPRA 3101. Nevertheless, jurisprudentially, we have rejected the application of the presumption of severalty to the field of tort law for the sake of protecting the injured party. Thus, in a tort law action, any of the joint tortfeasors is liable for the payment of the indemnity in full. See Maldonado Rivera v. Suárez, 195 DPR 182, 195-96 (2016).
*200 As we have mentioned, in joint and several obligations, each debtor is bound to answer for the full amount of the debt. As such, in order to recover his or her credit, a creditor may file an action against any of the joint and several debtors or against all of them simultaneously. See 31 LPRA sec. 3108. Nevertheless, in the instant case, the joint and several codebtor is a municipality, protected by a liability limit established in the Autonomous Municipalities Law. 21 LPRA sec. 4704. Since the City of San Juan is insured, the applicable statutory liability limit is "the extent of the collectible indemnity actually provided by such insurance with regard to a particular occurrence". 26 LPRA sec. 2004. For this reason, the plaintiffs would be unable to recover from this party an amount greater than that allowed by the liability limit, that is, the maximum amount of the City's insurance.
We have yet to consider if a joint and several codebtor of a municipality can be required to pay the full amount of the debt, regardless of whether the amount of the debt attributed to the municipality exceeds the liability limit protecting the latter.
C.
We have had more than one opportunity to analyze the consequences of a debtor's statutory immunity on a fellow joint and several codebtor.
*4 In the context of the immunity of an employer for workplace accidents, the question was decided more than fifty years ago. In Cortijo Walker v. AFF, 91 DPR 574 (1964), the defendant attempted to file a third-party lawsuit to hold the plaintiff's employer liable for the damages suffered. This, despite the fact that the plaintiff's damages were sustained at the workplace and that, therefore, the employer was immune to a direct claim from the worker due to the Worker's Compensation for Workplace Accidents Law. On that occasion, we concluded that "statutory immunity may not be dissolved through the indirect means of a third-party lawsuit."Id. on pg. 582. Therefore, had the final resolution been that the employer was liable for a portion of the damages, it would not have been possible file an action seeking the recovery of what was paid in excess.
Subsequently, faced with a factual situation similar to that in Cortijo Walker, we concluded that the employer whom
the defendant was attempting to bring into the case as a third-party defendant, "would not be held liable indirectly as a third-party defendant, nor could the defendant be later reimbursed by the employer as a collaborator in the damages".Viuda de Andino v. AFF, 93 DPR 170 181 (1966). However, in Viuda de Andino, we went even further when we held that, due to the immunity of the employer who collaborated in the damages, the defendant was only obligated to pay damages "in proportion to its own fault and to the extent that it collaborated to produce it".Id. on pg. 182. We reiterated said rule the following year in Rosario Crespo v. AFF, 94 DPR 834, 849 (1967).
In this manner, we came to a similar conclusion in relation to intrafamily immunity in the field of tort law established in Art. 1810A of the Civil Code. See 31 LPRA sec. 5150. After wavering for a few decades with regard to the applicable rule in these cases,[3] in Colón Santos v. Coop Seg. Múlt. PR we concluded definitively that:
[I]n a case where a minor suffers damages due in part to the fault or negligence of their close family circle, it is appropriate to discount the proportion of negligence of said family member from the sum total of the damages awarded to the plaintiff, regardless of whether this means reducing the indemnity of the minor that suffered the damages. Colón Santos v. Coop Seg. Múlt. PR, 173 DPR 170, 184 (2008).
We decided thus because said solution avoids a subsequent recovery action against a family member who jointly caused the damage, which would completely undermine the protection conferred by way of statutory immunity. Seeid. As Professor Álvarez González has commented, the solution we came to in Colón Santos was "correct and rigidly just" as it avoids "the functional equivalent of a lawsuit among members of a nuclear family for the damages suffered by one of them". José J. Álvarez González,Responsabilidad Civil Extracontractual, 78 REV. JUR. UPR 457, 467-68 (2009).[4]
*5 First of all, in the cases we have summarized, we prevented a defendant from exercising an action to recover against a joint tortfeasor who was statutorily immune. As we have indicated, allowing an action to recover under those circumstances would practically undermine the immunity conferred by law to the joint tortfeasor who caused the damages. That would be *201 unacceptable, since it would imply bypassing the strong public policy considerations that led legislators to confer immunity to certain persons.
Second, we reject imputing a joint and several codebtor with the responsibility of paying for a portion of the damages that is attributable to a codebtor who is protected by statutory immunity. If a codebtor is immune due to a law that so prescribes, their portion of the debt should not be a part of the joint and several debt. Likewise, if a codebtor is protected by a liability limit stipulated by law, as in the instant case, then their portion of the debt cannot exceed the established limit.
Finally, we must point out that the logic that underlies all of these cases is explicitly framed in our Civil Code. Art. 1101 lists the exceptions that joint and several debtors may invoke against claims from creditors. The jurisprudence adopting the joint and several rule in tort law cases never discussed this article; nevertheless, it is an essential part of joint and several obligation theory. The cited article reads as follows:
A joint and several debtor may use against claims by a creditor, all the exceptions arising from the nature of the obligation and those personal to the debtor. Those personally pertaining to the others, may only be employed by the debtor with regard to the share of the debt to which the former may be liable. 31 LPRA sec. 3112.
As the treatise writer Gómez Ligüerre explains with regard to Art. 1148 of the Spanish Civil Code, which is analogous to our Art. 1101, the phrase "share of the debt refers to the internal relationship [among the debtors] and, contrary to the purpose that passive joint and several obligations respond to, one of the codebtors is allowed to raise before the creditor exceptions that are not their own nor arise from the obligation". Carlos Gómez Ligüerre,Solidaridad y derecho de daños: Los limites de la responsabilidad colectiva, 69 (2007). As Josée Puig Brutau reasons:
We are, of course, dealing with norms guided by public policy criteria, rather than an inflexible derivation of the nature of
the joint and several obligation. Furthermore, if it were not so established, the creditor could avoid the effect of the personal exceptions of some debtors by going against any of the other obligated parties. José Puig Brutau, Fundamentos de Derecho Civil, t. I, v. II, pgs. 170-71 (3rd ed., 1985).
*6 For example, Vázquez Bote illustrates that "the creditor who entered into an agreement with a minor may elude the special voidability rule by making claims against the remaining debtors ... and the debtor against whom the payment is claimed may refuse to satisfy the proportion for the minor, precisely because he or she is a minor." Eduardo Vázquez Bote,Tratado teórico, práctico y critico de Derecho privado puertorriqueño t. V pg. 146 (1991).
While it is true that the cases discussed above do not mention this article, in practice, they applied its postulate to the letter. Immunities or liability limits established by law are personal exceptions or defenses that a debtor may raise. Thus, a debtor may take advantage of the immunity or statutory liability limit of another codebtor in the portion of the debt for which said other party is liable. Therefore, today we hold that a joint and several debtor may make use of the statutory liability limit that protects a municipal codebtor in the portion of the debt that is attributable to this municipality.
III.
In the instant case, due to the liability limit established by law, the plaintiffs were only able to recover up to $500,000 from the City of San Juan, the maximum amount of the actual collectable indemnity provided by the City's insurance. Therefore, before the plaintiff's, the City of San Juan has a personal defense of statutory liability limit. Now then, the amount of $500,000 had already been deposited with the Court of First Instance, and for this reason the plaintiffs were unable to recover additional monies from the City in federal court, and for this reason the case against the City was dismissed. With regard to the joint and several codebtor that remained in the case, Ox Bodies, this party had the option of raising the personal defense of the City as it pertained to the part of the debt for which the City was liable, *202 that is, eighty percent (80%). And it did so. Therefore, Magistrate Judge Carreño Coll was correct in limiting the final liability of Ox Bodies to $1,200,000, equal to twenty percent (20%) of the damages awarded by the jury.
Judgment will be entered accordingly.
JUDGMENT
For the grounds set forth in the preceding Opinion, which shall be made a part of this Judgment, we hold that Magistrate Judge Carreño Coll was correct in limiting the final liability of Ox Bodies to $1,200,000, equal to twenty percent (20%) of the damages awarded by the jury.
So agrees the Court and is certified by the Clerk of the Supreme Court. Associate Justice Mdm. Pabón Charneco did not intervene. Associate Justice Mr. Estrella Martínez issued a Concurring Opinion.
Juan Ernesto Dávila Rivera
Clerk of the Supreme Court
Concurring opinion issued by ASSOCIATE JUSTICE MR. ESTRELLA MARTÍNEZ
*7 I am in agreement with the ruling issued by this Court in concluding that due to the liability limit established in the Commonwealth of Puerto Rico Autonomous Municipalities Law,infra, a joint and several codebtor of a municipality in an action for damages may raise said defense and make use of the limit with regard to the portion of the debt attributable to said municipality. However, in light of the jurisprudential void that exists regarding the application of Article 1101 of the Civil Code,infra, I believe it adequate to expound on its effects.
With this in mind, I proceed to set forth the factual and procedural background that gave rise to the issue before us.
I
On October 1, 2010, Ms. Maribel Quílez Bonelli (Ms. Quílez Bonelli) was driving a motor vehicle with her minor child as a passenger. On her way, she hit a truck belonging to the City of San Juan (City), which was stopped. The truck had, on its rear section, a
bumper designed by the Ox Bodies, Inc. company (Ox Bodies). When the crash occurred, the bumper penetrated the interior of the vehicle. Five days later, Ms. Quílez Bonelli died due to the injuries sustained in the accident.
As a result of these events, Ms. Quílez Bonelli's family (plaintiffs) filed actions for damages in both state and federal court. Specifically, in the Court of First Instance they sued the Commonwealth of Puerto Rico, the Roads and Transportation Authority, the City and its insurer. For its part, the City sued Ox Bodies as a third-party defendant. Similarly, the plaintiffs sued Ox Bodies in the Federal District Court for the District of Puerto Rico (District Court), since there was diversity of citizenship. The latter party in turn brought in the City and its insurer as third-party defendants.
This being the state of things, the plaintiffs settled and agreed with the City in the Court of First Instance that its insurer would deposit the maximum amount of its public liability coverage, that is, $500,000. The amount deposited was to be distributed among the plaintiffs if the City were to be held liable. Pursuant to this agreement, the lawsuit in state court was dismissed with regard to the City and its insurer, as well as the third-party defendant, Ox Bodies. When the District Court was notified of the deposit with the state court, the federal lawsuit against the City was dismissed. Nevertheless, the action against Ox Bodies remained.
In federal court, the jury awarded $6,000,000 in damages, which it distributed in the following manner: 80% of the liability was attributed to the City and 20% of the liability to Ox Bodies. Despite being a joint and several codebtor, the District Court held that Ox Bodies should only answer for 20% of the amount awarded, that is, $1,200,000. Said forum underscored that, due to the liability limit protecting the City, Ox Bodies was deprived of its right to recover from said entity. As a result, the court decided that Ox Bodies was only bound to indemnify the plaintiffs for the damages it had caused directly. To sustain its decision, the court made an analogy between the limited liability of municipalities and the immunity of employers in claims for damages.
*203 *8 Dissatisfied, the plaintiffs went before the United States Court of Appeals for the First Circuit (Court of Appeals). In essence, they argued that Ox Bodies, like all joint and several codebtors, was liable for the full amount of the debt before its creditor. Similarly, they argued that the internal relationship of the codebtors should not affect the damages awarded to the plaintiffs.[5] For its part, Ox Bodies maintained that it should not be held liable for the full amount of the damages, since it has no right to recover from the City.
The Court of Appeals understood that the issue was unprecedented in Puerto Rican Law, and for this reason it filed an interjurisdictional certification with the following question:
Was the magistrate judge's decision correct in limiting the damages awarded to the Quílez-Velar family to 1,200,000 corresponding to the percentage of liability attributed to Ox Bodies and denying the joint and several damages amounting to $6,000,000 as determined by the jury?
Having examined the factual situation, we now proceed to set forth the legal framework that is applicable to the issue we consider herein.
II
Autonomous municipalities in Puerto Rico enjoy liability limit in cases of damages. The Commonwealth of Puerto Rico Autonomous Municipalities Law (Autonomous Municipalities Law) specifies that they shall only answer for a maximum of $75,000 per person or $150,000 where damages have been caused to more than one person or when there are several causes of action. The Autonomous Municipalities Law, Law No. 81 of August 30, 1991, as amended, 21 LPRA sec. 4704. However, where a municipality has obtained liability insurance, it shall answer up to the maximum amount of the coverage. Puerto Rico Insurance Code, 26 LPRA sec. 2004.
Recently, we defined the term liability limit. We indicated that it refers to "a limit imposed by the Legislature on the collectible amounts for actions or omissions involving fault or negligence".Rodríguez Figueroa v. Centro de Salud Mario Canales Torresola, decided on April 12, 2017, 2017 TSPR 53, pg. 4. That is, we explained that in the case of limited liability there is a cause of action, but the indemnity for the damages suffered will be limited. Consequentially, this limitation established in the Autonomous Municipalities Law may be raised as a defense against claims from a creditor.
III
A.
As is well known, "[a] person who by an act or omission causes damage to another through fault or negligence shall be obliged to repair the damage so done." PR Civ. Code, Art. 1802, 31 LPRA sec. 5141. The cited article "protects the general duty of diligence necessary for social coexistence". Carlos J. Irizarry Yunqué,Responsabilidad Civil Extracontractual: Un estudio basado en las decisiones del Tribunal Supremo de Puerto Rico, 7th ed., 2009, pg. 19 (citing Muñiz-Olivari v. Steifel Labs., 174 DPR 813, 818 (2008). For this reason it has been determined that the obligation to compensate the injured party arises from the damages.Agosto Vázquez v. F.W. Woolworth & Co., 143 DPR 76, 81 (1997).
*9 As it pertains to obligations, it is well known that that where there is more than one debtor, these may be classified as several or joint and several. "In the case of the first, the debt may be divided and each debtor answers only for the corresponding part. In the case of the second, the debt is considered indivisible and each debtor answers equally for the full amount of the debt."Maldonado Rivera v. Suárez, 195 DPR 182, 194 (citation omitted). In this regard, the Puerto Rico Civil Code establishes that where several creditors or debtors concur in an obligation, the latter is presumed to be several. PR Civ. Code. Art. 1090, 31 LPRA sec. 3101. Nevertheless, this Court has held that this principle is inapplicable when it comes to tort law and that, therefore, liability for damages caused is joint and several.Sánchez Rodríguez v. López Jiménez, 118 DPR 701, 705 n. 2 (1987).
In this regard, joint and several liability is based on its usefulness as an instrument with which to satisfy, in the best way possible, the purposes of the relationship from which it is born. In the case of joint and several debtors, that usefulness would be the increased security of the satisfaction of the debt promptly and with the creditor having the ability to choose which debtor is capable of complying in the best way possible. M. Albaladejo,Comentarios al Código Civil y Compilaciones Forales, Madrid, Editorial Revista de Derecho, Madrid, Privado *204 1983, T. XV, Vol. II, pg. 227. It is for these reasons that the main characteristic of joint and several obligations is the transcendence of the actions of each one of the subjects with respect to the other creditors or to the debt. #Id., pg. 258. In other words, the usefulness of joint and several obligations among debtors, that is, passive joint and several obligations, is to make the position of the creditor more secure. This is so because where there are more debtors, each one can be required to answer for the full amount of the debt. Once the creditor has been satisfied, the debtors may settle the matter amongst themselves. M. Albaladejo,Derecho Civil, 8th ed., Barcelona, Librerí Bosch, 1989, T. II, Vol. I pg. 105.
For the reasons stated above, joint and several obligations imply an external relationship between the creditor and the codebtors, wherein each debtor is answerable for the full amount of the debt before the creditor.Torres Ortiz v. ELA, 136 DPR 556, 563-564 (1994). Similarly, an internal relationship arises among the codebtors that "allows the joint and several debtor who has paid more than what is proportional to claim the corresponding proportions from the remaining codebtors".Szendrey v. Hospicare, Inc., 158 DPR 648, 654 (2003) (citing the PR Civ. Code, Art. 1098, 31 LPRA sec. 3109). This internal relationship is called the "right of recovery, repayment, reimbursement, contribution, or return". J.R. Vélez Torres,Derecho de Obligaciones, Curse de Derecho Civil 2nd ed. Rev. San Juan, 1997, pg. 93. Now then, let us examine the effects of Article 1101 of the Civil Code on the issue we have formulated.
B.
*10 The Puerto Rico Civil Code establishes the following in Article 1101:
A joint and several debtor may use against claims by a creditor, all the exceptions arising from the nature of the obligation and those personal to the debtor. Those personally pertaining to the others, may only be employed by the debtor with regard to the share of the debt to which the former may be liable. 31 LPRA sec. 3112.
This precept is from Article 1148 of the Civil Code of Spain, which shares the same text. By way of these provisions, both jurisdictions contemplate a "well-founded exception to the principal of joint and several obligations". E. Vázquez Bote,Derecho Civil de Puerto Rico, San Juan, FAS, Ediciones Jurídicas. 1973, T. III, Vol. I, pg. 159.
Treatise writers of Puerto Rican and Spanish Law acknowledge that Article 1101 and Article 1148, respectively, weaken the principles of joint and several obligations that establish that each debtor is answerable for the full amount of the debt to the creditor. "[I]t supposes a deviation from the principle that we are dealing with a joint and several obligation, as the content of the internal relationship surfaces in the external relationship." Albaladejo,Derecho Civil, op. cit., pg. 100. Nevertheless, they highlight that "instead of being an inflexible derivation of the nature of the joint and several obligation", owing to public policy criteria, a debtor is allowed to raise defenses had by the other debtors or his own in order to avoid "paying someone else's debt where it is also undue". José Puig Brutau,Fundamentos de Derecho Civil, 3rd ed. rev., Barcelona, Bosch, Casa Editorial, S.A., 1985, T. I, Vol. II, pgs. 170-71. The purpose, therefore, is to avoid a restrictive interpretation of joint and several obligations that would lead to a debtor paying a debt "without the possibility of later claiming, whether definitively or temporarily, repayment from a codebtor" J. Castán Tobeñas,Derecho civil español, común y foral, Madrid, 17th ed., Ed. Ruis S.A., 2008, T. III, pg. 168.
For these reasons they believe that this "exorbitant effect need not be a part of the typical structure of joint and several obligations among debtors, since no one should he obligated to answer for a nonexistent debt, unless it has been expressly agreed to". A Cañizares Laso,et. al., Código Civil Comentado, Navarra, Civitas, Vol. III, T. IV, 2011, pg. 310. What's more, they acknowledge that "the joint and several debtor may use, even externally, as with any debtor, all the defenses available against a claim for an obligation that he has incurred and of which he is the main obligated party". #Id., pg. 311. This would resolve "the old concern of why joint and several debtors must bear and prorate the portion of the common debt that one of them rigorously does not owe insomuch as he can raise an exception for having to make said payment". A. Cristobal Montes,Excepciones oponibles por el deudor solidario, 74 Revista de Derecho Privado 863, 874 (1990).
*11 It has been argued that the intention of the Legislature was not to extend the consequences of joint and several obligations to the extreme of preventing the application of personal exceptions. Despite the fact that the purpose of joint and several obligations is to guaranty that the rights of creditors are not reduced and allow them to claim from each debtor *205 without limitation or condition, it has been pointed out that it may be unlawful, in certain circumstances such as the nullity of the obligation with regard to a debtor, for it to be conserved in full with regard to the remaining debtors. It is to this effect that personal exceptions for debtors have been recognized. Q. Micius Scaevola,Código Civil Comentado y Concordado Extensamente y Totalmente Revisado y Puesto al día Francisco Ortega Lorca, 2nd ed., Madrid, Institute Editorial Reus, 1957, T. XIX, pgs. 880-882. Therefore, "the incapacity of one of the joint and several debtors ... may be alleged by the party lacking capacity to free himself fully from immediate payment; and by another to free himself from the portion of the debt corresponding in the internal relationship-in reality-to the party lacking such capacity." J.L. Lacruz Berdejo,Elementos de Derecho Civil, 5th ed. rev., Madrid, Dykinson, 2011, T. II, Vol. I, pg. 43.
Article 1101 does not specify which defenses joint and several codebtors may raise. Furthermore, the difficulty in knowing which specific exceptions have been derived from this article has been acknowledged. J. Caffarena Laporta,La solidaridad de deudores: Excepciones oponibles por el deudor solidario y modos de extinción de la obligación en la solidaridad pasiva, Madrid, Editorial Revista de Derecho Privado, 1980, pgs. 1-2. However, the article does specify that debtors may raise the following: (1) exceptions that have been derived from the nature of the obligation; (2) personal exceptions of a debtor who has been sued; and (3) personal exceptions of the other debtors.
Exceptions derived from the nature of the obligation are those that come from the origin of the latter and that arise during its development or that affect the validity thereof Cañizares Laso,op. cit. They refer to "the defenses derived from the content, creation, vicissitudes, and generally, the objective circumstances of the debt". M. Albaladejo,Comentarios al Código Civil y Compilaciones Forales, op. cit., pgs. 90-91. Their particular characteristic is that they may be raised by any of the joint and several debtors and they affect the entire group of debtors. M. Albaladejo,Comentarios al Código Civil y Compilaciones Forales, op. cit., pg. 394.
In terms of personal exceptions, claims for defect of consent and lack of capacity to enter into agreements are typically referenced.
Cañizares Laso,op. cit. See also Vélez Torres,op. cit., pg. 91. Nevertheless, personal defenses may be broader and more general:
*12 The word `personal' applied to exceptions that concur singularly with each debtor, does not exclusively and rigorously mean that they refer to the circumstances of his personal capacity or special consent, rather they encompass all those exceptions that in a special way are present in his own debt.
When speaking of personal exceptions, we mean peculiarities of each partial obligation included in the joint and several obligation, whether because, even where it is just one obligation, it must, in the end ... be considered divided among the various obligated parties. J.M. Manresa y Navarro, Comentarios al código civil español, 6th ed., Madrid, Institute Editorial Reus, 1967, T. VIII, Vol. I, pgs. 536-537 (emphasis added).
That is, what constitutes a personal defense can be interpreted liberally, always bearing in mind that personal defenses in the name of other debtors only free the debtor using them from the part of the debt corresponding to the debtor to whom the exception personally applies. Cañizares Laso,op. cit. Albaladejo maintains that personal exceptions "originate from the particular and distinct relationship between the creditor and each one of the debtors". Albaladejo,Comentarios al Código Civil y Compilaciones Forales, op. cit., pgs. 393-394. He also points out that "[t]he codebtors of the holder of the personal exception are not bound to pay the part of the debt that, by virtue of such exception, is extinguished for the benefit of them all." #Id., pg. 398.
This Court has not directly addressed Article 1101 of the Civil Code. Nevertheless, recent opinions have shown a tendency toward an evolutionary interpretation of joint and several obligations in the field of tort law that reflects coherence with the use of this article.
Thus, for example, in Fraguada Bonilla v. Hospital Auxilio Mutuo, this Court incorporatedin solidum joint and several obligations from France and adopted by Spain to our tort law framework as it pertained to the statute of limitations.Fraguada Bonilla v. Hospital Auxilio Mutuo, 186 DPR 365 (2012). Imperfect orin solidum joint and several obligations sustain the principal effect that *206 each of the debtors is answerable to the injured party for the full amount of the debt. #Id., pg. 380 (citing A. Cristóbal Montes,Mancomunidad o solidaridad en la responsabilidad plural por acto ilícito civil, Barcelona, Bosch, Casa Editorial, S.A., 1985, pg. 36). However, different from ordinary joint and several obligations,in solidum joint and several obligations do not have the secondary effect of representation among the codebtors. Rather they contemplate a sort of autonomy among the debtors because, contrary to a contractual relationship, they are not "encouraged by a common will". #Id., pg. 381 (citing C. Gómez Ligüerre,Solidaridad y derecho de daños: Los limites de la responsabilidad colectiva, Navarra, Editorial Aranzadi, S.A., 2007, pg. 99). Consequentially, we held that the party affected by an injury must interrupt the statute of limitations of the cause of action against each on of the joint tortfeasors.
*13 Subsequently, in Maldonado Rivera v. Suárez, we sustained the incorporation ofin solidum joint and several obligations in establishing that a tortfeasor who has not been included in the action for damages within the statute of limitations cannot later be brought in as a third-party defendant.Maldonado Rivera v. Suárez, 195 DPR 182, 208 (2016). Furthermore, following the logic of Fraguada Bonilla v. Hospital Aux. Mutuo, we concluded that there is also no right to recovery against said party, because it would be unnecessary. An action that has lapsed against one joint and several debtor implies that this party's obligation has been extinguished before the creditor and the remaining tortfeasors. #Id., pg. 210.
Despite the fact that this Court did not mention Article 1101 in its opinions, said article is certainly coherent with these interpretations. As is provided in Article 1101, joint tortfeasors were allowed to raise defenses derived from the nature of the tort obligation-in those cases it was the statute of limitations-in order to reduce the amount of the damages for which they are directly liable. This Court, therefore, favored the evolution of joint and several obligations in order it pursue a "more equitable distribution of the damages and of the risks, avoiding the drastic distinction of the Civil Code obligating `all' or nothing as it pertained to fault or any other circumstance". J.R. Leóon Alfonso,La categoría de la obligación in solidum, Sevilla, Publicaciones de la Universidad de Sevilla, 1978, pg. 103.
It is worth mentioning that the Supreme Court of Spain has in deed acknowledged the defenses that arise from their Article 1148. In a tort law case due to an automobile accident, said supreme forum stated that "each one of the debtors must comply entirely with the indemnity, each joint and several debtor having the option to, in cases such as this one under Art. 1148, ... use all exceptions that may be derived from the nature of the obligation." S. May 7, 1993, No. 3464/1993. That very year, The Supreme Court of Spain acknowledged the lapsing of the statute of limitations as a defense for a joint and several codebtor. S. June 23, 1993, No. 4722/1993.
C.
In Puerto Rico, joint and several obligations have certain exceptions. One of them occurs, for example, where employers who provide their employees with insurance under the Workplace Accidents Compensation System Law cannot be sued for damages. Workplace Accidents Compensation System Law, Law No. 45 of April 18, 1935, 11 LPRA sec. 21. We have sustained this immunity in prohibiting a defendant in an action for damages from suing the employer as a third-party defendant.Cortijo Walker v. AFF, 91 DPR 574, 582 (1964). In line with this, later, we held that the codebtors of an employer who has immunity are only answerable "in proportion to their own fault".Viuda de Andino v. AFF, 93 DPR 170, 182 (1966). See also Rosario Crespo v. AFF, 94 DPR 834, 849 (1967). Therefore, in these cases, there is no need to seek recovery from the employer, because the amount of liability attributable to the employer has been discounted from the indemnity awarded to the injured party.
*14 Another exception to joint and several liability is intrafamily immunity. PR Civ. Code, Art. 1810(A), 31 LPRA sec. 5150.Colón Santos v. Coop Seg. Múlt. PR, 173 DPR 170, 184 (2008). As with employer immunity, in these situations, the amounts awarded for damages are reduced by the percentage attributable to the family member.Id. For this reason, joint tortfeasors cannot sue the family member as a third-party defendant or seek recovery from the latter.
In both circumstances, immunity, as an exception to joint and several liability, implies that the injured party will not be indemnified for the full amount of the damages suffered.
*207 The proportion of fault attributed to joint tortfeasors with immunity will not be compensated, since it is discounted from the total amount of the damages awarded. For this reason, joint tortfeasors cannot sue the immune party as a third-party defendant or seek recovery from said party. Immunity, then, constitutes a significant exception to the general principle of joint and several obligations that requires all debtors to answer for the full amount of the debt.
D.
Additionally, we must be advised that Article 1098 of the Puerto Rico Civil Code clearly establishes that the financial insolvency of a joint and several debtor will be absorbed by the remaining codebtors. PR Civ. Code, Art. 1198, 31 LPRA sec. 3109. In cases where a codebtor is financially incapable of paying his share of the damages for liability, his joint and several codebtors shall pay the portion corresponding to the former of the debt prorated among them all.Id. Due to the express nature of the provision, financial insolvency cannot be a defense raised by a joint and several codebtor against a claim by the creditor under Article 1101. Albaladejo concurs with this view when he states that "although his portion has been assessed, the debtor has not been freed from his obligation to provide for ... the insolvency of other codebtors." M. Albaladejo,Derecho Civil, op. cit., pg. 100. See also Gómez Ligüerre,op. cit., pg. 69.
Now then, it is relevant to underscore that financial insolvency is distinguishable from the limited liability of a municipality. The Legislature made sure to expressly provide that financial insolvency shall not be an impediment for indemnifying a creditor for the damages awarded. In such cases, the remaining codebtors supply the liability of the insolvent codebtor proportionally. As such, "the risk of insolvency is mutually covered". Puig Brutau,op. cit., pg. 173 (citation omitted). In this way, our Legislature provided a remedy so that the risk may be assumed in a proportional manner. In contrast, as we have shown, in the case of the limited liability of municipalities, there is no rule that provides
any process whatsoever for the distribution of liability among the joint and several codebtors in these circumstances.
IV
*208 *15 Pursuant to Article 1101 of the Civil Code, recent pronouncements of this Supreme Court, and the interpretations of treatise writers, I conclude that a joint and several codebtor may raise the liability limit protecting another codebtor as a personal defense of the latter for not having to answer for his percentage of the liability. Certainly, a codebtor's liability limit is a peculiarity that arises from one of the partial obligations, which constitutes a personal defense in accordance with Article 1101 of the Civil Code. See Manresa Navarro,op. cit. In this way, we may avoid a scenario where every party who coincides with a municipality is obligated to pay the portion left uncovered due to the liability limit conferred by law to the latter. The effect of allowing this defense is to subtract from the joint and several debt the amount corresponding to the debtor with limited liability. Therefore, as we held in Maldonado Rivera v. Suárez,supra, the discussion on recovery would be unnecessary, since the codebtors will not pay in excess of their liability.
Having provided this picture, I am in agreement with what has been provided in the Majority Opinion. The reasoning set forth herein regarding the above-discussed Article 1101 of the Civil Code weighs heavily on my ruling. Secondly, I also share the analogy anchoring the Majority Opinion regarding employer immunity and intrafamily immunity.
V
For the reasons set forth above, it is unquestionable that a municipality's liability limit is a personal defense that may be raised by a joint and several codebtor, pursuant to Article 1101 of the Civil Code. This being so, I am in agreement with the decision issued by this Court.
FOOTNOTES
[1] In Law, analogical arguments - an inductive form of formulating arguments - are an indispensable tool for applying the Law. Analogies allow a party or a magistrate judge to sustain that an issue must be addressed/resolved in a certain way because there is another - similar to the formerin essence - that was addressed/resolved in that manner. Thus, the legal principle or rule applied to the first situation shall be applied equally to the second, due to the essential or material similarities of both cases. Ruggero J. Aldisert,Logic
I, Juan E. Segarra, USCG 906-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen. for Lawyers, Chap. 6 (1989). Analogies allow for reasoning based on examples and operates only where a legal vacuum exists with respect to the issue posed in a case. See Orraca López v. ELA 192 DPR 31 (2014).
[2] The certified question, in its original form, reads as follows:
Was the magistrate judge correct in this case to limit the damages award against Ox Bodies to $1,200,000 and deny Quilez a joint and several damages award of $6,000,000 against Ox Bodies?
[3] See Miranda v. E.I.A. 137 DPR 700 (1994);Molina, Caro v. Dávila. 121 DPR 362 (1988);Ramos Acosta v. Caparra Dairy 113 DPR 357 (1982);Torres Pérez v. Medina Torres 113 DPR 72 (1982);Quintana Martínez v. Valentin, 99 DPR 255 (1970).
[4] For his part, Professor Bernabe Reifkohl has commented that the correct solution would be to prevent a recovery action against the immune family member, while requiring the defendant to pay the full amount of the damages awarded. See Alberto Bernabe Reifkohl,Colón Santos v. Cooperative de Seguros Múltiples y el aparente conflicts entre las doctrinas de la solidaridad y la inmunidad, 79 REV JUR. UPR 1091 (2010). However, that proposal seems mistaken to us, insomuch as it allows the plaintiff to avoid the statutory immunity of a joint tortfeasor by going against another of the tortfeasors.
[5] Note that we are not here tasked with considering the matter of the constitutionality of the act of legislating liability limits for public entities.
I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.
*209 ATTACHMENT IV
Fonseca
v.
Inter-American Hospital for Advanced Medicine
2012 TSPR 3
[English Translation]
*210 IN THE SUPREME COURT OF PUERTO RICO
Miriam N. Fonseca, Rosa M. Fonseca and Felicita Rodríguez Appellees Appeal v. 2012 TSPR 3 Inter-American Hospital for 184 DPR ___ Advanced Medicine (HIMA) Dr. Guillermo Tirado Menéndez Dr. Arnulfo Santana and Medical Malpractice Insurers Syndicate (SIMED) Appellants
Case Number: AC-2010-62
Date: January 5, 2012
Court of Appeals:
Judicial Region of Caguas Panel X
Judge Writing for the Court:
Hon. Troadio González Vargas
Counsel for Appellants:
Sonia Ortega Rivera, Esq.
Counsel for Appellees:
Alfredo Cruz Resto, Esq.
Subject Matter: Damages
This document is an official document of the Supreme Court which is subject to the changes and corrections of the process of compilation and official publication of Court decisions. The electronic distribution hereof is done as a public service to the community.
*211 IN THE SUPREME COURT OF PUERTO RICO
Miriam N. Fonseca, Rosa M. Fonseca and Felicita Rodríguez Appellees AC-2010-62 Certiorari v. Inter-American Hospital for Advanced Medicine (HIMA); Dr. Guillermo Tirado Menéndez; Dr. Arnulfo Santana and Medical Malpractice Insurers Syndicate (SIMED) Appellant
Opinion of the Court issued by Chief Justice HERNÁNDEZ DENTON
San Juan, Puerto Rico, January 5, 2012.
On this occasion, we have another opportunity to apply, to a lawsuit for damages, a settlement agreement through which several doctors who committed malpractice are released from all liability. We must determine whether the agreement also had the effect of releasing the sole co-defendant who was not a party thereto: the Hospital. Since we consider that the Court of Appeals erred in applying the doctrine of res judicata, where it should have only enforced the aforesaid agreement, we reverse the decision.
I.
Ms. Miriam N. Fonseca, Ms. Rosa M. Fonseca and *212 Ms. Felicita Rodriguez (the plaintiffs) filed an action for damages for medical malpractice against Dr. Guillermo Tirade Menendez, Dr. Arnulfo Santana, the Medical Malpractice Insurers Syndicate (S.I.M.E.D.), the insurer of the aforementioned doctors, and Centro Medico del Turabo Inc. d/b/a Inter-American Hospital for Advanced Medicine (HIMA), San Pablo, as a result of the death of Ms. Iris Fonseca. The first court ruled in favor of the claim and determined that the defendant doctors were jointly and severally liable. However, it dismissed the complaint against HIMA, after concluding that the hospital nurses and staff followed the instructions of the doctors, who were not HIMA employees. Finally, it assessed the damages and emotional suffering of plaintiffs at $370,000.00.
In disagreement, plaintiffs petitioned for reconsideration for HIMA to be determined jointly and severally liable along with the co-defendant doctors, under the doctrine of apparent authority. Specifically, they underscored that Ms. Iris Fonseca was originally a patient of another hospital and was taken to HIMA as it was the nearest hospital. Meanwhile, HIMA failed to appear, despite having been granted a period of time to make its arguments. Consequently, the first court issued a determination finding HIMA jointly and severally liable for the actions of doctors authorized to provide professional services at said institution. HIMA did not request reconsideration or review of this determination.
After several procedural steps, in 2009 plaintiffs reached a "Private Settlement Agreement" with *213 Dr. Tirado Menéndez, Dr. Santana and S.I.M.E.D. Under the agreement, these co-defendants were released from liability for any further matter relating to the death of Ms. Iris Fonseca. The cause of the settlement agreement was the top limit of the policies of the aforementioned doctors, set at $350,000.00. Specifically, clause six (6) of this agreement establishes that, through this payment, plaintiffs were satisfied "with respect to any obligation that might be imposed on them for the alleged damage, arising from the event that led to the filing of the complaint. Under no circumstances will the appearing parties pay any amount additional to the amounts specified in this instrument."
Regarding the subsequent proceedings against HIMA, this settlement agreement established the following:
7.[...] Plaintiff's expressly and fully reserve the right to pursue any post-judgment proceedings against co-defendant HIMA, which remains in the lawsuit and has not been released from liability by this agreement nor may benefit from it. This agreement will be subject to all particulars established in Szendrey Ramos v. Hospicare, Inc., 158 D.P.R. 648 (2003), 2003 T.S.P.R., 18, and in US Fire Insurance Company et al. v. Autoridad de Energia Electrica et al., 175 D.P.R., 2008 T.S.P.R. 160, and therefore co-defendant HIMA, which remains in the lawsuit, and against whom the post-judgment proceedings are pursued, will not be liable in any way for any damages that may be attributable to and/or have been caused by the appearing co-defendants. Co-defendant HIMA is only liable to plaintiffs for damages caused by its own negligent acts or omissions, the negligent acts or omissions of its employees and/or of those persons for whom it is accountable under any legal doctrine in force in Puerto Rico, or for the share that HIMA is determined in due course to be responsible for paying in accordance with the judgment issued by the Court of First Instance. (Emphasis supplied.)
*214 In this state of affairs, plaintiffs carried out extrajudicial procedures to require HIMA to pay the remaining balance of the judgment from the first court. In response to the refusal of HIMA to pay, plaintiffs appeared before the Court of First Instance and petitioned for a writ of attachment in enforcement of judgment thereagainst.
HIMA objected to the petition for writ of attachment and argued that, although the forum of first instance imposed joint and several liability thereon together with the co-defendant doctors, it was not a joint tortfeasor of the damage sustained by plaintiffs. Moreover, it noted that, under clause seven (7) of the settlement agreement, plaintiffs reserved the right to continue litigation against HIMA only for HIMA's own negligence. Therefore it argued that the attachment against it was without merit, since the forum issuing the judgment determined that HIMA was not negligent. Plaintiffs objected to HIMA's arguments again invoking the doctrine of apparent authority. They also noted that Ms. Fonseca entered HIMA through the emergency room.
This being the case, on October 28, 2009 the first court issued a determination that declared the petition for writ of attachment against HIMA to be without merit. This determination noted that the defendant doctors were not employees of the hospital, since Dr. Tirado Menéndez was hired by the corporation that operates the HIMA Emergency Room and Dr. Santana was authorized to treat patients there.
*215 It also underscored that no evidence whatsoever was presented with respect to the supervision or lack thereof by HIMA-employed medical practitioners of the aforementioned doctors who proved liable for malpractice. Moreover, no evidence was presented on prior acts of professional malpractice of said doctors. It also concluded that HIMA was not liable because its employees acted under the instructions of Drs. Tirado and Santana. Therefore, it denied the attachment and collection of the amount claimed from HIMA.
In disagreement, plaintiffs appeared before the Court of Appeals. Said court concluded that the determination on the joint and several liability of the Hospital was res judicata and could not be altered. It therefore reversed the decision of the first court.
After having petitioned for reconsideration without success, HIMA comes before us through an appeal and requests we reverse the decision of the intermediate forum. HIMA argues that, while it recognizes the effect of the decision issued in 2007, which imposes thereon joint and several liability together with the co-defendants, no degree of fault was ever determined against it. Therefore, on releasing the doctors from their liability through the settlement agreement, plaintiffs also released HIMA from any claim. In short, HIMA does not challenge the application of the doctrine of res judicata; it only asks us to recognize that it was released through the settlement agreement.
*216 Having reviewed the appeal filed by HIMA, we have decided to accept certiorari and issue same. With both parties having appeared, we proceed to render judgment.
II.
A. Liability of hospitals to patients
In recent decades, we have established several bases for the imposition of liability on hospitals for injury sustained by patients.Márquez Vega v. Martínez Rosado, 116 D.P.R. 397, 404-405 (1985);Hernández v. la Capital, 81 D.P.R. 1031, 1038 (1960). First, we concluded that hospitals are liable for the negligent acts or omissions of their medical or paramedical personnel in the context of their duties. To such ends, we substantiated this argument in the doctrine of vicarious liability established in Art. 1803 of the Civil Code of Puerto Rico, supra.Sagardía de Jesús v. Hosp. Aux. Mutuo, 177 D.P.R. 484, 512 (2009);Márquez Vega v. Martínez Rosado, supra, p. 405 (1985).
We then determined that hospitals are also liable for institutional policies that hinder patient care. See Núñez v. Cintrón, 115 D.P.R. 598 (1984);Pérez Cruz v. Hosp. La Concepción, 115 D.P.R. 721 (1984). We have also argued that hospitals are liable for damage caused by not having basic equipment available needed to respond to foreseeable situations or having such equipment in an obsolete or deficient condition.
*217 Bias Toledo v. Hospital Guadalupe, 146 D.P.R. 267, 323-327 (1998). Where the hospital's liability is concurrent with the doctor's liability, the liability of the former is joint and several with the latter without affecting the determination of the exact degrees of fault in the internal relationship between the two, for the purposes of obtaining direct reimbursement in proportion to that liability.Núñez v. Cintrón, supra, p. 606.
Moreover, we have also concluded that hospital liability for doctors depends on the legal relationship of the doctors with the hospital. First, hospitals are vicariously liable for doctors they employ.Márquez Vega v. Martínez Rosado, supra. Second, hospitals are vicariously liable for negligent acts of doctors who, though not employees of the hospital, are on their staff and are available for consultations of other doctors. Id., p. 407;Núñez v. Cintrón, supra, p. 606. Third, hospitals are jointly liable withholders of exclusive concessions to provide services at the hospital when these concessionaires commit acts of medical malpractice.Sagardía de Jesús v. Hosp. Aux. Mutuo, supra, pp. 515, 516. Examples of these concessionaires include anesthesiologists, radiologists and emergency room service providers. Id. with respect thereto, the hospital is liable for having chosen such staff and having them at the hospital offering services to patients. Id.
As a final category, we have the doctors who, while not hospital employees, are authorized to use *218 hospital facilities to intern their own private patients. In regard to the matter, our imposition of liability on hospitals for acts of medical malpractice committed by doctors has depended on a distinction: whether the hospital assigned the patient to that doctor not employed by the hospital, or whether the patient is a private patient of said doctor.Sagardía de Jesús v. Hosp. Aux. Mutuo, supra, p. 513;Márquez Vega v. Martínez Rasedo, supra, p. 402-405.
On the one hand, if the person came directly to the hospital seeking medical assistance and the hospital provided the patient with the medical practitioners who treated him, the doctrine of apparent authority applies. Id. In that case, the hospital is vicariously, jointly and severally liable with the doctor responsible for the act of medical malpractice, regardless of whether the doctor is an employee of the hospital or someone to whom the hospital has granted a concession to provide specialized medical services to the patients thereof, or a member of the hospital staff called in consultation for treatment of the patient. Id.
In Márquez Vega v. Martínez Rosado, supra, we apply this doctrine to a situation of events in which the medical malpractice victim was a private patient of the doctor not employed by the Hospital who was authorized to intern his private patients at the Hospital facilities. In this case, there were no allegations of negligent acts of Hospital employees, nor of negligence of the institution on granting and maintaining the authorization of the doctor who committed malpractice.
*219 Moreover, it was not alleged that the hospital facilities and equipment were connected with the act of malpractice. Therefore, we imposed no liability on the Hospital and we dismissed the case against it.
B. Settlement agreement to release one or more joint tortfeasors
Once joint and several liability is imposed on a hospital and the doctors who committed malpractice, the victim may execute a settlement agreement, either with one, several or all of the co-defendants. The settlement is an agreement whereby the parties, each giving, promising or retaining something, avoid the continuation of a lawsuit or put an end to one that has already begun. Art. 1709 of the Civil Code of Puerto Rico, 31 L.P.R.A. § 4821.
We have previously established that the elements of a settlement agreement are: 1) an uncertain litigious legal relationship; 2) the intent of the parties to settle the case and change the uncertain relationship into a certain and incontrovertible one; and 3) the mutual concessions of the parties. Regarding this last element, each of the parties to the agreement must reduce and sacrifice, to the other party, a portion of its demands in exchange for a part of what is in dispute.Mun. de San Juan v. Prof. Research, 171 D.P.R. 219, 239 (2007);Neca Mortg. Corp. v. A. & W. Dev. S.E., 137 D.P.R. 860, 870 (1995).
*220 We have also established that, in interpreting a settlement agreement, the general rules for interpretation of contracts apply insofar as they are not inconsistent with a particular rule of interpretation. Specifically, the rules established on the need to discover the true intention of the parties to the agreement apply when this is not clear from the terms of the agreement.Sucn. Román v. Shelga Corp., 111 D.P.R. 782, 789 (1981);Merle v. West Bend Co., 97 D.P.R. 403, 409-411 (1969).
In the context of tortious liability and joint and several liability, we recently established that a victim releasing one of the co-defendants from liability through a settlement agreement does not necessarily mean that the victim releases the other co-defendants if such intention is not clearly stated in the agreement. Therefore, the victim may continue his claim against the other co-defendants.Sagardía de Jesús v. Hosp. Aux. Mutuo, supra;U.S. Fire v. A.E.E., 174 D.P.R. 846, 855 (2008).
We have also determined that the effects of this type of settlement agreement depend on the stipulations agreed to by the parties, with respect to the internal relationship between joint and several co-defendants and the external relationship between co-defendants and plaintiffs. What is decisive is the intention of the parties concerning the effects of the settlement. Therefore, when the settlement agreement clearly shows that the plaintiff releases a co-defendant from any liability that might arise from the event that caused the damage, it will be understood that said co-defendant has been released with respect to the *221 plaintiff (external relationship) and with respect to the other co-defendants (internal relationship). In that case, the plaintiff will accept the degree of liability that the court ultimately attributes to the released co-defendant.Sagardía de Jesús v. Hosp. Aux. Mutuo, supra;Blas Toledo v. Hospital Guadalupe, 167 D.P.R. 439, 450-453 (2006);Szendrey v. Hospicare Inc., 158 D.P.R. 648, 655-656 (2003).
Meanwhile, the other tortfeasors who are not released will only be liable for the percentage of liability remaining after subtracting the amount of the released joint tortfeasor's portion of liability, and not for the total amount of damages. This, in turn, means that the other joint tortfeasors cannot file an action for contribution against the joint tortfeasor that was released from liability.Sagardía de Jesús v. Hosp. Aux. Mutuo, supra;U.S. Fire v. A.E.E., supra.
To some extent, both parties assume a risk in this type of settlement agreement. On the one hand, the plaintiff assumes the risk that the amount of the released joint tortfeasor's share of liability will be greater than that received in exchange for the release of liability. On the other hand, the released joint tortfeasor assumes the risk that the amount of its share of liability will be less than the amount paid in exchange for its release. In addition, if the released joint tortfeasor is ultimately not found liable, he will not be entitled to recover the amount paid, nor may the joint tortfeasors who are not released demand a deduction of the amount paid by the released joint tortfeasor ultimately found *222 not to be liable. In this case, the plaintiff receives the gain.Sagardía de Jesús v. Hosp. Aux. Mutuo, supra.
Moreover, the settlement agreement may release a joint tortfeasor only in the external relationship, without releasing it from any liability it may have with the other joint tortfeasors in the internal relationship. Id. This will have the effect of reducing the amount awarded in the judgment by the amount obtained through the settlement agreement, but same will not be reduced by the amount equal to the degree of liability of the released joint tortfeasor. Id. Therefore, the plaintiff may claim, from any of the other joint tortfeasors, the remainder of the amount of damages awarded by the court, without having to subtract the amount equal to the degree of liability determined for the released co-defendant. Consequently, the plaintiff may not recover the full amount of the judgment award plus the amount obtained through the settlement. With respect to the internal relationship, the non-released joint tortfeasors may file an action for contribution against the joint tortfeasor that was released solely in the external relationship, Id.;U.S. Fire Insurance v. A.E.E., supra;Blas Toledo v. Hospital Guadalupe, supra.
With respect to the degree of liability among joint tortfeasors, we have established that the judge deciding the matter must determine such on issuing judgment. If he does not do so, the presumption of equal fault will apply.Sánchez Rodríguez v. López Jiménez, 118 D.P.R. 701, 707-708 (1987). However, when a joint tortfeasor is released from liability through a settlement agreement in the course of an action for *223 damages, before judgment is issued, the first court must determine the total liquid amount of the damages caused to the victim by all joint tortfeasors and will deduct the percentage of liability of the released tortfeasor from the total amount.Szendrey v. Hospicare Inc., supra, pp. 658-59.
Moreover, the first court must determine the degree of liability of each joint tortfeasor not released from liability for purposes of subsequent contribution between them. Id. Otherwise, independent action for contribution would be available as an alternative.Soc. de Gananciales v. Soc. de Gananciales, 109 D.P.R. 279, 282-283 (1979).
C. Res judicata
Additionally, the doctrine of res judicata, established in Art. 1204 of the Civil Code of Puerto Rico, 31 L.P.R.A. § 3343, prevents, after issuance of a judgment in a previous lawsuit, the same parties from subsequently relitigating the same causes of action and subject matter, disputes already litigated and adjudicated, and those which they may have litigated.Mun. de San Juan v. Bosque Real S.E., 158 D.P.R. 743, 769 (2003);Acevedo v. Western Digital Caribe, Inc., 140 D.P.R. 452, 464 (1996). In order to trigger the presumption of res judicata in another action, the adjudicated case and the case in which the presumption is invoked must be identical with respect to subject matter, causes, litigating persons and their capacities in the case. 31 L.P.R.A.S
*224 3343. See also:Méndez vs. Fundación, 165 D.P.R. 253, 267 (2005);Pagán Hernández v. U.P.R., 107 D.P.R. 720, 732 (1978).
The doctrine of res judicata is based on considerations of public order and necessity. To begin with, it acts to secure the governmental interest in having lawsuits be finalized. It also seeks to give court rulings the dignity due thereto. Moreover, it is concerned with not subjecting citizens to the onerousness of having to litigate the same case twice.Rodríguez Rodríguez v. Colbert Comas, 131 D.P.R. 212, 218-219 (1992);Pérez v. Bauzá, 83 D.P.R. 220, 225 (1961). Nevertheless, the application of the doctrine of res judicata is not inflexible and automatic when it would defeat the purposes of justice or considerations of public order.Parrilla v. Rodríguez, 163 D.P.R. 263, 269 (2004).
III.
A. Liability of hospitals to patients
The court of first instance determined, in its reconsideration, that HIMA was jointly and severally liable for the acts of the co-defendant doctors. This determination was based on the argument put forward by plaintiffs under the doctrine of apparent authority in their motion for reconsideration.
With regard to Drs. Tirado Menendez and Santana, it is evidenced on the record that they are not HIMA employees. Dr. Tirado Menendez was hired by the corporation that operates the Emergency Room at HIMA and Dr. Santana had been granted *225 privileges to see his private patients at HIMA. In view of this, we must determine whether HIMA is vicariously, jointly and severally liable for the acts of malpractice of the two doctors, under the doctrine of apparent authority.
It is evidenced on the record that Ms. Iris Fonseca was admitted to the Hospital via the Emergency Room, without having previously been a private patient of the co-defendant physicians. Moreover, it is on record that Ms. Iris Fonseca was a patient at another hospital and was taken to HIMA because it was the closest hospital. There, HIMA provided her with the services of the two physicians. In doing so, under the doctrine of apparent authority, HIMA is vicariously, jointly and severally liable together with the co-defendant doctors.
We are left with the question of whether direct liability is attributable to HIMA due to its own negligence. As stated above, this type of liability can be imposed if the hospital did not take care in granting and maintaining privileges for doctors not in its employ to accommodate their private patients in the hospital facilities, when it lacks the equipment necessary to meet foreseeable needs or has such equipment in a defective condition, or when it implements administrative policies that hinder the provision of medical services. In this regard, in its judgment the Court of First Instance did not impose any liability on HIMA for its own acts.
With regard to the decision issued in 2009, the Court only reiterated the doctrine of corporate liability that imposes joint and several liability on hospitals for their own *226 negligence. In this regard, the Court noted that plaintiffs never presented any evidence whatsoever of negligence on the part of HIMA in its supervision of the co-defendant doctors or for prior acts of medical malpractice thereby. Finally, it recalled that it had concluded in the judgment that became final and enforceable that HIMA was not liable because its employees acted under the directions of Drs. Tirado and Santana. Thus, it denied the petition for writ of attachment filed by plaintiffs.
On the other hand, there is no evidence whatsoever in the findings of fact of the first court or on the record of independent negligence on the part of HIMA, lack of necessary equipment or implementation of administrative policies that hindered the medical service. Consequently, the first court did not impose direct liability on HIMA, since the hospital itself did not commit negligence.
In view of the foregoing, it must inevitably be concluded that the court of first instance only imposed vicarious liability on HIMA for the acts of malpractice of the co-defendant physicians. Therefore, it was not deemed admissible to impose any degree of liability on HIMA for independent acts of negligence.
Having concluded this point, we must determine whether the settlement agreement released HIMA from liability.
B. Settlement agreement to release one or more joint tortfeasors
The settlement agreement was executed by plaintiffs to release Drs. Tirado Menendez and Santana, as well as SIMED [the Medical Malpractice Insurers Syndicate], from all liability.
*227 In this way, in paragraph six (6) of the settlement agreement, plaintiffs released them from liability
[..] for any obligation that may or may not be imposed upon them for the damage alleged, arising from the event that gave rise to the filing of the claim. Under no circumstances, shall the parties hereto pay any amount additional to those specified in this document. (Emphasis added)
Subsequently, plaintiffs effectively finalized the matter with regard to Drs. Tirade Menéndez and Santana, as well as with SIMED.
From our analysis of this settlement agreement, we conclude that plaintiffs released them from liability, both in the external relationship and in relation to HIMA in the internal relationship. The text of the aforementioned paragraph six (6) uses comprehensive and extensive language to describe the obligations which released the co-defendant doctors [from liability]. In the same way, this paragraph uses language that absolutely `excludes the possibility that the released co-defendants should pay any additional amount. Moreover, paragraph seven (7) sets forth that HIMA shall not in any way be liable for damage caused by the co-defendant doctors. This further supports our conclusion that plaintiffs released the co-defendant doctors in both the external and the internal relationship. Thus, plaintiffs placed themselves in the position of the released joint tortfeasors and assumed their degree of liability.
With regard to HIMA, plaintiffs reserved the right to continue the judgment enforcement process against *228 it. However, paragraph seven (7) of the agreement specified that
HIMA, which remains in the action and against whom the post-judgment proceedings continue, shall not be liable in any way for damage that could be attributable to and/or have been caused by the co-defendants herein. HIMA shall only be liable to plaintiffs for damage caused by its own negligent acts or omissions, the negligent acts or omissions of its employees and/or of persons for whom it should be responsible under any legal doctrine in effect in Puerto Rico, or for the share which it is determined in due course that HIMA should pay according to the judgment issued by the Court of First Instance.
In this regard, we must bear in mind that the Court of First Instance, in its decision in 2007, determined that HIMA was jointly and severally liable "for the actions of doctors authorized to provide professional services in the Hospital." This was after having determined in its judgment that the death of Iris Fonseca was due to malpractice on the part of Drs. Tirado Menendez and Santana. It was precisely in relation to the negligent acts of the co-defendant physicians that paragraph seven (7) of the settlement agreement stipulated that HIMA would not be liable in any way.
It is true that plaintiffs did reserve the right to pursue the action against HIMA for damage caused by its own negligent acts or omissions or by the negligent acts or omissions of its employees. Nevertheless, no proof that HIMA or its employees committed any negligent acts or omissions was ever presented.
*229 The first court found that the nurses and staff of the hospital followed the instructions of the doctors, and that therefore HIMA was not vicariously liable for their negligent acts or omissions. Moreover, in the decision issued in 2009, the court of [first] instance found that no evidence whatsoever had been presented regarding the supervision or lack thereof by the medical practitioners employed by HIMA of Drs. Tirade Menéndez and Santana. Nor was any evidence presented of prior acts of professional malpractice by these doctors. Thus, the first court concluded again that HIMA was not liable because its employees acted on the instructions of Drs. Tirado Menendez and Santana. Therefore, the court issuing the judgment was consistent in determining that HIMA did not commit negligence independently of the negligence of the co-defendant doctors. For their part, plaintiffs have also not convinced us that HIMA committed negligence independently of that of the co-defendant physicians.
In applying the settlement agreement to these facts, we find that plaintiffs released the co-defendant doctors from all liability for the death of Iris Fonseca, both in the external relationship with plaintiffs and in the internal relationship with HIMA. In doing so, plaintiffs placed themselves in the position of the released co-defendants and assumed any liability that may have been attributed to them. With regard to HIMA, plaintiffs reserved the right to pursue the action against them, but only for HIMA's own negligence or that of its employees, *230 independently of the negligence of the co-defendant doctors. As discussed above, the court of first instance did not attribute any degree of liability to HIMA, nor did it find that it had committed negligence. On the contrary, it imposed joint and several liability on HIMA for the negligent acts of the co-defendant doctors. As the co-defendant physicians have been released from all liability, we are compelled to conclude that plaintiffs also released HIMA, as it was jointly and severally liable only for the negligent acts of the co-defendant doctors and did not commit negligence itself.
Having resolved the above, it now falls upon us to determine whether the Court of Appeals was in error in applying the doctrine of res judicata in this case.
C. Res judicata
The first court did not impose liability on HIMA. The court of first instance then determined in its reconsideration that HIMA was jointly, severally and vicariously liable for the acts of doctors authorized to provide professional services in the hospital, under the doctrine of apparent authority. This determination of joint and several liability became final and enforceable.
Then, in the decision issued in 2009, the first court denied the petition for writ of attachment against HIMA. This decision included only a brief discussion of the joint and several liability of hospitals for their own acts. The decision did not discuss the liability of hospitals pursuant to the doctrine of apparent authority. In its findings of fact, *231 it noted that no evidence of own negligence own the part of HIMA was ever presented. It therefore denied the requested writ of attachment. For this determination, the Court of First Instance took the settlement agreement into consideration. Moreover, in its opposition to the writ of attachment HIMA alleged that, although joint and several liability was imposed on it together with the co-defendant doctors, it was not a joint tortfeasor of the damage sustained by plaintiffs and had not itself committed negligence.
Therefore, in considering HIMA's arguments, the first court did not reconsider its initial imposition of joint liability on HIMA under apparent authority, but correctly applied the settlement agreement, as interpreted previously. In other words, the first court merely reiterated that it did not impose liability on HIMA for its own acts, whichmeans that plaintiffs have no cause of action against HIMA by virtue of the full release from liability that they granted to the only joint tortfeasors. Therefore, we conclude that the doctrine of res judicata does not apply in this case, since it is not a reconsideration of a matterresolved by means of a final and enforceable judgment. It would constitute a breakdown of justice to conclude otherwise and impose additional liability on a co-defendant who was already released from liability by plaintiffs by means of a settlement agreement.
IV.
In view of the facts set forth above, the judgment of the Court of Appeals is hereby reversed and the appealed decision *232 of the Court of First Instance which denied a writ of attachment against HIMA is reinstated.
Judgment shall be issued accordingly.
Federico Hernández Denton Chief Justice
*233 IN THE SUPREME COURT OF PUERTO RICO
Miriam N. Fonseca, Rosa M. Fonseca and Felicita Rodriguez Appellees v. AC-2010-62 Certiorari Hospital Interamericano de Inter-American Hospital for Advanced Medicine (HIMA); Dr. Guillermo Tirado Menéndez; Dr. Arnulfo Santana and Medical Malpractice Insurers Syndicate (SIMED) Appellants
JUDGMENT
San Juan, Puerto Rico, January 5, 2012.
In view of the facts set forth in the foregoing Opinion, which forms an integral part of this Judgment, we hereby issue the writ of certiorari, reverse the judgment of the Court of Appeals and reinstate the appealed decision of the Court of First Instance which denied a writ of attachment against HIMA.
So agreed by the Court and certified by the Court Clerk. The Associate Justices Mr. Rivera Garcia and Mr. Feliberti Cintrón take part without a written opinion.
Larissa Ortiz Modestti Interim Clerk of the Supreme Court
*234 CERTIFICATE OF TRANSLATOR # JF-2012-010
I am a United States Court-Certified Interpreter, and I certify that the above is a faithful translation of the Spanish source, which I have performed to the best of my ability. It consists of twenty-five (25) pages, including this certification page, and contains no changes or erasures.
The content of this translation is an opinion issued by the Chief Justice of the Puerto Rico Supreme Court, in the case of Miriam N. Fonseoa, et. al., Appellees vs. HIMA et. al., Appellants, dated January 5, 2012.
In San Juan, Puerto Rico, on February 13, 2012. Joaquin Font Calle Cataf 400, Suite 268, San Juan, PR 00918 Toll-Free Tel. & Fax: 1-877-JOAQUIN (562-7646) E-Mail: Jf@Fonttranslations.com
*235 ATTACHMENT V
U.S. Fire Insurance v.A.E.E.
174 D.P.R. 219 (2008)
[English Translation]
*236 IN THE SUPREME COURT OF PUERTO RICO
US Fire Insurance Company and others Certiorari Paintiff-Respondent 2008 TSPR 160 v. 175 D.P.R. ___ Electric Power Authority and others Defendant-Petitioner v. Universal Insurance Company; Federal Insurance Company; Royal Sun Alliance Insurance Company Third-Party Defendants-Petitioners Case Number: CC-2006-1060 Date: September 24, 208 Court of Appeals: Carolina Judicial Region Panel X Presiding Judge: Hon. Carmen A. Pesante Martinez Attorneys for Petitioner Atty. Luis M. Ortega Garcia Atty. Jose A. Andreu Fuentes Attorney for Respondent: Atty. Jaime F. Agrait Llado Atty. Blanca E. Agrait Lladco Subject: Tort Damages
This document constitutes an official document of the Supreme Court that is subject to the changes and corrections of the process of compilation and official publication of the decisions of the Court. Its electronic distribution is made as part of a public service to the community.
*237 IN THE SUPREME COURT OF PUERTO RICO
US Fire Insurance Company and others Plaintiff-Respondent v. Electric Power Authority and others CC-2008 1600 Defendant-Petitioner v. Universal Insurance Company; Federal Insurance Company; Royal & Sun Alliance Insurance Company Third-Party Defendants-Petitioners
Opinion of the Court delivered by Associate Justice Mrs. Rodriguez Rodriguez
San Juan, Puerto Rico, on September 24, 2008
In this case, we are to determine whether by virtue of a settlement agreement the respondent may retain an amount of money charged in excess to what was owed according to the judgment favoring it.
We go on to summarize the fax that serve as background to the issue before our consideration.
I.
On July 26, 1996. An accident occurred wherein a helicopter of the Puerto Rico Police crashed when impacting some electrical lines that were not duly marked, in the environs of the Carraizo Dam. Three policemen, who were crew of the vessel, died.
*238 As a result of these events, several complaints for damages were filed againstthe Electric Power Authority (PREPA) and the Aqueduct and Sewer Authority (PRASA). Further, US Fire Insurance Company (US Fire), insurer of the Puerto Rico Police filed a complaint for subrogation to recover the $842,048 paid for the loss of the helicopter.
On September 10, 1998, the First Instance Court granted the complaint filed ordering the payment of the amount claimed (the $842,048). Further, provided to what is in accordance to what is provided in Rule 44.1 (d) of Civil Procedure, 32 L.P.R.A. Ap. III. R. 44.1 (d), the court ordered the payment of attorney's fees and interests for temerity. It also granted the complaint for subrogation filed by US Fire.
US Fire requested the execution of the judgment entered in his favor. To satisfy the judgment, PREPA deposited with the court $250,000 and the PREPA Union of Insurers (the Union) deposited $750,000, for a total of $1,000,000. US Fire filed a motion wherein it requested the withdrawal of the funds. In the motion, it made an express reservation of rights because it understood that the amount withdrawn represented less than what they were entitled to by judgment. It explained that the interests over the judgment were of 9.5% annually, which was the rate applicable to private litigants. It further argued, that the amounts to be paid for attorney fees and costs of litigation to be paid should be added. Based on the above, US Fire claimed the amount of $1,588,294.60, *239 as amount owed. The First Instance Court authorized the withdrawal of the funds deposited.
Afterwards, PRASA'S insurer, Zurich Insurance Company (Zurich) and US Fire subscribed a settlement agreement. Through it, Zurich agreed to pay half of the amount of the principal ($842,048) of the judgment entered in favor of US Fire, quantity which amounted to $421,000. In exchange, US Fire released Zurich from all liability under the policy that it had with PRASA. Nevertheless, it reserved the right of continuing its claim against PRASA until the full payment of the amount owed in accordance to the judgment, including, of course, the interests owed.
Meanwhile, the First Instance Court entered a resolution wherein it decided that the interest rate applicable to the judgment entered was 5.25% annually, which is the interest rate applicable to government entities. From said resolution, US Fire resorted to the Court of Appeals. That court affirmed, essentially the resolution resorted, although it modified the applicable interest rate from 5.25% to 5.5% because that was the prevailing interest at the moment in which the instance judgment was entered. Afterwards, this court affirmed the ruling of the intermediate form.Gutíerrez Calderón v. US Fire Insurance Company, res. February 10, 2006, 166 D.P.R. ___, 2006 TSPR 21.
In attention to the above, PREPA filed before the First Instance Court a motion requesting to order US Fire to return the money withdrawn in excess *240 of the amount of the judgment entered in its favor. In synthesis, it alleged that the total amount which US Fire was entitled to by virtue of the judgment entered was $1,262,036.22, which included principal plus interest. Therefore, after receiving the payment of the $1,000,000 and of $421,000, US Fire received $158,963.78 in excess of what it was entitled to by judgment. PREPA requested the return of that money.
US Fire opposed. It alleged that the payment made by Zurich occurred as a result of a contractual settlement and the amount paid was to purchase the risk that it be judicially determined that the interest rate applicable to private entities had to be paid. It stated that if the issue over the applicable interest rate would have been decided in favor of US Fire, the latter would not have been able to claim additional amounts from Zurich without violating the settlement agreement. It argued that the settlement agreement was agreed exclusively to terminate the litigation between both insurers. It added that PREPA could not expect to be accredited part of the money that Zurich paid to US Fire by virtue of the settlement agreement.
The First Instance Court by resolution entered on May 22, 2006, approved the position of US Fire determined that the return of money requested by PREPA was improper. From said decicion, PREPA and the Union resorted to the Court of Appeals by writ ofcertiorari.
The Court of Appeals denied the issue of the writ. It argued in its resolution that the liability had not been *241 distributed between codefendants and the amount corresponding to the costs and attorney's fees had not been determined either; therefore, it was not possible to determine whether there had been payment in excess.[1] It added that in the event that PREPA's claim had merit, what was proper was a leveling action against PRASA.
Not in agreement, PREPA and the Union resorted to us and reiterated what they stated before the lower forms. We issue the writ requested. Both parties have appeared, for which we rule.
II
Faced with the issue in this case, we will start reviewing our laws regarding the figure of the settlement agreement and its effects over a claim for damages.
A
Article 1709 of the Civil Code, 31 L.P.R.A. sec. 4821, defines a settlement agreement as an agreement whereby "the parties, giving, promising or retaining each one a thing, avoid the provocation of a lawsuit or terminate the one they had started". This agreement - described by Scaevola as an "instrument of peace attained" - is consensual, reciprocal and onerous. In it, the parties, through mutual sacrifices, terminate an issue with the purpose of avoiding the sorrows *242 that a litigation entails. Q. M. Scaevola,Código Civil, Tome XXVIII, Instituto Editorial Reus, Madrid, 1953, pg. 246. See,Mun. de San Juan v. Professional Research & Community Services, res. May 18, 2007, 171 D.P.R. __, 2007 TSPR 95;López Tristani v. Maldonado Carrero, res. September 8, 2006, 168 D.P.R. __, 2006 TSPR 147;Neca Mortgage v. A & W Developers, 137 D.P.R. 860 (1995);Citibank v. Dependable Insurance Company, 121 D.P.R. 503 (1988), and other cases cited therein.
There are several requirements necessary for its validity. First, it is required that an issue or uncertain juridical relationship exists -judicial or extrajudicial- representing the possibility of a litigation or that one already be in dispute.Mun. de San Juan v. Professional Research & Community Services, supra. See also, S. Tamayo Haya,El Cotrato de transacción, Thomson Civitas, Madrid, 2003, pg. 75. The uncertainty refers to the subjective concept that the parties may have over the objective elements -certain and determined- of the juridical relationship. Tamayo Haya, op, cit. Second, the parties have the intention of substituting, by settlement, this uncertain relationship with the certainty of another "certain and indisputable" one.Mun. de San Juan v. Professional Research & Community Services, supra. The third requirement is represented by the mutual concessions of the parties. The mutual concessions "constitute not only the essential method for the development of the cause of the settlement business, rather, they become part of the cause."López Tristani v. Maldonado Carrero, supra. InMun.
*243 de San Juan v. Professional Research & Community Services, supra, we indicated, rightly so, that "every settlement supposes that the parties have doubts on the judicial accuracy or validity of their respective pretensions and choose to resolve the differences through mutual concessions." (Emphasis in original.) See also, J. Puig Brutao,Fundamentos de Derecho Civil, Tome II, Volume II, Casa Editorial Bosch, Barcelona, 1982, pgs. 626-630; See also I. Sierra Gil de la Cuesta,Comentario al Código Civil, Tome 8, Editorial Bosch, S.A., Barcelona, 2000, pg. 84-90.
Because of its complex juridical nature, the settlement agreement must be interpreted restrictively; therefore, its effect extend to what was expressly agreed by the parties. The Civil Code provides concrete interpretive rules for settlements. The rule that disciplines it is Article 1714 of the Civil Code, 31 L.P.R.A.sec. 4826, which sets forth that the settlement "does not comprise other than the object express object determined in it, or that, by a necessary induction of its words, must be reputed comprised in it." As a result, only the matters directly related to the object settled shall be deemed resolved with the final nature, which presupposes the need for clarity and accuracy in the description of the matters settled. Sierra Gil de la Cuesta,Comentario al Código Civil, Tome 8,supra, pg. 105;Sucn. Román v. Shelga Corp. supra.
The settlement agreement may have its place in situations where a plurality of subjects intervene *244 either from the active side -several creditors- or from the passive side -several debtors- because of the existence at the same time of clarity plurality of creditors and debtors. The efficacy of the settlement sets forth doctrinal inconveniences when we consider what the effect of the settlement concluded between one of the debtors and its creditor will be with regards to other debtors. Precisely, that is a matter at hand today.
B
In matters of civil tort liability, the damage caused could be the result of the negligence of more than one causer. In these cases, each one is liable for the totality of the damage caused.Rivera Hernández v. Comtec Communication, res. June 22, 2007, 171 D.P.R. __, 2007 T.S.P.R. 131;Arroyo v. Hospital La Concepción, 130 D.P.R. 596, 603 (1992);Garcia v. Gob. de la Capital, 72 D.P.R. 138, 146 (1951);Rivera v. Great Am. Indemnity Co., 70 D.P.R. 825, 828 (1950).
In a lawsuit for tort damages, the victim can waive his claim with regards to one of the co-causers of his damage through a settlement agreement. Depending on what was agreed, so will be the effects of that agreement over the co-causer with whom it is settled, and the other co-causers who remain in the lawsuit.S.L.G. Szendrey v. Hospicare Inc., 158 D.P.R. 648, 656 (2003);Biás Toledo v. Hospital Nuestra Señora de la Guadalupe, et al., res. March 30, 2006, 167 D.P.R. 2006 T.S.P.R. 47. Therefore, to test what those effects are, it is necessary *245 to first establish what was what was agreed. 31 L.P.R.A. sec. 4826.
We have stated in the past that if the victim of the damage releases one of the co-causers of the damage from liability, that does not suppose the release of liability of the other co-causers if the latter does not appear clearly from the settlement agreement.Merle V. West Bend Co., 97 D.P.R. 403, 409 (:969);S.L.G. Szendrey v. Hospicare Inc., supra, pg. 655;Biás Toledo v. Hospital Nuestra Senora de la Guadalupe, et al., supra. Thus, the victim can continue his claim against the other co-causers of the damage. With which, the liability of these co-causers shall depend, in greater extent, on the settlement agreement between the victim and the released co-causer.
In the settlement agreement, the victim may release the co-causer of all liability that may arise with regards to the harmful event, to wit, that he is released from his liability toward the victim as well as in the internal relationship between co-causers. When this occurs, the victim assumes the portion of liability that is attributed to the released co-causer.Szendrey v. Hospiscare, Inc., supra, pg. 656, 659. In these cases, the other co-causers of the damage cannot recover from the released co-causer any amount whatsoever.
The above responds to that according to the settlement agreement, the other co-causers will not have available a leveling action to recover any amount paid in excess to the portion of liability that *246 corresponds to them.[2] The leveling action pursues to avoid the unjust enrichment of one party.Szendrey v. Hospicare Inc., supra, pág. 654; P.R.Fuels, Inc. v. Empire Gas Co., Inc., 149 D.P.R. 691, 712-713 (1999);Ramos v. Caparra Dairy, Inc., 116 D.P.R. 60, 63-64 (1985). Therefore, the other co-causers cannot be deprived of the leveling action, except when they are not subject to pay more than what corresponds to them according to the portions of liability. Thus, in this context, the other co-causers will not be subject to indemnifying the totality of the damages, rather only in the remaining portion after subtracting the amount corresponding to the portion of liability of the released co-causer.Szendrey v. Hospicare Inc., supra, pág. 658. See also, D. Fernandez Quinones,Análisis del Término 2002-2003: Tribunal Supremo de Puerto Rico: Responsabilidad Civil Extracontractual, 73 Rev. Jur. U.P.R. 807, 827-830 (2004). Given that the amount that should be paid by virtue of the judgment does not include the amount corresponding to the portion of liability of the released co-causer, the amount received in exchange for the release of liability is not attributed to the payment of the judgment.
Through this type of settlement agreement, the uncertainty of what in due course plaintiff would be entitled to recover by virtue of the portion of liability that is attributed to the released co-causer is eliminated. L.R. Rivera *247 Rivera,El Contrato de Transacción, sus efectos en situciones de solidaridad, San Juan, Puerto Rico, Juridica Editores, 1988, pg. 36. Said amount is established in the settlement agreement. Therefore, plaintiff will only be entitled to receive the amount established in the settlement agreement as payment of the amount corresponding to the portion of liability of that co-causer. Thus, he assumes the risk of recovering less than what is it determined by judgment in due course.
As a corollary of the above, in the event that according to the judgment entered, the amount corresponding to the portion of the liability of the released co-causer is greater than that received in exchange for the release of liability, plaintiff assumes said decrease. On the contrary, if said amount is less than what is received in exchange from the release of liability, plaintiff receives the gain.
On the other hand, the settlement agreement can be circumscribed to the plaintiff waving an action for tort damages against one of the co-causers, without anything else. This type of settlement does not prevent the victim from continuing the complaint against the other co-causers ofhis damage, expecting to recover from them up to the totality of the amount corresponding to the damages caused. See,Biás Toledo v. Hospital Nuestra Señora de la Guadalupe, et al., supra. In the event that in order to satisfy the judgment entered in due course, the other co-causers shall have to pay an amount in excess to the portion of liability that correspond to them in order to compensate the portion of *248 liability of the released co-causer, they would also have available the corresponding leveling action.Biás Toledo v. Hospital Nuestra Señora de la Guadalupe, et al., supra, n. 3.
In this context, the amount received by plaintiff by virtue of the settlement agreement is considered a partial payment of the judgment that may be entered.Blás Toledo v. Hospital Nuestra Senora de la Guadalupe, et al., supra. ("... the instance court must only reduce from the amount of the judgment the amount (...) corresponding to the alluded settlement.") On the contrary, the plaintiff could recover the totality of the amount of the judgment, in addition to what is obtained through the settlement agreement without having assumed any risk.
The above would constitute an unjust enrichment.[3] This, because defendants would be subject to indemnifying an amount greater than the amount corresponding to the damages caused, which is translated into an impoverishment. In turn, plaintiff would collect an amount greater than the amount corresponding to the damages suffered; and therefore, would experience an enrichment. Since he has not assumed any risk, it would be an enrichment without cause.
*249 In light of the normative framework set forth above, we rule that a plaintiff who subscribes a settlement agreement with one of the co-defendants and ends up receiving in total an amount greater than what he is entitled to according to the judgment entered in his favor, could receive said gain depending on what was agreed in the settlement agreement. Thus, as long as he assumes a portion of liability that is charged on the released co-causers in the settlement agreement; for which, he also assumes the risk of recovering less than what is determined in due course by judgment, he may be attributed the gain. If, on the contrary, plaintiff does not assume the portion of liability that is charged on the released co-causer; and therefore, does not assume either the risk of recovering less than what could be determined in due course by judgment, he would only be entitled to recover exclusively what he is entitled to according to the judgment.
III
In light of the above, to resolve the case at bar, we must establish what the agreement gathered in the settlement agreement subscribe between US Fire and Zurich was, to thus determine the effects of the settlement in this judicial proceeding.
In the settlement agreement subscribed by US Fire and Zurich, it was stipulated, in its pertinent part, the following: 1. at Zurich issued in favor of PRASA an insurance policy covering part of liability for the loss of the helicopter property of the Puerto Rico Police; 2. That under the causes of the insurance agreement, Zurich was obligated to reimburse to *250 its insured the amounts covered under the policy for the payment of the principal of the judgment favoring US Fire; 3. that according to the letter of the policy, Zurich is not obligated to pay interests over the judgment, either pre-or post-judgment; 4. That in exchange of the payment of $421,000, US Fire releases a Zurich from all liability under the policy at reference and 5. that expressly, Zurich acknowledges US Fire's right to continue its claim against PRASA and PREPA and their other insurers until full payment of what is owed in accordance to the judgment that favors it.
It appears from the above that Zurich agreed to pay part of the principal of the judgment because it was stipulated that that was the liability it had under the policy issued in favor of its insured, PRASA. In exchange, US Fire released Zurich of all liability under the policy. In other words, US Fire obtained $421,000 in concept of what Zurich would be obligated to pay as established in the policy subscribed in favor of PRASA, nothing else.
The settlement agreement also expressly acknowledges US Fire's right to continue its claim against PRASA and PREPA and their other insurers, until full payment of what is owed in accordance to the judgment that favors it. Therefore, it is clear that through said settlement US Fire did not release from liability the other defendants as well as it did not limit either the liability of the other defendants to the remaining portion after subtracting the amount corresponding to the portion of liability of the released codefendant.
*251 It does not appear either from the agreement that US Fire releases Zurich from all liability that may arise in regard to this event. Therefore, it did not release it from liability with regard to an internal relationship between co-causers. Consequently, the other defendants conserve their right to level.
In conclusion, according to the settlement agreement, US Fire did not assume Zurich's liability. The money received by virtue of said agreement did not constitute a payment to assume liability of this codefendant. Thus being so, US Fire cannot benefit from the settlement agreement to obtain monetary benefits greater than what it is entitled to according to the judgment that favors it. As we explained, this benefit is obtained only if plaintiff assumes a portion of liability that is attributed to the released co-causers and likewise, assumes the risk of recovering less than what the judgment entered in due course provides. Pursuant to what is stated above, US Fire can only collect the total of what is owed according to the judgment that favors it, without anything else. In accordance to that, the payment made by virtue of the settlement agreement constitutes a partial payment of the judgment.
IV
Both parties alleged that the total amount that US Fire is entitled to by virtue of the judgment entered in its favor is $1,262,036.22. Nevertheless, US Fire received a total of $1,421,000.00. Therefore, it is to return the amount of $150,963.78, plus the interests *252 earned ever since it received the payment from Zurich, which is the moment in which the judgment was satisfied.
In this case, the First Instance Court did not pinpoint in its judgment the portions of liability attributed to PREPA and to PRASA. When there is no judicial ruling on the exact portion of guilt of the co-causers or when the harmful effect of the action of the co-causers is not susceptible to be measured, it's "the imposition of joint liability in equal contributive quotas" is proper.[4]Sánchez Rodriguez v. Loépez Jiménez, 118 D.P.R. 701, 710 and n. 2 (1987);Torres Ortiz v. E.L.A., 136 D.P.R. 556, 567 n. 6 (1994). Therefore, at this procedural stage, we must infer that PREPA and PRASA are liable in equal parts.[5]
US Fire received from Zurich, PRASA's insurer, only $421,000.00. PREPA being a joint debtor, is liable not only for half of what corresponds to it, rather for the amount that is yet to be satisfied of the judgment in its totality, which according to the parties, amounts to $1,262,036.22. Thus being so, US Fire was entitled to collect from PREPA a total *253 of $841,036.22. Nevertheless, PREPA deposited a total of $1,000,000.00. In other words, PREPA paid $158,963.78 in excess to what was owed according to the judgment. Therefore, PREPA is entitled to receive said amount from US Fire, plus the interests owed from the moment in which the judgment was satisfied.
In accordance with the above, the resolution of the Court of Appeals that denied the issue the writ ofcertiorari is revoked and we affirm what was decided by the First Instance Court. US Fire is ordered to return to PREPA $150,963.78, plus the interests earned.
Judgment will be entered accordingly.
Anabelle Rodríguez Rodríguez Associate Justice
*254 IN THE SUPREME COURT OF PUERTO RICO
US Fire Insurance Company and others Plaintiff-Respondent v. Electric Power Authority and others CC-2008 1600 Defendant-Petitioner v. Universal Insurance Company; Federal Insurance Company; Royal & Sun Alliance Insurance Company Third-Party Defendants-Petitioners
JUDGMENT
San Juan, Puerto Rico, on September 24, 2008
For the reasons set forth in the preceding Opinion, which are incorporated wholly to this Judgment, we revoke the Court of Appeals and US Fire is hereby ordered the return to PREPA of $150,063.78 plus the interests earned.
So pronounced, mandated by the Court and certified by the Clerk of the Supreme Court, Associate Justice Mrs. Fiol Matta concurred with the result without written opinion. Associate Justice Mr. Rivera Perez is inhibited.
Aida Ileana Oquendo Gaulau Clerk of the Supreme Court *255 No. 2015-012 TRANSLATOR'S CERTIFICATE OF ACCURACY I, Mayra Cardona Durán, of legal age, single, resident of Guaynabo, Puerto Rico, Certified Interpreter of the United States Courts (Certification No. 98-020) and certified member of the National Association of Judiciary Interpreters (Member No. 10671) member in good standing of the American Translators Association (Member No. 230112), and admitted to the Puerto Rico Bar Association (Bar No. 12390) hereby CERTIFY: that according to the best of my knowledge and abilities, the foregoing is a true and rendition into English of the original Spanish text, which I have translated and it is stamped and sealed as described therein. This document is comprised of Twenty (20) Pages, including this certification page, and does not contain changes or erasures. In Guaynabo, Puerto Rico today, Tuesday, February 17, 2015. Leda. Mayra Cardona BA Lit/Fr, MA Trans, JD United States Courts Certified Interpreter NAJIT Certified Interpreter and Translator 3071 Alejandrino Ave. PMB 306 Guaynabo, Puerto Rico 00969-7035 Tel. (787) 530-1414 Fax (787) 789-7363 e-mail: mayra@cardona.com
ATTACHMENT VI
Sagardía de Jesús v.Hosp. Auxilio Mutuo
177 D.P.R. 484 (2009)
[English Translation]
*256 IN THE SUPREME COURT OF PUERTO RICO
Miguel Sagardía de Jesús et al, Pettioners v. No. CC-2005-1263 Certiorari Hospital Auxilio Mutuo et al., Respondents
JUSTICE KOLTHOFF CARABALLO delivered the opinion of the Court.
San Juan, Puerto Rico, November 12, 2009
Here we must determine whether a sum settled by compromise between plaintiffs and some codefendants may be deducted from the total damages awarded when the codefendants released by the compromise agreement are not held liable for the tortious act We, must also determine whether a hospital is vicariously liable for the acts of medical malpractice committed by a physician working as an independent contractor in an exclusive franchise that provided anesthesiology services to patients in that institution. Moreover, we must determine whether it is proper to reduce the compensation awarded to plaintiffs for the physical damage sustained by their son because the latter remained unconscious for several days.
I
The essential findings of fact are the following.
In mid-1992, Rita M. Deliz Cordero became pregnant and received prenatal treatment from a group of obstetrician-gynecologists constituted by Dr. Arsenio Comas Urrutia, Dr. Ubaldo Catasús, and Dr. Than Figueroa Longo, under the main care of Dr. Comas. The pregnancy was nominal and there was no evidence of problems with the fetus during the gestation period. In the morning of April 2, 1993, Mrs. Deliz arrived at Hospital Auxilio Mutao (Hospital) by order of Dr. Comas because she was in active labor. While she Was being examined in the Hospital, Dr. Comas ruptured the membranes (a procedure known as "breaking water") and the amniotic fluid was noted to be meconium stained[1] Since no progress in the labor process Was being observed at that nine, the physician determined that probably Mrs. Deliz would have to undergo a caesarean section.
At 11:30 a.m. in view of the fact that labor was not progressing and there was cephalopelvic disproportion, in addition to the previously detected presence of Meconium, Dr. Comas decided to perform the cesarion section. No steps were taken prior to the surgical procedure to require the presence of a pediatrician or other trained medical staff *257 during delivery despite the fact that meconium had been detected. No pediatrician was available during delivery, even though the Hospital's medical staff at the time included pediatricians and neonatologists. The following medical staff was present during delivery: Dr. Comas, Dr. Miguel A. Eliza García (anesthesiologist), a female anesthetist, and two nurses (a circulating nurse and a scrub nurse).
Miguel Alfonso, a baby boy weighing 9 pounds and 6 ounces, was born at 12:16 p.m., with his body covered in meconium. At that time, Dr. Comas, as prescribed by the standard procedure, suctioned the baby's mouth and then his nose. Immediately after that procedure, the baby started to cry and Dr. Comas gave him to Dr. Eliza, who assumed the responsibility of taking care of the baby, inasmuch as no other person in the operating room had the necessary training and experience in caring for a newborn baby.
Dr. Eliza suctioned 4cc of meconium out of Miguel Alfonso, gave him oxygen, intubated him endotracheally, and used a laryngoscope.[2] The baby was given an Apgar score[3] of 7 at birth and 9 five minutes later. However, the record does not show who assigned the Apgar score or the criteria employed to assign that score. In view of the fact that the medical record is not very clear - but rather has countless deficiencies and gross omissions - Dr. Eliza testified at the trial that it was he who had assigned the Apgar score.[4]
When the attending physician (Dr. Sanchez) examined the newborn Miguel Alfonso in the Nursery, he suctioned the baby once more. In addition to the 4cc of meconium suctioned by Dr. Eliza in the Operating Room, an additional 7cc of meconium was suctioned from the baby's stomach and almost 1cc from the trachea. To prevent an infection, Dr. Sanchez ordered the administration of antibiotics. However, the antibiotics were ordered at 1:00 p.m., and the hospital's nurses administered them at 3:15 p.m. It was not until 3:30 p.m. that all medical orders were fulfilled.
At 4:55 p.m., it was confirmed that Miguel Alfonso had pneumonia. In view of this situation and of the continuous deterioration in the newborn's condition, Dr. Sánchez *258 contacted Dr. Jaunarena (the family's pediatrician) and decided to transfer the baby to a Neonatal Intensive Care Unit at Hospital Damas in Ponce, since Hospital Auxilio Mutuo did not have one at the time.
At 5:30 p.m., Dr. Ochoa (neonatologist at Hospital Damas in Ponce) accepted the transfer of the baby to that institution. Since Hospital Auxilio Mutuo had not established a protocol for situations of this type, it was not until 7:15 p.m. that Miguel Alfonso was transported by ambulance to Hospital Damas. In this trip, the newborn was accompanied by Dr. Sánchez, a female respiratory therapy technician, an intensive care nurse, and two paramedics.
The baby was admitted to the Intensive Care Unit of Hospital Damas on the night of April 2, 1993, and continued to receive medical treatment. Despite the care provided, his respiratory condition worsened. In these circumstances, the physicians at Hospital Damas advised plaintiffs to transfer the newborn to a hospital in the United States that had a specialized Extracorporeal Membrane Oxygenation (ECMO) machine.
The baby was transferred by air ambulance to Miami Children's Hospital, where he was placed in an ECMO machine. He was treated at Miami Children's Hospital since April 4, 1993, and his small body was pierced by countless needles and tubes. He was also kept in the Intensive Care Unit inside a machine that had some openings through which the hands could be introduced in order to provide the medical treatment he needed. The father, Miguel Sagardia de Jesus, was with the baby at all times until the mother, Mrs. Deliz Cordero, was allowed to travel and could also be with him. During the baby's stay in that hospital, both parents watched helplessly how their firstborn deteriorated until Miguel Alfonso, among other complications, suffered a cardiac arrest that kept him in a coma from April 23 to April 27, 1993, when he died.
Miguel E. Sagardía de Jesus, Rita M. Deliz Cordero, and the conjugal partnership constituted by them filed an action for damages against the Hospital, obstetriciangynecologists Comas Urrutia, Catasús, and Figueroa Longo, and anesthesiologist Eliza García. Plaintiffs alleged that Miguel Alfonso had died 25 days after his birth as a result of defendants' negligent acts and omissions.
Before the trial began, plaintiffs voluntarily dismissed with prejudice their action against Drs. Comas, Catasús, and Figueroa Longo by way of a private compromise agreement under which plaintiffs released those codefendants from their liability to them and to the remaining codefendants. The released codefendants, in turn, bound themselves to pay $200,000 to plaintiffs. The Court of First Instance accepted the compromise by way of a partial judgment, and the Hospital and Dr. Eliza remained in the action.
During the discussion on the compromise agreement held on the first day of trial, the codefendants, according to the transcript of the hearing, stated in open court that they had no interest in claiming any sum from the released codefendants.[5] Furthermore, the judge who conducted the proceedings clearly allowed the Hospital and Dr. Eliza with the *259 consent of all the parties, to present evidence on the liability of the released codefendants should they deem it pertinent.[6]
After conducting the trial, examining the extensive evidence presented, and hearing the testimony, the court found for plaintiffs, ordered codefendants (Hospital Auxilio Mutuo and Dr. Eliza) to solidarily compensate plaintiffs for the damage sustained, and found that it was more likely than not that the baby would have survived if he had received earlier, continuous, and more adequate medical care from Dr. Eliza, the Hospital's nursing staff, and the Hospital itself as an institution.
The court concluded that Dr. Eliza assumed responsibility for the baby when the latter was born and negligently failed to request the presence of a pediatrician, a neonatologist or any other professional. Regarding the medical record, the court concluded that Dr. Eliza's failure to enter annotations was alarming and inexcusable. The court also found that even though the presence and inhalation of meconium is not unusual, when such situation is noticed, fast and adequate action must be taken to suction as much as it is possible in order to prevent or reduce the damage that may be caused to the baby. The court further concluded that if the attending pediatrician extracted 7cc of meconium from the baby's stomach and 1cc from his trachea when the baby arrived at the nursery, it was because Dr. Eliza had been negligent in extracting the meconium.
Consequently, the court concluded that Dr. Eliza was negligent in failing to suction all the meconium inhaled by the baby, and this failure caused the damage that resulted in the baby's subsequent death. The court specifically stated that Dr. Eliza's handling of the baby was brief, inadequate, discontinuous, and not entered in the medical record. The court further concluded that the Hospital was solidarily liable to plaintiffs[7] and ordered them to solidarily pay $809,778.52.[8] Moreover, defendants were ordered to *260 pay $4,000 in costs, expenses, and attorney's fees for obstinacy, plus interest at the prevailing rate of 5.25%.
Therefore, according to the evidence presented, the trial court held that codefendants Dr. Eliza and the Hospital were solely liable for the tortious event. Thus, even though they filed a motion for additional findings of fact and conclusions of law and sought a finding of liability against the released codefendants, the judge denied the motion.
The Hospital and Dr. Eliza filed separate appeals, which were consolidated. In a lengthy judgment, the Court of Appeals thoroughly discussed the issues raised by defendants, modified the judgment rendered by the Court of First Instance, and held that the Hospital was not negligent in keeping and maintaining an exclusivity contract with the anesthesiology firm of which Dr. Eliza was a member, thereby delegating to that group unsupervised decisions on what staff and equipment were needed in its operating rooms. Likewise, the court held that no causal relation was established between the damage caused and the fact that the Hospital did not have a protocol for the transfer of infants in critical condition to a tertiary care hospital. The court, however, upheld the finding of solidary liability made by the Court of First Instance against the Hospital and Dr. Eliza.
The Court of Appeals likewise modified the $50,000 award to plaintiffs for the physical pain suffered by their son at the rate of $2,000 for a period of 25 days and reduced it to a period of 17 days, for a total of $34,000. The intermediate court deemed that since the award was based on the physical pain suffered by the baby, the amount resulting from the number of days in which, according to the record and the evidence presented, he was sedated and/or comatose had to be deducted from the total award; therefore, since the baby felt no pain for eight days, no compensation could be awarded for physical pain not suffered on those days.
The Court of Appeals also deducted from the total award the $200,000 already paid to plaintiffs under the compromise agreement between them and the released codefendants. Thus modified, the judgment appealed was affirmed.
Since none of the parties was satisfied by this judgment, they resorted to this Court through their respective petitions. The Court did not accept those filed by Hospital Auxilio Mutuo and by Dr. Eliza. Plaintiffs, in turn, assigned the following errors in their petition for certiorari:
i. The Court of Appeals erred in modifying the Judgment rendered by the Court of First Instance and thus deducting from the amount awarded in damages to plaintiffs-petitioners the total amount settled by compromise between plaintiffs-petitioners and Drs. Comas, Catasús, and Figueroa Longo, invoking reasons of equity.
*261 ii. The Court of Appeals erred in modifying the Judgment rendered by the Court of First Instance and in holding that Hospital Auxilio Mutuo is not liable for not having, back in 1993, a protocol for the transfer of infants in critical condition to a tertiary care unit.
iii. The Court of Appeals erred in modifying the Judgment rendered by the Court of First Instance and reducing the amount awarded to plaintiffs for the physical damage suffered by the newborn.
iv. The Court of Appeals erred in modifying the Judgment rendered by the Court of First Instance and not imposing vicarious liability on Hospital Auxilio Mutuo for Dr. Eliza's acts even when it was shown that the group of anesthesiologists for which Dr. Eliza worked was contractually responsible for having the necessary trained staff available at all times in the delivery room.9
We are ready to decide this case.
II
In their first assignment of error, petitioners allege that the Court of Appeals erred in subtracting the amount settled by way of a compromise agreement between them and some codefendants from the total amount awarded in damages. We agree.
[1] A. The main elements of a compromise are: (1) the existence of an uncertain and litigious controversy or legal relationship; (2) the parties' intent to replace, by way of the compromise, the uncertainty over the objective elements of the legal relationship with another relationship that is "certain and incontestable"; and (3) the mutual concessions.[10] In most cases, the cited uncertainty is the cause of the compromise. Prior to compromising, the parties may find themselves in a state of uncertainly about the legal grounds on which they may rest and the lack of objective knowledge about the outcome of the lawsuit or future lawsuit. That uncertainty is what ordinarily leads the parties to compromise.[11]
As a result, under a compromise agreement, the parties replace uncertainty with the certainty of a contract. Furthermore, when both parties reach a compromise, they assume the risk (of paying more or receiving less) in order to avoid or put an end to a lawsuit.
[2] B. In damages cases, the victim may waive his or her claim against any of the joint tortfeasors by way of a compromise agreement. Moreover, this situation may also occur in situations involving a plurality of subjects. In the last few years we have explained the effects produced by this type of agreement in damages cases in which a plurality of subjects is solidarily liable for the damage caused. We have held that the effects of the agreement on the joint tortfeasor or codefendant with whom the compromise is reached and on those who remain in the action depend on the terms of the *262 compromise.[12] Therefore, it is vitally important to know what was agreed upon in order to accurately determine the scope of the compromise.[13]
[3] In a recent case,US Fire Insurance v. A.E.E., 174 D.P.R. 846 [74 P.R. Offic. Trans. ___] (2008), we clarified the standards that govern the effects of a compromise in terms of both the internal relationship between solidarily liable codefendants and the external relationship between codefendants and plaintiffs. There, we stated that the release of one of the codefendants from liability by a victim does not entail the release of the other codefendants if such intention is not clearly stated in the compromise agreement.[14] Consequently, the victim may continue with his or her claim against the remaining codefendants.
[4] In turn, the effects of a compromise on the non-compromising codefendants will depend on the agreement reached between the plaintiff and the released codefendant. It may happen that by way of the compromise agreement, the victim releases a codefendant fromail liability that may arise with respect to the tortious event. This act is considered a release from liability to the victim (external relationship) as well as to the relationship existing between the codefendants (internal relationship). As a result, when this situation occurs, if the released codefendant accepted his or her liability for the tortious event, or if the court finds him or her liable, the main effect is thatthe victim assumes the share of liability attributed to the released joint tortfeasor.[15] Consequently, the remaining joint tortfeasors cannot recover anything from the released joint tortfeasor.[16] The action for contribution is not available to them because the compromise agreement exempted the released joint tortfeasor from internal liability. Therefore, the share of liability attributed to the released joint tortfeasor is deducted so that they may not pay more than their share.[17]
In these circumstances, the remaining joint tortfeasors will be liable only for the amount that remains after deducting the sum corresponding to theshare of liability of the released joint tortfeasor, not for the totality of the damages.[18] The plaintiff, in turn, will *263 receive the amount established in the compromise agreement in payment of the amount corresponding to the share of liability - if any - that may be determined in due time for that joint tortfeasor.[19]
For this reason, in accordance with the risk assumed, if, when judgment is rendered, the amount corresponding to the share of liability of the released joint tortfeasor is greater than the amount received in exchange for the release from liability, the plaintiff assumes said reduction. Contrariwise, if that amount is lower than the amount received in exchange for the release from liability, the plaintiff receives the additional amount.[20]
Under this type of settlement, if the joint tortfeasor, after being released, is not held liable, he or she is not entitled to recover the amount paid; neither are the other joint tortfeasors entitled to file an action for contribution. In this case, the plaintiff receives the additional amount.
[5] On the other hand, the compromise agreement may be limited to the release of a joint tortfeasor only in terms of the external relationship. In other words, the plaintiff may waive an action for damages against one of the joint tortfeasors without releasing him or her from the effect this may have on the remaining joint tortfeasors. This type of compromise does not preclude the victim from continuing with the action against the other joint tortfeasors in order to recover the totality of the damages.[21] If, in order to satisfy a judgment, the other joint tortfeasors have to assume the share of the released joint tortfeasors and pay a sum that exceeds their share of liability, they may file the corresponding action for contribution.[22]
In this context, it is proper to deduct theamount settled in the compromise agreement. Otherwise, the plaintiffs, without assuming any risk, may recover the totality of the money judgment plus the amount obtained through the compromise agreement.[23] This would constitute unjust enrichment, inasmuch as the joint tortfeasors would sustain an impoverishment by paying more than their share, while plaintiff would experience an enrichment without assuming - as we have pointed out - any risk. Consequently, that type of compromise agreement that exempts the released tortfeasors only from the external relationship has the effect of making available to the non-released joint tortfeasors the action for contribution against the released joint tortfeasors.
C. With respect to the facts of this case, in the Private Compromise Agreement (Agreement) signed by plaintiffs and Drs. Comas, Figueroa Longo, and Catasús, the physicians agreed to pay $200,000 as total compensation for all the facts alleged by plaintiffs against them. The released codefendants, however, stated that the payment of that *264 sum did not constitute an admission of liability. As a result of the Agreement, plaintiffs released Drs. Comas, Figueroa Longo, and Catasns from all claims made in the complaint, thereby releasing them from the external relationship between them and plaintiffs.
On the other hand the Agreement shows that plaintiffs' intent was to also release codefendants from the internal relationship. The compromise agreement shows that plaintiffs totally released the compromising codefendants from any claim made by the other codefendants should a cross-claim be filed.[24] Consequently, the Agreement released the compromising codefendants from external liability as well as from internal liability.
When plaintiffs released codefendants Dr. Comas, Dr. Figueroa Longo, and Dr. Catasús from both the internal relationship and the external relationship, plaintiffs subrogated themselves in place of those codefendants. The main consequence of this action was that if any of the released codefendants was held liable,the portion of liability imposed would be deducted from the sum awarded. Here, the released codefendants were not held liable or found to be joint tortfeasors; therefore, nothing could be deducted from the sum awarded to plaintiffs as a result of the compromise agreement they had signed.
[6] InUS Fire Insurance v. A.E.E., 174 D.P.R. at 858 [74 P.R. Offic. Trans. at ___], we held "that a plaintiff who signs a compromise agreement with one of the codefendants and ends up receiving, in total, an amount greater than the amount to which he or she would be entitled under the judgment rendered in his or her favor, may keep said additional sum if this was set forth in the compromise agreement." The compromise agreement reached in this case shows that plaintiffs assumed the portion of liability that would be imposed on the released codefendants and, therefore, assumed the risk of recovering less or more. Compromises in cases of this type entail the assumption of risks by the plaintiffs and the released codefendants. As we have already pointed out, the compromise agreement is based on the uncertainty that surrounds the litigation. It could happen that the released codefendant is held liable and, depending on his or her share of liability, the outcome could turn out to be (or not to be) beneficial for one party or for the other. That is the risk involved in a compromise agreement.
In this case, Drs. Comas, Figueroa Longo, and Catasús reached a compromise agreement with plaintiffs and thus, avoided a lengthy litigation. They assumed the risk of paying more - which eventually occurred. In its judgment, the Court of Appeals deducted *265 $200,000 from the total damages awarded on equity grounds, stating that the "[f]ailure to deduct said sum from the total amount awarded by the trial court would constitute double compensation to plaintiffs with respect to the stipulated sum."[25]
However, we believe that under these standards, we may dispose of the controversy without resorting to equity. Furthermore, the possible effect of recovering a larger sum for the risk assumed in a compromise agreement does not constitute double compensation for the damage sustained.
On the other hand, affirming the appellate court's decision would be tantamount to benefiting those codefendants who took no part in the compromise agreement. They would be paying less than what they have to thanks to a compromise agreement to which they were not parties and for which they assumed no risk whatsoever. Moreover, allowing plaintiffs to receive a gain does neither harm nor concern the codefendants because they did not contribute to that gain and, on the other hand, they would have to pay their respective percentage of liability anyway.
Consequently, we reverse the Court of Appeals' decision in this respect and hold that the sum of $200,000 resulting from the compromise agreement should not have been deducted from the total award of damages.
III
In the second assignment of error, plaintiffs allege that the Court of Appeals erred in holding that the Hospital is not liable for not having, back in 1993, a protocol for the transfer of infants in critical condition to a tertiary care unit. We do not agree.
[7] Among the elements required by Civil Code sec. 1802[26] is that of causality or a causal relation, which is not established on the basis of mere speculation or conjecture. In medical malpractice cases, this causal relation is established by showing that the damage sustained was most likely caused by the physician's acts.[27]
In the facts of this case, there is no controversy over the Hospital's liability for the negligence of its employees (which, along with Dr. Eliza's liability and the lack of trained staff in the Delivery Room, was what most likely caused the harm). However, according to the evidence presented, it was established that although Miguel Alfonso was in a delicate condition, he remained stable in Ponce, and even that he was not intubated until the following day. Moreover, there is no evidence on record to show that the transfer was negligent or that the absence of a protocol affected Miguel Alfonso. Therefore, as the appellate court correctly concluded, plaintiffs failed to establish the existence of a causal relation between the lack of a protocol for the transfer of infants in critical condition to a tertiary care unit and the damage sustained.
*266 IV
Plaintiffs allege that the Court of Appeals erred in reducing the compensation awarded to them for the physical damage suffered by their son. We agree.
[8-9] A. Civil Code sec. 1802, which is the threshold of noncontractual (tort) civil liability, provides: "A person who by an act or omission causes damage to another through fault or negligence shall be obliged to repair the damage so done." Caselaw has defined damage as "any material or moral loss resulting from the violation of a legal provision, suffered by a person and for which another person is liable."[28]
[10-11] Patrimonial damages and non-patrimonial damages are intrinsic to the concept of damage.Patrimonial damage is the loss - measurable in terms of money - in the wealth or patrimony of the person suffering the damage.[29]Non-patrimonial damage, in turn, is "in principle, [that] whose value in terms of money is not based on parity like patrimonial damage, because [it involves] elements or interests whose monetary value is difficult to assess."[30]
[12] Moral damage is essentially non-patrimonial damage. However, caselaw has made a distinction between genuine moral or pure damage and oblique moral damage or indirect patrimonial damage. The consequences produced by the first type of damage are non-patrimonial in nature, while the second type of damage is that which, "by harming immaterial interests, transcend[s] to patrimonial values."[31]
[13] We have previously stated that moral damage is that inflicted on beliefs, feelings, dignity, social esteem, or physical or psychic health of the person aggrieved.[32] Therefore, such damage mainly affects personal rights - either from a physical or a moral standpoint - of human beings.[33] Likewise, the harm caused to the integrity of physical faculties, the act ofdepriving a person of a limb or faculty, as well as all forms of physical or moral pain, have been recognized as moral damage.[34]
[14] Now, moral damage is a broad concept that includes different aspects of human nature and results from multiple causes.[35] As we have already pointed out, such *267 broadness covers from physical or body pain and mental anguish to bodily harm and injuries. Although the termssuffering andphysical damage have been used as concepts independent from the concept ofmoral damage, we must recognize that these are part of the latter concept, even if they constitute different aspects of it.
[15] A tortious act may result in bodily injury or damage, which may range from light blows to a serious injury that leads to death.[36] This type of bodily damage may be compensated and is recognized as an independent type included in the concept of moral damage.[37]Consequently, an injury inflicted on a person's physical integrity or faculties as a result of a tortious act may be compensated.
On the other hand, one of the main manifestations of bodily injury can be pain, which may occur in the person's body or mind. Physical pain "[i]s the local or general manifestation of the injury as a result of the nerve receptors specialized in the reception of different stimuli."[38] It is an afflictive sensation caused by a physical condition that becomes manifest in different forms, most of which are perceptible. For that reason, in order to feel pain, a person must have the capacity to feel it. Therefore, aside from the difficult process of quantifying pain, evidently it is easier to establish the existence of physical pain (because of its intrinsical relationship with bodily injury) than the existence of psychic pain or mental anguish.[39]
Mental anguish, in turn, is the reaction of the mind and the conscience to an event or to a bodily injury or damage suffered and its subjective impact on personal well-being.[40] Consequently, mental anguish is not always related to bodily damage because it mainly affects the emotional and mental ambit of human beings. It may arise as a direct consequence of the tortious event or as a collateral effect of the damage suffered by another person.
[16] B. This Court held a long time ago that the victim of a tortious act may be compensated for his or her physical and mental sufferings from the time of occurrence to his or her death; therefore, upon death, the victim transmits the cause of action to his or her heirs.[41] However, with respect to newborns, this Court has stated that a child cannot *268 sustain mental damage, in the legal-compensatory sense, during the first months of his or her life.[42] Thus, in cases involving children who are a few months old and who die as a result of a tortious act, they transmit their cause of action - though limited - for moral damages in its aspect of mental damages.
[17] C. It is incumbent upon the judge, in his or her sound judgment, experience, and discretion, to make a fair and necessary assessment of the damage suffered in order to award adequate compensation therefor.[43] However, reasonableness must be the compass guiding the judge in the circuitous task of assessing and appraising damages. Thus, inS.L.G. Rodríguez v. Nationwide, 156 D.P.R. 614, 622 [56 P.R. Offic. Trans. ___, ___] (2002), we stated:
The assessment and appraisal of damages is a difficult and distressing task and endeavor because there is a certain degree of speculation involved in it and because it involves, in turn, subjective elements such as the discretion, sense of justice, and human conscience of the trier.44
The judicial task becomes even more complicated in cases involving moral damages, since the assessment of and eventual compensation for moral damage is not a mechanical or easy task. For this reason, it takes great effort to assign monetary value to personal interests that are not part of the framework of patrimonial damages.
[18] Thus, on countless occasions this Court has held that it will abstain from disturbing the weighing of the evidence and assessment of damages made by a trial court.[45] It is a well-settled rule that out of deference and respect for trial courts, and for the sake of stability, appellate courts have the power to modify the amounts awarded only in cases in which those amounts "are absurdly low or exaggeratedly high."[46]
*269 D. The Court of First Instance awarded Miguel Alfonso's parents $50,000 for the baby's physical damage and sufferings. That court specifically stated:
Instead of being received by the warm and tender arms of his parents, baby Sagardía-Deliz was placed in a crib with a respirator, and his small body was entirely pierced by tubes and needles used to medicate and feed him during the 25 days he lived. That physical suffering is compensable, and for that reason we award a reasonable amount to the parents in the action inherited from their son on those grounds.47
However, at the end of the judgment, the trial judge stated that the $50,000 awarded to both petitioners for the cause inherited from their son was on account of the physical pain suffered by the baby, at the rate of $2,000 per day, for a period of 25 days. Thus, the Court of Appeals used this expression to deduct from the award the number of days in which the baby "felt no pain." The court subtracted eight days from the sum awarded on the ground that the child was not intubated for one day, was sedated and irresponsive to stimuli for two days, and was five days in a coma.[48]
Although it is true that the trial court stated at the end of the judgment that the sum awarded was at the rate of $2,000 per day, the truth, as may be inferred from the judgment, is that the $50,000 award was for the physicaldamage and sufferings endured by Miguel Alfonso; not only for his physical pain, but also for the broader concept of moral damage, which includesbodily injuries.[49] It is evident that baby Miguel Alfonso remained sedated and comatose for some days because his physical integrity was affected by an act of medical malpractice.This bodily injury, as well as the harm caused to his capacity to feel, is compensable. The condition of a person who is comatose or sedated as a result of a tortious act constitutes a bodily injury compensable as moral damage. Said compensation is not based solely on the perception of pain, but also, among other things, on the injury that keeps the person in a coma or unable to feel pain.[50]
Therefore, the sum awarded to plaintiffs for the damage sustained by their son covers all the moral damages he suffered as consequence of the tortious act. Since we deem that sum reasonable, we abstain from disturbing the trial court's weighing of the *270 evidence and assessment of damages. In view of the above, we reverse the Court of Appeals' decision to reduce the amount awarded to Miguel Alfonso's parents for the damage suffered by the child.
V
Lastly, in the fourth assignment of error, plaintiffs contend that it was established that the group of anesthesiologists for which Dr. Eliza worked had the contractual responsibility to have all necessary skilled and trained staff available in the delivery room at all times and that, therefore, the Hospital should be held vicariously liable for Dr. Eliza's acts. However, when we examine the judgment rendered by the Court of Appeals, it becomes clear that said court modified the judgment of the Court of First Instance by stating that the liability fell on the Hospital, not on the group of anesthesiologists.[51] Consequently, as the intermediate court correctly stated, the Hospital's liability was direct, not vicarious. We must, therefore, determine whether the Hospital is vicariously liable for Dr. Eliza's acts.
[19] A. There is no doubt that a hospital is liable for the negligence of its employees when they commit acts of malpractice against patients treated in its facilities. The hospital's liability in these cases is framed within the concept of vicarious liability established under Civil Code sec. 1803.[52] However, this Court has established a clear distinction in cases involving acts of medical malpractice committed by physicians not employed by a hospital, but to whom that institution granted the privilege of using its facilities to treat their private patients.
When the acts are committed by the physician against his or her private patients at a hospital chosen by the physician, ordinarily the hospital is not held liable.[53] However, the hospital could be held liable for the acts of these physicians if it fails to fulfill any of the following obligations: (a) to carefully select the physicians who are granted that privilege; (b) to require that said physicians keep up-to-date through professional advancement studies; (c) to monitor the work of those physicians and take action, when possible, in the face of an obvious act of malpractice; (d) to discontinue the privilege *271 granted in the face of repeated or crass acts of malpractice committed by those physicians; and (e) to keep reasonably abreast of available technological breakthroughs.[54]
[20] In turn, when a patient goes to the hospital and the hospital provides the physicians, we have held that the hospital will be solidarily liable with the non-employee physician who committed malpractice.[55] This is because, in the first place, it is the hospital that provides the services of that particular physician, and the patient ordinarily has no option and takes no part in that choice.[56] For that reason, "[t]o a certain point one can affirm that in this type of situation the hospital is `guaranteeing' to the patient that said physician, or any other who treats him under those circumstances, is a competent physician who is fit to render medical assistance."[57] In second place, what the patient sees and deals with is the hospital, not physicians acting independently.[58] Therefore, a physician who works at that hospital is, to the patient, an apparent employee or assistant [agent] of the hospital. In third place, evidently when a patient goes to the hospital to receive services, the main relationship established in that case is between the patient and the hospital,[59] since in this context, the hospital is not a place that houses many independent physicians, but an entity bound to provide good services to patients who visit it Lastly, this Court has held that even in cases involving an independent contractor bound by a relationship in which "the hospital is the main beneficiary of the work done by the physician, the hospital must be held liable for the negligent acts committed by the physician.[60]
Regarding the above-cited standards, we have also recognized "that it makes no difference whether the attending physician is a hospital employee or not, or a physician granted a `franchise' to offer his specialized medical services to the hospital patients, or a physician belonging to the hospital staff and called in for consultation to treat the patient, etc."[61]
[21] In cases involving exclusive franchises - such as contracts for radiology, anesthesiology, and emergency room services, among others - it is clear that the above-cited doctrine applies. In this type of scenario, the patient usually has no option and takes no part in the selection of a given physician or service. The hospital provides the service to the patients who resort to it. Therefore, in situations of this type, the hospital and the *272 physician are jointly liable to the patient. An implicit guarantee is created to assure that the hospital will provide the service competently. However, in situations in which the hospital grants an exclusive franchise to a physician or a group of physicians to render specialized medical services to hospital patients, the institution must be liable for the negligent acts of said physicians.
[22] This Court has held that physicians granted an exclusive franchise to render anesthesiology services at a hospital are jointly liable with the hospital if the hospital lacks the basic equipment to adequately operate the franchise.[62] However, we must add that although many of these cases involve an independent contractor, since the hospital benefits from the work done by the physician, the hospital and the physician must answer jointly for the negligent acts of the physician.[63]
However, the hospital's liability is not vicarious, but direct, primary, and separate with respect to the patient. This liability cannot be shirked by hiring independent contractors, since the hospital itself is the one providing the service and the physicians to the patients. Therefore, both must answer solidarily for the negligent act committed.
[23] We have previously acknowledged that in certain circumstances, hospitals could be held liable for those physicians who only enjoy the privilege of working at the hospital without being employees.[64] On that occasion, we stated that in those cases, liability would be solidary, without prejudice to a finding of the exact degrees of liability and to the right of contribution within the internal relationship.[65] Thus, if the patient went to the hospital - either on his or her own or by order of his or her private physician - and he or she suffers a compensable damage caused by an independent contractor physician, both the physician and the hospital will be solidarily liable.
B. Regarding the Hospital's liability for Dr. Eliza's acts, clause number 30 of the exclusivity contract expressly shows that the latter is an independent contractor of the former. However, as we previously stated, the Hospital is solidarily liable for Dr. Eliza's acts. In this case, Mrs. Deliz went to the Hospital by order of her physician, but the medical malpractice act was not caused by that physician, but by anesthesiologist Eliza, who is an independent contractor of the Hospital. Nevertheless, evidently Mrs. Deliz neither decided nor took part in the selection of the physician who would anesthetize her; much less did she decide that it had to be that anesthesiologist (Dr. Eliza) who would have to take care of her baby because there was no pediatrician in the Operating Room. In turn, when she was operated on, the anesthesiologist became an assistant of the Hospital; consequently, the institution is solidarily liable with the physician for the latter's acts. Therefore, the fourth error was not committed.
*273 VI
For the foregoing reasons,the judgment rendered by the Court of Appeals is modified as stated above and thus modified, it is affirmed.
Judgment will be rendered accordingly.
Justices Fiol Matta and Rodríguez Rodríiguez concurred in the result without a written opinion. Chief Justice Hernández Denton issued a partly concurring and partly dissenting opinion.
*274 IN THE SUPREME COURT OF PUERTO RICO
Miguel Sagardía de Jesús et al., Petitioners v. No. CC-2005-1263 Certiorari Hospital Auxilio Mutuo et al., Respondents
CHIEF JUSTICE HERNÁNDEZ DENTON, concurring in part and dissenting in part.
San Juan, Puerto Rico, November 12, 2009
I concur with Part IV of the Opinion of the Court because the court below erred in reducing the compensation awarded to the spouses Sagardía-Deliz for the damage suffered by their son Miguel Alfonso. However, I dissent from the rest of the Court's Opinion because I believe that in light of the compromise agreement signed in this case, we must apply the rule laid down inS.L.G. Szendrey v. Hospicare, Inc., 158 D.P.R. 648, 658-659 [58 P.R. Offic. Trans. ___, ___ (2003) (Szendrey ).
As a result, plaintiffs would absorb the share of fault that would have been attributed to the defendants they released from both the external relationship and the internal relationship and, consequently, the amount corresponding to the degree of negligence of those codefendants would be deducted from the sum awarded by the judgment. Absent a specific determination on the distribution of fault within the internal relationship, it is proper to remand the case to the Court of First Instance for it to make such a determination or to divide the fault equally among all the joint tortfeasors. See Puerto Rico Civil Code sec. 1091 (31 L.P.R.A. § 3102). See also:US Fire Insurance v. A.E.E., 174 D.P.R. 846 [74 P.R. Offic. Trans. ___] (2008);Sánchez Rodríguez v. López Jiménez, 118 D.P.R. 701, 705 n.2, and 710 [18 P.R. Offic. Trans. 808, 814 n.2, and 819-820] (1987).
The Court's Opinion, however, holds that the effects of the rule laid down inSzendrey are not applicable to this case because no claim was filed against the released physicians. It further states that the remaining codefendants-Dr. Miguel A. Eliza Garcia (anesthesiologist) and Hospital Auxilio Mutuo-presented no evidence on the liability of these codefendants or on the distribution of fault among the joint tortfeasors who caused Miguel Alfonso's death. As a result, the Court decided that the amount corresponding to the degree of fault of the released defendants cannot be deducted from the judgment.
The main problem with this decision is precisely thatSzendrey bars the filing of any claim-whether a cross-claim, a third-party complaint, or a separate action for *275 contribution-against the released codefendants when the intention stated in the compromise agreement is to release them from liability in terms of the internal relationship and the external relationship. It would not be necessary to bring suit against the released codefendants because under the terms of the compromise agreement, they would not be liable to the plaintiffs or to the defendants who remain in the action.
However, in exchange for that total release, the plaintiffs subrogate themselves in place of the released codefendants and thus assume the risk that in the final determination of liability againstall the joint tortfeasors, the Court will find the released codefendants liable for a higher degree of fault than that foreseen when the compromise agreement was signed. Only thus would it make sense to sign a compromise agreement because, as is well known, part of the consideration in this type of agreement is mutual renunciation. In this respect, it has been stated:
[It is not] fair to state that the cause should center on putting an end to a controversy; this must be necessarily complemented by mutual concessions.... It is always necessary that both parties sacrifice and concede something at the same time in order to end a litigation over the matter at issue.
. . . .
Overall, the litigation and the mutual concessions constitute the elements of the cause.
Silvia Tamayo Haya,El contrato de transacción 210, Madrid, Ed. Thomson-Civitas (2003) (cited inLópez Tristani v. Maldonado, 168 D.P.R. 838, 857 [68 P.R. Offic. Trans. ___, ___] (2006)). (Emphasis added.)
According to this principle, we must inevitably ask what is the true cause [consideration] of the compromise agreement signed by plaintiffs in this case. If despite signing said compromise agreement, they would not be facing any risk (since, according to the Opinion of the Court, they may recover damages fromall the tortfeasors), the agreement would lack a cause. More importantly, it would be improper to allow plaintiffs to recover both the amount obtained through the compromise agreement and the amount awarded by judgment, inasmuch as the defendants who were not part of the compromise agreement would be paying the totality of the judgment and would not be entitled, under the terms of said agreement, to file an action for contribution against the released defendants.
In view of this fact, inSzendrey, at 658 [58 P.R. Offic. Trans. at], we held, in clear and imperative terms, that the trial court "will have to assess the total cash value of the damage caused to plaintiffs byall the joint tortfeasors and will deduct from said total amount a sum equivalent to [the] degree of liability." Likewise, for purposes of contribution among the codefendants who remain in the case, "the court must determine the degree of each codefendant's contribution to the damage suffered by plaintiffs, even when they remain solidarity liable to plaintiffs for the totality of the remaining damages,"
*276 that is, for the amount that may result after subtracting the sum corresponding to the degree of fault of the released codefendant.Id. at 658-659 [58 P.R. Offic. Trans. at ___].
In the alternative, of course, the defendants who were not part of the compromise agreement - Dr. Eliza Garcia and the Hospital - could the a separate action for contribution to claim from plaintiffs the amount that the former paid in excess and that the latter should have assumed under the compromise agreement. SeeSoc. de Gananciales v. Soc. de Gananciales, 109 D.P.R. 279 [9 P.R. Offic. Trans. 365] (1979).Torres v. A.F.F., 94 P.R.R. 297 (1967).
However, since the litigants in that future action for contribution are already part of the case under our consideration, it is unnecessary to wait for that action to be There is no doubt that in this case, the trial court erred in failing to apply theSzendrey rule when rendering judgment. During the first day of trial, an extensive debate arose on the scope of the compromise agreement, its effects on the released codefendants, and its consequences with respect to the standards that govern solidarity. The trial court examined the issue and approved the compromise agreement (despite having initially refused to approve it) after plaintiffs' attorneys told the court that they would present evidence on the liability of all codefendants-even those who were released under the compromise agreement. See Addendum to the petition for certiorari at 61-62. Thus, the trial court would be able to assess the degrees of fault of each of the joint tortfeasors and, consequently, to correctly apply theSzendrey rule.
A reading of the compromise agreement reveals that the parties in this case had the intention to release Dr. Arsenio Comas Urrutia and his obstetrics group from both the external relationship and the internal relationship:
[P]laintiffs release, acquit, and forever discharge codefendants Dr. Arsenio Comas Urrutía, Seguros Triple-S Inc., and the professional Partnership for the practice of Gynecology Obstetrics Gynecology & Perinatal Medicine Associates, constituted by Dr. Arsenio Comas, Dr. Juan Figueroa Longo, and Dr. Ubaldo Catasús, from all claims or causes of action that may arise for any reason or as a result of any damage or loss ... suffered by plaintiffs or that may be suffered as a consequence of the facts set forth in the action filed in this case or in any of the amendments made thereto.
. . . .
At the time of signing this Agreement, there are no cross-claims filed among the codefendants. Should any of the codefendants remaining in the action file a cross-claim or a third-party complaint against all or some of the appearing codefendants after this agreement is signed and executed, even if any of said actions would be belated and legally untenable, plaintiffs agree, upon payment of the compromised sum of $200,000, to the following:
a. To totally release the appearing codefendants with regard to any claim made by the codefendants in said cross-claim.
*277 b. [Should any cross-claim or third-party complaint be allowed,] plaintiffs will release the appearing [codefendants] from payment of the corresponding sum regardless of the amount involved.
In view of the wording of the cited contract, the trial court, as part of its assessment, stated at the beginning of the hearing on the merits that "plaintiffs' counsel ... will prove all their allegations ... against parties that will not even be here." Addendum to the petition for certiorari at 61-62. This remark was made in clear reference to Dr. Comas and the other released defendants. Thus, it was not proper for the codefendants who remained in the action to present evidence against those who were released because under the terms of a compromise agreement such as the one signed in this case, any cross-claim or third-party complaint would have been untenable. Neither it is pertinent that Dr. Eliza had "waived" the filing of a claim for any sum against the released codefendants, since he could not do so under the terms of the compromise agreement.
Although some evidence on Dr. Comas's acts was presented on the first few days of the trial, plaintiffs reevaluated their previous determination to present evidence against him and informed their decision to withdraw the expert obstetrician they had hired because they believed that this was not necessary in light of the compromise agreement signed by the parties. Appendix to the petition for certiorari at 1164-1165. However, at that time, we had already decidedSzendrey by way of an Opinion dated February 14, 2003.
Consequently, I believe that before rendering judgment - in December 2003 - the trial court should have required evidence on the degree of fault of the released defendants as prescribed inSzendrey. Defendants informed this to the court on several occasions and even filed a motion for additional findings of fact and conclusions of law. Still, the Court of First Instance denied the motion on grounds that the compromise agreement was confidential. Appendix 5 to the petition for certiorari at 164-168. In so doing, it erred.
Therefore, I concur with Part IV of the Opinion of the Court, which reversed the decision to reduce the sum awarded to the spouses Sagardia-Deliz for the damage suffered by their son Miguel Alfonso. However, I dissent from the Court's refusal to apply to this case the rule laid down by this Court inSzendrey.
*278 ATTACHMENT VII
Febles Montalvo v.Pérez Cordero
2011 WL 5166431 (TCA)
[English Translation]
*279 2011 WE 5166431 (TCA)
Luis FEBIES MONTALVO, Wanda Guzman and the Marital Gains Partnership composed of both: Charlie Febles Montalvo, Lizbeth Febles Lizardi, for themselves and in representation of the Marital Gains Partnership composed of both, Plaintiffs-Respondents v. Mr. Raul PEREZ CORDERO; IHM Company; Mr. Javel Villega and Associates; ABX Company; Highways Authority; XYZ Company; Dr. Victor Valdes; SIMED; hospital de Damas; BCD Company; Jane Roe and Richard Roe, Defendants and Third Party Plaintiffs-Respondents v. L. Reyes Contractor, S.P., Third Party Defendant-Petitioner Luis Febles Montalvo, Wanda Guzman and the Marital Gains Partnership composed of both: Charlie Febles Montalvo. Lizbeth Febles Lizardi, for themselves and in representation of the Marital Gains Partnership composed of both, Plaintiffs-Respondents v. Mr. Raul Perez Cordero; IHM Company; Mr. Javel Villega and Associates; ABX Company; Highways Authority; XYZ, Company; Dr. Victor Valdes; SIMED; Hospital de Damas; BCD Company; Jane Roe and Richard Roe, Defendants and Third Party Plaintiffs-Respondents v. L. Reyes Contractor, S.P., Third Party Defendant-Petitioner COURT OF APPEALS Civil No.: JDP2004-0520 (601) KLCE201100414; KLCE201100531 In San Juan, Puerto Rico, on August 10, 2011 Aug. 10, 2011
CERTIORARI from the Court of Original Pleas Ponce Superior Part
Subject: Damages and Injuries
Panel composed of its Chief Judge, Lopez Feliciano, Judge. Associate Justice Hernández Serrano and Associate Justice Birriel Cardona.
JUDGMENT
HERNANDEZ SERRANO, WRITING FOR THE COURT
I.
On April 1, 2011, L. Reyes Contractor, S.P., came before the Court through awrit of certiorari, requesting that we vacate a partial judgment entered by the Court of Original Pleas, Ponce Superior Part (COP), on September 14, 2010, notified on the next October 1. In said partial judgment, the COP, after giving its approval to aSettlement Stipulation, Release and Motion for Partial Judgment, clarified that, by virtue of said agreement, Reyes Contractor isonly released from the claim filed by Luis Febles Montalvo and others.[1]
While said writ was before our consideration, on April 19, 2011, Reyes Contractor, tiled a second writ ofcertiorari to which anIn/Or/native Motion was attached. In that motion it tells us that both the writ filed on April 1 and the one filed on April 19, 2011, were exactly the same. It further explained that the filing of the second writ is is in response, among other things, to the existence of two notifications. In that manner, it asked for the consolidation of both writs.
In attention to said motion andafter a weighted analysis of the procedural peculiarities of the captioned case, on May 5, 2011, we entered a Ruling in which we ordered the consolidation of the writs in KLAN201100414 and KLAN201100531 and granted the respondents a term of ten days to show cause why we should not issue the writ and vacate the decision entered by the COP.
On May 19, 2011, respondent Highways Authority filed aBrief in Opposition. Thus, on June 3, 2011, we entered a ruling in which we indicated that "... the term granted to the respondent party on May 5, 2011, to show cause why we should not issue the writ and vacate the decision entered being challenged, having expired. without having appeared and taking into consideration that only the Highways Authority has made an *280 appearance before us, we deem the case as submitted."
After an examination of the briefs submitted before this forum, and considering the writ ofcertiorari filed by Reyes Contractor, we receive same as an appeal in conformity with the rules established by the Puerto Rico Supreme Court inAbraham Rivera v. Commonwealth, 178 D.P.R. 914 (2010);Bank of Santander P.R. v. Fajardo Farms, Corp., 141 D.P.R. 237 (1996).
On the grounds that we express below, the amended partial judgment being appealed is hereby affirmed.
II.
On November 23, 2004, Mr. Luis Febles Montalvo and others (Febles, et al.), filed a complaint in damages and injuries against Mr. Javel Villega and Associates, ABX Company, the Highways Authority, XYZ Company, Dr. Victor Valdes, SIMED, Hospital de Damas, BCD Company, Jane Roe and Richard Roe, among others. In its cause of action, he argued that on July 18, 2004, he, together with Wanda Guzman, his wife, had suffered a traffic accident on Commonwealth Road 2, kilometer 220.1, in the jurisdiction of Ponce, Puerto Rico. He maintained that the accident happened when corespondent Raul Perez Cordero collided with his car caused by certain construction work that was being performed in the area of the accident in a negligent manner by Jafer Construction, the Highways Authority, the Public Housing Authority and Reyes Contractor. He alleged that the respondents were jointly liable for the damages and injuries caused to him.
On March 14, 2005, the Highways Authority filed an answer to the complaint and on April 14, next, it joined Reyes Contractor in the lawsuit as a third party defendant. In both writings it denied the facts and the negligence alleged in the complaint. However, it pointed out that if there is any liability by it, it would be attributable to Reyes Contractor. It argued that it is the latter who would be liable to respond directly to Febles or to reimburse any sum of money that it had to pay.
On October 18, 2005, the Highways Authority filed a motion for partial summary judgment. In same it moved for dismissal of the complaint. It argued that by the date of the alleged accident. Reyes Contractor had finished its public works, moreover that at that time it was not performing any work whatsoever for the Highways Authority in the area of the alleged incident.[2]
After several procedural incidents, unnecessary to enter into detail, on August 13, 2010, the COP entered partial summary judgment. In same it adopted the same stipulation filed by Febles and Reyes Contractor in its entirety and made it to form a part thereof. In that manner, the COP released Reyes Contractor from the claims filed as the result of the facts being alleged in the complaint and decreed the dismissal, with prejudice, of all of the claims filed against Reyes Contractor.
On August 30, 2010, the Highways Authority tiled a motion for reconsideration and on other matters. In same it opposed the settlement and moved the COP to seta aside the partial judgment entered in favor of Reyes Contractor. It averred that: (1) it had not desisted from the third party complaint, that if the Highways Authority is found to be negligent, Reyes Contractor is directly liable to the plaintiff or to the Highways Authority; (2) the highways Authority is being deprived of its day in court, inasmuch as it was neither a party to the settlement nor desisted of its claims as against Reyes Contractor; (3) the Highways Authority was an additional insured under the insurance policy issued to Reyes Contractor by Mapfre-Praico, the insurance company, which means that both have equal rights under the insurance policy; (4) both Reyes Contractor and Mapfre-Praico executed a release of liability in favor of the Highways Authority, leaving both bound to provide and to pay the costs associated with the representation, as well as any judgment that may he entered against them for the actions of Reyes Contractor; (5) the Highways Authority is having its due process of law rights being violated to prove that Reyes Contractor and its insurance company are liable to the plaintiffs for the negligent actions that are expressed in the complaint and not the Highways Authority.
In attention to the Highways Authority's motion for reconsideration, on August 13, 2010, the COP entered an amended partial judgment. It found that in conformity with the settlement agreement, Reyes Contractor was released only from the claim filed by Febles, therefore, it is dismissed only with respect to the latter.
On October 14, 2010, Reyes Contractor filed a motion for reconsideration with respect to the amended partial judgment. On October 27, 2010, notified on the 29th of *281 the same month and year, the court of pleas entered an Order in which it provided "the present writing is entertained, pending the hearing scheduled for March 3, 2011." The corresponding hearing of March 3, 2011, having been held, after hearing the parties, the court in open court ruled "the arguments presented and the position of the parties having been heard,the court upholds the amended judgment entered. " (Emphasis in the Original).
On April 1, 2011, Reyes Contractor came before this court through a writ orcertiorari. In same, it requested that we vacate the partial amended judgment entered by the COP on August 13, 2010. For those effects, it argued that the court of pleas had committed the following reversible errors:
The Honorable Court of Original Pleas had erred in entering the amended partial judgment by providing or finding that the settlement that was reached between the plaintiff and the herein petitioner had the effect of only releasing the herein petitioner from the claim tiled by the plaintiff as a consequence of the facts alleged in the complaint.
In conformity with the first reversible error averred, the Honorable Court of Original Pleas erred in entering an amended partial judgment only with respect to the claim made by the plaintiff vis a vis the petitioner herein.
In conformity with the two reversible errors averred, the Honorable Court of Original Pleas erred in entering an amended partial judgment with the intervention of the express intention of the parties, as well as delimiting the scope and effect of the agreement and/or accord in the settlement between the plaintiff and the herein petitioner.
In conformity with the three reversible errors averred, the Honorable Court of Original Pleas erred by not entering an amended partial judgment in which it in reality adopted the totality of the contents of the Settlement Stipulation, Release and Motion for Partial Judgment and, in consequence thereof, dismiss, with prejudice, all of the claims filed as per the agreement and motion expressed in the settlement.
In conformity with the four reversible errors averred, the Honorable Court of Original Pleas erred by not dismissing the third party complaint filed by the Highways Authority against the petitioner herein.
While the aforesaid writ was before our consideration, on April 19, 2011, Reyes Contractor filed a second writ ofcertiorari, which had anInformative Motion attached. Upon evaluation of the writ, the motion and after a calm study of the procedural particularities of the captioned case, on May 5, 2011, we entered a ruling ordering the consolidation of the two writs, KLAN201100414 and KLAN201100531. Moreover, we granted the respondents a term of ten days to express themselves with respect to the matter.
In due time co-respondent Highways Authority appeared before the court, however, inasmuch as none of the other respondents presented their respective positions, on June 3, 2011, we entered a ruling in which we deemed the case as submitted.
After a detailed analysis of the case file before our consideration, the arguments outlined by Reyes Contractor and the arguments of the Highways Authority, we find ourselves in a position to decide.
III.
A settlement agreement is one that is defined as one "whereby each of the parties grant, promise or retain something, avoid provocation of a lawsuit orput an end to one that had been started. " 31 L.P.R.A. § 4821 (Emphasis ours). The settlement gives rise to the birth of new bounds or duties, in substitution of others extinguished, or to their modification, L. Diez-Picazo. A. Gullon,Civil Law System, 7th ed., Madrid, Ed. Technos, 1995, Vol. II, pg. 492.
The principal elements that are constitutional of a settlement agreement are: 1) the existence of a controversy or of an uncertain actionable judicial relationship; 2) the intention of the parties to substitute, through mediation, the uncertainties of settlement on the objective elements of the judicial relationship for another that is "certain and incontrovertible; 3) reciprocal concessions. The antecedent uncertainly. in most cases, is the grounds for the settlement. In settling, the parties could find themselves in a state of uncertainty with respect to the legal rationale that may be in favor and the objective ignorance of the results of the lawsuit or future litigation; that uncertainty is what normally drives a settlement. Therefore, by virtue of a settlement agreement the parties trade that uncertainty *282 for the certainty of an agreement. Moreover, by settling, both of the parties assume the risk of having paid too much or of receiving less with the aim of avoiding or ending a lawsuit. SeeSagardia de Jesus v. Hosp. Aux. Mutuo, 177 D.P.R. 484 (2009);Neca Mortg. Corp. v. A & W Dev. S.E., 137 D.P.R. 860 (1995);G.E.C. & I. V. So. T & O Dist. 132 D.P.R. 808 (1993);Citibank v. Dependable Ins. Co., Inc., 121 D.P.R. 503 (1088); See also, L. Rivera Rivera,El Contrato de Transaccion; sus efectos en situaciones de solidaridad, Puerto Rico, Ed. Juridica Editores, 1998, pg. 35.
Just as in all contracts, a settlement must perforce contain the requirements of consent, object and consideration, pursuant to Article 1213 of the Civil Code, 31 L.P.R.A. §3391.In this type of contract, the consent of the contracting parties is manifested by the consensual agreement between them of putting an end to the litigation. The object is putting an end to the controversy and the consideration consists of the reciprocal concessions made by the parties, because, although it has the purpose of making the pending conflict disappear, in difference to other contractual notions that have the same end, in this it is achieved through mutual waivers (Emphasis ours).Neca Mortg. Corp. v. A&W Dev. S.E., supra; Citibank v. Dependable Ins. Co., Inc., supra.
In our jurisdiction there are two types of settlement agreements; the extrajudicial and thejudicial. (Emphasis ours).Neca Mortg. Corp. v. A&W Dev. S.E. supra; Citibank v. Dependable Ins. Co., Inc., supra. The so denominated extrajudicial settlement agreement is that in which, before commencing a lawsuit, or even while the lawsuit is pending, the parties reach an agreement without the intervention of the court, in which case a simple notification of desisting suffices.Neca Mortg. Corp. v. A&W Dev. SE., supra. On the contrary, the judicial settlement agreement is that in which the parties agree to a settlement after having commenced judicial litigation, and request incorporation of the agreement to the process in course, thereby ending the lawsuit in question. (Emphasis ours).Neca Mortg. Corp. v. A&W Dev. S.E., supra,
In the event that either of the parties fails to comply with the stipulation in a judicial settlement, as a general rule the resolution does not lie.Neca Mortg. Corp. v. A&W Dev. S.E., supra. Once the voluntary agreement becomes a final and firm judicial order, subject to execution of judgment procedures and other judicial process guaranties, i.e., in a judicial settlement, the process to impugn same is through a motion for relief from judgment as provided in Civil Procedure Rule 49.2, 32 L.P.R.A. App. III.Insular Highway Products, Inc. v. A.I.I Co. 174 D.P.R. 793 (2008);Neca Mortg. Corp. v. A&W Dev. S.E., supra. However, in the case of an extrajudicial settlement, it has been accepted that these are susceptible to resolution.Neca Mortg. Corp. v. A&W Dev. S.E., supra; Alvarado v. Bonilla, 86 D.P.R. 490 (1962);Rivera v. Macias vda. De Riera, 42 D.P.R. 579 (1931).
The notion of settlement also establishes that settlement agreements are susceptible to the general rules of the interpretation of contracts, as long as these are not incompatible with the rules that govern them. (Emphasis ours).Negron Riveray Bonilla, Ex parte, 120 D.P.R. 61 (1987); L. Diez-Picazo, A. Gullon,op. cit., pg. 495. Moreover, from the general precepts of the interpretation of contracts. Article 1714 of the Civil Code, 31 L.P.R.A. §4826, it is established that settlements only encompass the objects expressed determinately in same, i.e., through the necessary induction of its language, those comprised in same are reputedly included.
That is why that once a judicial settlement is incorporated into the lawsuit and approved by the court, it will have the authority ofres judicata and the parties must consider the items discussed therein as definitively decided. 31 L.P.R.A. § 4827. See also,Monleagudo Pérez v. Commonwealth, 172 D.P.R. 12 (2007);Neca Mortg. Corp. v. A&W Dev. S.E., supra; Citibank v. Dependable Ins. Co., Inc., supra. Now then, the Supreme Court has reiterated that a judicial settlement must be interpreted in a restrictive manner, comprising only the matters determinately in the agreement, or that which through necessary induction of its language must reputedly he comprised therein. (Emphasis ours)Monteagudo Perez v. Commonwealth, supra; Citibank v. Dependable Ins. Co., Inc., supra.
Ordinarily, the intervention of a court in these cases is limited to the appreciation of the validity of a settlement agreement. Moreover, Article 1233 of the Civil Code, 32 L.P.R.A. §3471, is also applicable to these contracts, This provided that `if the terms and conditions of a contract are clear and do not give rise to doubts as to the intention of the parties, the literal sense of its covenants will prevail."
It is understood that the terms and conditions of a contract are clear when they are sufficient in content to be understood in just one sense, without giving rise to doubts or controversy, without diversity of interpretations and with no need for comprehension *283 thereof to resort to rationalization or demonstrations susceptible to impugnation.C.F.S.E. v. Union de Medicos, 170 D.P.R. 443 (2007);Sucesion Ramirez v. Tribunal Superior, 81 D.P.R. 357 (1959).
With respect to the interpretation of contracts, the P.R. Supreme Court held inJohnson & Johnson, Inc., v. Municipio de San Juan, 172 D.P.R. 840 (2007) as follows:
In the matter of the interpretation of contracts, our civil legal system of law provides that if the terms and conditions of a contract are clear and give no room for doubt as to the intention of the contracting parties, the literal sense of its provisions will prevail. Clear terms and conditions are those that in and of themselves are sufficiently lucid to he understood in only one sense, without giving room for doubt, controversies or diversity of interpretations and with no need for their comprehension, rationalization or demonstrations susceptible to challenge.
When the terms and conditions of a contract are clear and leave no room for doubt over the intention of the contracting parties, the is no need to resort to rules of interpretation. Article 1233, Civil Code,supra; Marcial v. Tomé, 144 D.P.R. 522 (1997).On the other hand, when the terms and conditions are not clear or when the words leave room/or doubt over the intention of/he contracting parties, then one has to perform cm interpretive labor. In these cases, in order to determine the intention of the parties, the judge must analyze all of the concurrent circumstances applicable to the execution of the contract, giving principal attention to the actions of the contracting parties simultaneously with, and subsequent to, the contract. Once it is determined what the parties' decided, the judge must resolve the controversies. (Emphasis ours). See Article 1234 of the Puerto Rico Civil Code, 31 L.P.R.A. §3472:C.F.S.E. v. Union de Medicos, supra; Marina Ind, v. Brown Boveri Corp. 114 D.P.R. 64 (1983).
IV.
We must commence by indicating that the language of the five reversible errors is somewhat confusing. However, after a careful study of the writ filed by Reyes Contractor is, in synthesis, the controversy that is presented to us consists of whether the lower court has erred by clarifying in its partial judgment that the stipulation therein adopted wasonly to finalize any controversy between Reyes Contractor and Febles in connection with the facts that give rise to the captioned case. From the outset, we find that the lower court did not err by thus deciding and that none of the reversible errors averred were committed. Let us see.
From theSettlement Stipulation, Release and Motion for Partial Judgment presented to the court of pleas by Febles and Reyes Contractor the following is seen:
. . .
. . .
. . .
1. The plaintiff and third party defendant. L. Reyes Contractor, S.P., have reached a settlement agreement whereby the plaintiff has convened, stipulated settled and released the third party defendant. I. Reyes Contractor, S.P., in the present case to enter Partial Judgment in conformity with the terms and conditions hereinbelow expressed.
2. According to the ease law developed by the Honorable Puerto Rico Supreme Court in the case ofMerle v. West Bend Co., 97 D.P.R. 403 (1969) andSzendrey v. Hospicare, Inc., 158:648 (2003), this Partial Settlement Agreement must not, could not, be interpreted in any manner as a release from liability that benefits the other defendant in this case, i.e., the Highways Authority. It is the express intention of the plaintiff to continue its claim against the remaining codefendant indicated above.
3. The plaintiff releases and jointly with the third party defendant L. Reyes Contractor, S.P., have agreed to partially settle the claims among themselves of the codefendants against the third party defendant, L. Reyes Contractor. S.P., for the total sum of $4,000.00, and that said sum will be satisfied by the Mapfre-Praico Insurance Company in favor of its insured, L. Reyes Contractor, S.P., in conformity with the terms and conditions of the insurance policy issued in favor of the latter. Therefore, the co-plaintiffs release and waive any direct claim, present or future, against Mapfre-Praico Insurance Company, or against its insured, L. Reyes *284 Contractor. S.P., in connection with the facts over which the complaint has been tiled.
4. In consideration of the payment of the mentioned sum, co-defendants released and exonerated the third party defendant, L. Reyes Contractor, S.P., and its insurance company, Mapfre-Praico Insurance Company, from all ulterior liability toward them for the damages and injuries that are alleged in the Complaint.
5. It was expressly agreed that the payment of the sum of $4,000.00 will he made through checks payable to the order of the co-plaintiffs and of their lawyer, as may be appropriate, and with the understanding that the appearing parties further agreed that through said payment and the present partial settlement agreement they waive any claim that they may among themselves in regard to costs, expenses and lawyers' fees.
6. This settlement is made as a business decision, with the express understanding that the intent of the parties thereto is only for the purposes of being able to put an end to the claim in a speedy and economic manner. Provided that said procedure is not understood as a tacit. acceptance of fault and/or negligence on behalf of L. Reyes Contractor, Inc.
7. It is expressly understood and convened that, if as a result of the continuation of litigation against the aforementioned co-defendant, the Highways Authority andior any other party, whether or not included in the Complaint:, it is found that the third party defendant, L. Reyes Contractor, S.P., incurs in any degree or percentage of fault, negligence or liability as the cause. of the facts that are the object of this action or of the damages resulting from same, suffered by the plaintiff that may be made jointly liable with the other codefendants, the plaintiffs do hereby waive their right to collect from the third party defendant, L. Reyes Contractor, S.P., or of Mapfre-Praico Insurance, Company, its insurer, that part of the sum of the Judgment attributable to the joint liability of these, as a consequence of any degree or percentage of the fault, negligence or liability thereof.
8. Furthermore, it is convened that if the plaintiff' is able to prove its allegations in the Complaint, these would be limited to collecting from the remaining codefendant the Highways Authority and/or from any other party that is liable for the allegations made in the Complaint, whether or not joined in same, only that part of the Judgment attributable to the degree or percentage of fault, negligence or liability in which the latter incurs as compensation for the facts alleged in the Complaint or of the damages suffered by the plaintiff, as found by this Honorable Court, in such a manner that the third party defendant, L. Reyes Contractor, S.P, will neither be liable nor will be obligated to pay to the plaintiff any sum of money in excess of what it has been bound to satisfy by virtue of this settlement, nor any sum to the remaining co-defendants through contribution, leveling or any other grounds. It is to be understood that through the present stipulation any possible solidarity among codefendants and the third party defendant is broken.
9. It is to he understood and convened that with respect to the remaining co-defendant, the Highways Authority, the sum to be received by the plaintiffs from the codefendants herein by virtue of these presents, neither represents nor pays off the entirety of the value of the damages and injuries sustained by the plaintiff, who in the continuation of this lawsuit could prove the entirety of said damages for purposes of its claim against the remaining co-defendant, the Highways Authority, which, as said before, was liable, pursuant to law, for that part of the sum of the value of the damages attributable to the degree or percentage of fault, negligence or liability in which it may have incurred as the result of the facts related to the present case and for the damages suffered by the plaintiff
10. The appearing parties request that final partial judgment he entered which adopts, by reference, and makes part of same of the stipulation in the present agreement, expressly provided that there is no reason whatsoever to postpone entry of same until the lawsuit is totally resolved and that same to be entered be final and firm and with prejudice from the date of filing of the copy of the notification in the case file, in conformity with the stipulations of the present agreement.
11. The payment of the sum of $4,000.00 by the Mapfre-Praico Insurance Company, under the name of its insured, L. Reyes Contractor, S.P., in favor (Tithe codefendants by reason of the present settlement is subject to, and will be paid, once the partial judgment with prejudice being requested from the Court is duly entered *285 in conformity with the agreement of the present stipulation and when same becomes final, firm and unappealable.
12. The expressions hereinabove made constitute the agreement reached between the parties. IN WITNESS WHEREOF, it is hereby requested of this Honorable Court that it grant the present Settlement Stipulation and, in consequence thereof, enter Partial Judgment ordering the dismissal of all claims in the present case, WITH PREJUDICE, in a final and unappealable manner and with no special taxation of costs, expenses, interest and no lawyers fees, with respect to the third party, defendant, L. Reyes Contractor. S.P., and any other pronouncement that may be appropriate at law.
...
...
...
Through said stipulation, Febles and Reyes Contractor put an end to any controversy among themselves for the damages resulting from the facts of the captioned case. However, a reading of the agreements therein expressed shows that through said agreement Febles and Reyes Contractorproposed to position themselves in the place of the other parties in the lawsuit and to give consent for these to waive their own claims. It will be noted that the stipulations would release Reyes Contractor and its insurers fromall liability and is extensive to any claim that the other parties may have in the lawsuit against Reyes Contractor; this is legally impossible. Febles and Reyes Contractor could neither give their consent to, nor express the volition of, the other parties to the litigation.
We must bear in mind that the Highways Authority, which brought Reyes Contractor to the lawsuit as athird party defendant, alleging that if any damage exists, Reyes Contractor and its insurers not only answer to Febles, but also respond to it. Moreover, as is shown in the case file before our consideration, there are insurance policies issued by Puerto Rico American Insurance Co. (now Mapfre-Praico Insurance Company) in favor of Reyes Contractor that are extensive to the Highways Authority, in addition to aCertificate of Liability Insurance. From these documents it is seen that the Highways Authority, as well as the Transportation and Public Works Department, are additional insurees, which means that both have the same rights as the principal insured. Reyes Contractor. It is also seen in said documentation that Reyes Contractor: (a) released the Highways Authority from liability (b) it bound itself and its insurance company to provide and bear the cost of legal representation to the Highways Authority; (c) it hound itself to paying any judgment that may be entered against the Highways Authority for its actions. Last of all, inasmuch as the release of liability refers to its own actions, Reyes Contractor included the Highways Authority as an additional insured for its insurance policies covered by its own actions.[3]
With this in mind, the deciding court amended its partial judgment and appropriately made it clear that the stipulation that it adopted therein was only for purposes of ending any controversy between Reyes Contractor and Febles in regard to the facts that gave original rise to the captioned case. We reiterate that it would be jurisdictionally unsuitable to approve the stipulations without the clarification made by the court of pleas.
On the grounds of the arguments that we had before us we conclude that none of the reversible errors argued by Reyes Contractor were committed. In light of that reality, we proceed to affirm the amended partial judgment entered by the court of first pleas.
V.
On the grounds of the antecedent facts and in conformity with the points of law cited, the amended partial judgment being appealed is affirmed.
Notification ordered.
Entered by the Court and certified by the Clerk of the Court of Appeals.
Dimarie Alicea Lozada
Clerk of the Court of Appeals *286 Footnotes
1 On October 14, 2010, Reyes Contractor, filed a motion before the COP styled `Motion for Reconsideration Amended Partial Judgment." On October 27, 2010, notified on the 29th of that same month and year, the court of pleas entered an order in which it provided "being entertained the present writing is pending the proposed scheduling for March 3 2011 In that manner, pursuant to Civil Procedure Rule 47, 32 L.P.R.A App. V R 47, the terms to file for appeal are tolled. After holding the corresponding hearing of March 3, 2011, and after hearing the parties, the Court in open court ruled "... after hearing the arguments presented and the position of the parties, thecourt affirmed the amended judgment entered. " (Emphasis in the original)
2 From the case file that is before our consideration, it does not appear that the COP had entered any decision with respect to the referenced motion. It is important to point out that on June 8, 2006, Febles had filed an amended complaint in order to make allegations directly against Reyes Contractor
3. See Addendum XIX, pages 90-100 of the writ filed by Reyes Contractor.

Unless otherwise stated, Cybex and Navigator will be hereinafter collectively referred to as "Cybex."

They did sue the settling and Universal defendants in the Mayaguez Part of the Court of First Instance of Puerto Rico. See, Docket No. 238-1, p. 2; Docket No. 279, Exhibit 6; and Docket No. 335, Exhibit 9.

Plaintiffs were the direct victim of the crash, and her spouse and two sons. See, Vernet, 566 F.3d at 256 & n.1 (identifying plaintiffs).

Adequate cause, a concept similar to proximate cause, permits the fact-finder to conclude that two or more persons "have caused" a harm on equal or different shares or degrees. Tokyo Marine and Fire Ins. Co., Ltd., 142 F.3d at p. 6 & n.5.

The right to contribution is known as "nivelación" (leveling), Wojciechowicz v. United States, 474 F.Supp.2d 291, 295 (D.P.R. 2007), and reimbursement, repayment, or return. See, Quilez-Velar v. Ox Bodies, Inc., 2017 TSPR 165, Certified English Translation (Docket No. 317, Exhibit 1)(Attachment III), p. 7 (so noting).

The Louisiana Civil Code "shares a common parentage with the Puerto Rico Civil Code in that they are both derived from the Napoleonic Code." Tokyo Marine and Fire Ins. Co., 142 F.3d at 4 & n.1.

The Puerto Rico Supreme Court discussed and validated these principles not only in Fonseca (Attachment IV) and Szendrey (Attachment I), but also in U.S. Fire Insurance v. A.E.E., 174 D.P.R. 846 (2008), Certified English Translation (Attachment V), and Sagardía de Jesús v. Hosp. Aux. Mutuo, 177 D.P.R. 484 (2009), Certified English Translation (Attachment VI). Where appropriate, for ease of reference the court will refer to this type of settlement agreement as Szendrey agreement.

See also, Valet v. City of Hammond, 577 So.2d 155, 160-161 (La. App. 1991) (summary judgment dismissing third-party claim for contribution as that right was lost as a result of settlement and release of solidary obligor, where obligee's recovery would be reduced by the amount corresponding to the released obligor's portion of fault).

The Puerto Rico Autonomous Municipalities Act, Law No. 81 of August 30, 1981, as amended, P.R. Laws Ann. tit. 21 § 4704, specifies that autonomous municipalities shall only answer for a maximum of $75,000 per person or $ 150,000 where damages have been caused to more than one person or in cases of several causes of action. If the municipality has obtained liability insurance, it shall answer up to the maximum amount of the coverage pursuant to the Puerto Rico Insurance Code, P.R. Laws Ann. tit. 26 § 2004.

See also, Austin Ex Rel. Soiett v. Universal Cheerleaders Ass'n, 812 A.2d 253, 255 & n. 1 and 2 (Me. 2002) (Pierringer release does not preclude submission of the issue of the released tortfeasor's fault to the fact-finder in a suit against the a nonsettling tortfeasor; the released defendant is entitled to be dismissed with prejudice from the case but trial court must preserve for the remaining parties a fair opportunity to adjudicate the liability of the released and dismissed defendant); Valet, 577 So.2d at 161 (nonsettling obligor entitled to have trial court determine settling obligor's percentage of fault and have amount of award reduced by that percentage).

See also, Vélez v. Cessna Aircraft Company, 2011 WL 13234190, *1, *4 (D.P.R. 2011) (aircraft manufacturer solidarily liable in Puerto Rico with aircraft operators and those who provided maintenance to the aircraft in a case for damages resulting from a fatal crash that killed all on board). Thomas v. W &W Clarklift, Inc., 375 So.2d 375, 377-378 (La. 1979) (in Louisiana, two defendants may be solidarily liable even if sued under different theories of law, one for breach of warranty and negligence, and the other for negligence).

Puerto Rico is a "comparative-negligence jurisdiction." Rodríguez v. Señor Frog's de la Isla, Inc., 642 F.3d 28, 37 (1st Cir. 2011) ; Candelario Del Moral v. UBS Financial Services Incorporated of Puerto Rico, 2016 WL 1275038, * 25 (D.P.R. April 6, 2016) (discussing concept).

See also, Restatement, Restitution § 96, at 418 (1937) (a person who, without personal fault, has become subject to tort liability for the unauthorized and wrongful conduct of another, is entitled to indemnity from the other for expenditures properly made in the discharge of such liability); 2-1 Planiol, Treatise on the Civil Law, Louisiana State Law Institute (1959), § 913, pp. 513-514 (the person made responsible for another has an action against the author of the damage, which it may institute if held liable).

Cybex moved to strike the reference to Cortijo-Walker because the settling defendants did not provide the court with a certified English translation of the case (Docket No. 323, pp. 4-5). The request must be denied. Cybex should know that Puerto Rico Reports (P.R.R) are official translations of the "Decisiones de Puerto Rico," that is, of the decisions of the Puerto Rico Supreme Court. See, Aybar v. F & B Mfg. Co., Inc., 498 F.Supp. 1184, 1193 & n.18 (D.P.R. 1980) (explaining term). They have been cited by the First Circuit -see, Alcoa Steamship v. Pérez Rodríguez, 376 F.2d 35, 39 (1st Cir. 1967) - and this court. See, Aybar, 498 F.Supp. at 1193.

See, U.S. Fire Insurance Co. (Attachment V), p. 9 (when the victim assumes the portion of liability that is attributed to the released co-causer "the other co-causers of the damage cannot recover from the released co-causer an[y] amount whatsoever ")(emphasis added); Sagardía de Jesús (Attachment VI), p. 7 (by the victim's "assuming the share of liability attributed to the released tortfeasor, the remaining tortfeasors cannot recover anything from the released tortfeasor ")(emphasis added).

Similarly, Rule 44.3(b) of the Puerto Rico Rules of Civil Procedure imposes pre-judgment interest on obstinate non-prevailing parties. See, P.R. Laws Ann. tit. 32, App. V, R. 44.4(b)(so decreeing).